SCHWARTZ, STEINSAPIR, DOHRMANN & SOMMERS LLP
D. William Heine, Esq. (111079)
Alejandro Delgado (302717)
Attorneys at Law
6300 Wilshire Boulevard, Suite 2000
Los Angeles, California 90048-5268
Telephone: (323) 655-4700
Facsimile: (323) 655-4488
E-mail: dwh@ssdslaw.com
E-mail: afd@ssdslaw.com

Attorneys for Defendants

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTOPHER DEERING, individual,<br><br>Plaintiff,<br><br>vs.<br><br>INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL 18, an employee organization; CITY OF LOS ANGELES, a public agency; ROB BONTA, in his official capacity as Attorney General of California; BRIAN D'ARCY, GUS CORONA, MARTIN MARRUFO, RAFAEL LOPEZ, MARTIN ADAMS, RICHARD HARASICK, ANDREW KENDALL, and DAVID WRIGHT, trustees of the Joint Safety and Training Institute<br><br>Defendants. | CASE NO. 2:21-CV-07447-DSF-AS<br><br>**IBEW, LOCAL 18 AND JSTI'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS**<br><br>**DATE:     MARCH 28, 2022**<br>**TIME:        1:30 P.M.**<br>**COURTROOM:    7D**<br><br>**JUDGE:   HON. DALE S. FISCHER** |

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................8

STATEMENT OF FACTS .....................................................................................9

ARGUMENT ........................................................................................................10

   I.   THE COMPLAINT DOES NOT STATE A PLAUSIBLE CLAIM FOR RELIEF UNDER 42 U.S.C. § 1983 AGAINST LOCAL 18. ...............................................11

      A.  Plaintiff does not allege sufficient facts to support a plausible inference that Local 18's alleged conduct amounted to state action...........................................12

          1.  Plaintiffs has not alleged sufficient facts to show that the Local 18's enforcement of the dues deduction authorization was state action. ............14

          2.  The City's ministerial processing of dues deductions does not transform those deductions into state action. ................................................................16

          3.  The window period provided in the MOU does not change the analysis....18

          4.  The City and Local 18's agreement in collective bargaining to deduct employee contributions to fund JSTI was not state action. ........................20

      B.  Plaintiff has not alleged sufficient facts to show that the Local 18's conduct impaired his freedom of speech under the First Amendment. .........................22

          1.  Plaintiff has not alleged sufficient facts to show that the Local 18's conduct in enforcing the dues deduction authorization impaired his freedom of speech under the First Amendment. ...........................................................22

          2.  Plaintiffs has not alleged sufficient facts to show that Local 18's negotiation of employee contributions to fund JSTI violated his freedom of speech under the First Amendment. ...........................................................24

  II.  THE COMPLAINT DOES NOT STATE A PLAUSIBLE CLAIM FOR RELIEF UNDER 42 U.S.C. 1983 AGAINST JSTI..........................................................25

      A.  Plaintiff lacks standing to assert his claims against the JSTI Trustees. ............25

      B.  The DWP's appointment of trustees to the JSTI Board of Trustees does not constitute state action. .......................................................................................26

C. Plaintiff has not alleged sufficient facts to support a plausible inference that JSTI is controlled by or an agent of Local 18 used to fund political communications...................................................................28

CONCLUSION ...............................................................31

3

# TABLE OF AUTHORITIES

**Cases**

*Aasum*

  395 F. Supp. 363 (D.Ore, 1975)......................................................................26, 27, 28

*Adams v. Vandemark*

  855 F.2d 312 (6th Cir. 1988)..........................................................................26, 27, 28

*Am. Mfrs. Mut. Insu. Co. v. Sullivan*

  526 U.S. 40, (1999) ........................................................................................16, 17, 21

*Anderson v. Nat'l R.R. Passenger Corp. (AMTRAK)*

  754 F.2d 202 (7th Cir. 1984)....................................................................................27

*Anderson v. Serv. Emps. Int'l Union Loc. 503*

  400 F. Supp. 3d 1113 (D. Or. 2019)

  *aff'd sub nom. Anderson v. Serv. Emps. Int'l Union (SEIU) Loc. 503*, 854 F.App'x 915

  (9th Cir. 2021) ....................................................................................................23, 26

*Ashcroft v. Iqbal*

  556 U.S. 662 (2009) ...................................................................................................11

*Bain v. California Tchrs. Ass'n* 2016 WL 6804921 (C.D. Cal. May 2, 2016).......12, 16, 19

*Belgau v. Inslee*

  975 F.3d 940 (9th Cir. 2020).......................................................................... passim

*Bell Atl. Corp. v. Twombly* 550

  U.S. 544 570 (2007) ..................................................................................................11

*Blum v. Yaretsky*

  457 U.S. 991 (1982) ......................................................................................12, 13, 27

*Cohen v. Cowles Media Co.*

  501 U.S. 663 (1991) ...................................................................................................23

*Collins v. Womancare*

  878 F.2d 1145 (9th Cir. 1989)..............................................................................12, 13

*Cooley v. California Statewide L. Enf't Ass'n*

  385 F. Supp. 3d 1077 (E.D. Cal. 2019)....................................................................23

4

*Crowder v. Conlan*

  740 F.2d 447 (6th Cir. 1984)..................................................................26, 27, 28

*Cty. of Riverside v. McLaughlin*

  500 U.S. 44 (1991) ........................................................................................25

*Daniels-Hall v. Nat'l Educ. Ass'n*

  629 F.3d 992 (9th Cir. 2010)..........................................................................11

*Degrassi v. City of Glendora* 207 F.3d 636 (9th Cir. 2000) ................................13

*Dietrich v. John Ascuaga's Nugget*

  548 F.3d 892 (9th Cir. 2008)..........................................................................13

*Farrell v. Int'l Ass'n of Firefighters, AFL-CIO, Loc. 55*

  781 F. Supp. 647 (N.D. Cal. 1992) ............................................................20, 21

*Fisk v. Inslee*

  759 F.App'x 632 (9th Cir. 2019) ................................................................22, 23

*Hallinan v. Fraternal Ord. of Police of Chicago Lodge No. 7*

  570 F.3d 811 (7th Cir. 2009)......................................................................16, 19

*J.K.J. v. City of San Diego*, 17 F.4th 1247

  1254 (9th Cir. 2021) .........................................................................................9

*Jackson v. Temple Univ. of Com. Sys. of Higher Educ.*

  721 F.2d 931 (3d Cir. 1983)...........................................................................21

*Janus,*

  --- U.S. ---

  138 S.Ct. 2448 (2018). ..........................................................................22, 24, 30

*Kidwell v. Transportation Commc'ns Int'l Union*

  946 F.2d 283 (4th Cir. 1991)..........................................................................19

*Knox v. Westly*

  2006 WL 2374763 (E.D. Cal.  Aug. 16, 2006) ..............................................19

*Labarrere v. Univ. Pro. & Tech. Emps., CWA 9119*

  493 F. Supp. 3d 964 (S.D. Cal. 2020),

    aff'd sub nom. *PABLO LABARRERE; SAM DOROUDI, Plaintiffs-Appellants, v.*

*UNIVERSITY PROFESSIONAL AND TECHNICAL EMPLOYEES (UPTE) CWA 9119;*

*MICHAEL V. DRAKE, M.D., in his official capacity as President of the Univ. of*

*California, Defendants-Appellees.,*

No. 20-56173, 2022 WL 260868 (9th Cir. Jan. 27, 2022). ..................................... passim

*Laboy v. Seabrook*

   1996 WL 417523 (S.D.N.Y. July 25, 1996) ...................................................................19

*Loftus v. Se. Pennsylvania Transp. Auth.*

   843 F. Supp. 981 (E.D. Pa. 1994) ................................................................................21

*Loritz v. U.S. Ct. of Appeals for Ninth Cir.*

   382 F.3d 990 (9th Cir. 2004)..................................................................................25, 26

*Lugar v. Edmondson Oil Co.*

   457 U.S. 922 (1982) ................................................................................................. passim

*Lujan v. Defenders of Wildlife*

   504 U.S. 555 (1992) ........................................................................................................25

*Messman v. Helmke*

   133 F.3d 1042 (7th Cir. 1998).......................................................................................19

*Naffe v. Frey*

   789 F.3d 1030  (9th Cir. 2015).......................................................................................12

*Naoko Ohno v. Yuko Yasuma* 723 F.3d 984 (9th Cir. 2013)..................................12, 13, 15

*Nat'l Collegiate Athletic Ass'n v. Tarkanian*

   488 U.S. 179 (1988) ...........................................................................................17, 20, 22

*Quezambra v. United Domestic Workers of Am. AFSCME Loc. 3930*

   445 F.Supp.3d 695 (C.D. Cal. 2020)........................................................12, 16, 17, 18

*Quirarte v. United Domestic Workers AFSCME Loc. 3930* 438 F.Supp.3d 1108 (S.D.

   Cal. 2020) ................................................................................................................. passim

*Raines v. Byrd*

   521 U.S. 811, 81 (1997) ...............................................................................................25

6

*Seager v. United Tchrs. Los Angeles*

  2019 WL 3822001 (C.D. Cal. Aug. 14, 2019)

  *aff'd*, 854 F.App'x 927 (9th Cir. 2021) ................................................. 22

*Semerjyan v. Serv. Emps. Int'l Union Loc. 2015*

  489 F. Supp. 3d 1048 (C.D. Cal. 2020) .................................. 16, 17, 18

*Smith v. Bieker*

  2019 WL 2476679 (N.D. Cal. 2019)

  *aff'd*, 854 F.App'x 937 (9th Cir. 2021) ................................................. 23

*Smith v. Teamsters Loc. 2010*

  2019 WL 6647935 (C.D. Cal. Dec. 3, 2019) ........................................ passim

*Spokeo, Inc. v. Robins*

  578 U.S. 330 (2016) ................................................................. 10

*Stock West, Inc. v. Confederated Tribes*

  873 F.2d 1221 (9th Cir. 1989) ............................................... 11

*Sutton v. Providence St. Joseph Med. Ctr.*

  192 F.3d 826 (9th Cir. 1999) ................................................. 12

*Tom Beu Xiong v. Fischer*

  787 F.3d 389 (7th Cir. 2015) ................................................. 21

*Tsao v. Desert Palace, Inc.*

  698 F.3d 1128 (9th Cir. 2012) ............................................... 12

*Twombly*

  550 U.S. at 555 ..................................................................... 11

*United States v. Hays*

  515 U.S. 737 (1995) ............................................................. 25

*United States v. Ritchie*

  342 F.3d 903 (9th Cir. 2003) ............................................... 9, 29

**INTRODUCTION**

Plaintiff is an employee of the Los Angeles Department of Water and Power ("Department") and was a member of International Brotherhood of Electrical Workers Local 18 ("Local 18" or "Union").  Plaintiff alleges that, after he resigned from union membeship and cancelled his dues deduction authorization, the continued deduction of dues during the "opt-out" period violated his First and Fourteenth Amendment rights.  He similarly alleges that the deduction of employee contributions to fund the Joint Safety and Training institute ("JSTI") also violate these rights.

Plaintiff has not and cannot state a plausible claim for relief under 42 U.S.C. § 1983 against Local 18 or the JSTI Trustees.  Plaintiff has not and cannot allege sufficient facts to show that Local 18's enforcecment of Deering's dues deduction autorization was state action, as federal courts have repeatedly held that such union conduct is not an exercise of state authority.  Federal courts have also repeatedly held that the unions' post-membership deduction of dues in accordance with dues deduction authorization card's "opt-out" provision does not violate former members' First Amendment rights.  Nor does Plaintiff allege sufficient facts to make a plausible claim that Local 18's negotiation of payroll deductions for employee contributions to JSTI constitute state action and violated his constitutional rights.

Plaintiff also has not and cannot establish a plausible claim against the JSTI Trustees under 42 U.S.C. § 1983.  Deering lacks standing to sue the JSTI Trustees because he cannot allege that he suffered an injury-in-fact traceable to their actions, since it was Local 18 and the City who implemented the deduction of employee contributions to fund JSTI, not JSTI itself.  Therefore, Plaintiff's alleged injury is not traceable to the conduct of the JSTI Trustees and a decision in Deering's favor against JSTI's Trustees would not cure the alleged injury.  Plaintiff also has not and cannot establish that any alleged conduct by the JSTI Trustees constitutes state action or violates the First Amendment.  Therefore, the Court should dismiss Plaintiff's Complaint.

**STATEMENT OF FACTS**

The relevant facts are alleged in the Complaint as follows:

Plaintiff Deering has been employed as a customer service representative by the Department of Water and Power, agency of the City of Los Angeles, since 2005.  Compl., ¶¶ 16, 18.  When he was hired by the City in 2005 he agreed to join Local 18 by "executing an IBEW 18 membership agreement and dues authorization."  *Id.*, ¶¶ 20-25, Ex. A.  He was aware at the time that dues were deducted "[u]nder the applicable MOU between IBEW 18" and the dues authorization card and that he had the option of being a "nonmember" but elected to become member and sign the dues authorization card anyway.  *Id.*, ¶¶ 21-25; *see id.*, ¶ 5 fn.1.  Deering alleges that, "[u]nder Cal. Gov't Code § 1157.12 and the terms of the Memorandum of Understanding (MOU), IBEW 18 is empowered to represent whether Deering has affirmatively consented to monetary deductions."  *Id.*, ¶ 5 fn.1.

The Complaint alleges that the procedure and window for members to cancel their dues deduction agreement with Local 18 under Article 8.5 of the MOU was not included in the dues deduction agreement he signed in 2005.  Compl., ¶¶ 24-25, Ex. A, 33-40, Exs. B, C, 44-47, Exs. E, F; Exhibit A[1].  The payroll deduction authorization card states that the Department is authorized to deduct an amount specified by and to be paid to Local 18.  *Id.*, ¶ 24-25, Ex. A.  It further states that Deering authorized the deduction and payment of dues to Local 18 if the amount changed and that the "authorization shall be effective until cancelled by Deering in writing."  *Ibid.*  Article 8.5 of the MOU states that the Department agrees to deduct the dues on behalf of Local 18 and upon receipt of a dues deduction authorization agreement from an employee and that those deductions will be subject to the provisions of the dues deduction agreement which as been agreed to by

---

[1] See MOU attached hereto as Exhibit A. The Court may consider documents outside the complaint if they are "incorporated into the complaint by reference." *J.K.J. v. City of San Diego*, 17 F.4th 1247, 1254 (9th Cir. 2021). A document is "incorporated by reference into a complaint if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003)

9

Local 18 and the employee.  *Id.*, 5 fn.1; Exhibit A at 17-18 (MOU).  Article 8.5 further states "Employees' requests to cancel their dues withholding authorization agreement shall be processed by the department to be effective on the ending of the first complete pay period following April 1 or each calendar year."  *Id.*

On August 3, 2020, Deering sent a letter to Local 18 requesting the "immediate cancellation of membership, and the end of all dues and fee deductions from his lawfully earned wages," which satisfied the "in-writing" requirement for the cancellation of dues authorizations in his dues deduction authorization card and all other monies taken from his wags.  Compl., ¶ 33-35, Ex. B.  On August 13, 2020, Deering received a letter from Local 18 confirming his resignation and request to end dues deductions but also stating that the Union would continue authorizing the Department to continue "to take his lawfully earned wages until April 1, 2021."  *Id.*, ¶¶ 36-40, Ex. C.  Local 18 and the Department continued to "take monies from Deering's lawfully earned wages without his affirmative consent, and used it in political speech . . . from August 2020 to April 2021."  *Id.*, ¶ 48.

Deering also alleges that, in March 2019, the Joint Safety Institute and Joint Training Institute trusts were combined into the Joint Safety and Training Institute.  Compl., ¶¶ 50-51, 60.   As part of the reorganization, funding for JSTI was shifted from ratepayers to Deering and other Department employees.  *Id.*, ¶¶ 52, 61.  "In October 2018, the Department and IBEW 18, acting jointly, began deducting $15.00 from Deering's lawfully earned wages and remitting it to JSTI without his affirmative consent."  *Id.*, ¶ 64.

## ARGUMENT

Defendants assert their Motion under Rule 12(b)(1) and 12(b)(6).  To survive a motion to dismiss brought under Rule 12(b)(1), a plaintiff must "clearly allege facts demonstrating each element" required to establish he has standing.  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citation omitted).  To meet this standard, a plaintiff

must set forth facts showing he "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* (citations omitted). The plaintiff bears the burden of proving the existence of subject matter jurisdiction. *Stock West, Inc. v. Confederated Tribes*, 873 F.2d 1221, 1225 (9th Cir. 1989).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Courts need not credit legal conclusions or "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Id.* Federal Rule of Civil Procedure 8 "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Id.* at 678-79.

Determining whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. In deciding a motion to dismiss under Rule 12(b)(6), courts must accept as true all "well-pleaded factual allegations" of the complaint. *Id.* The court must also draw all reasonable inferences in the light most favorable to the non-moving party. *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). Yet, "courts 'are not bound to accept as true a legal conclusion couched as a factual allegation.'" *Twombly*, 550 U.S. at 555.

## I.    THE COMPLAINT DOES NOT STATE A PLAUSIBLE CLAIM FOR RELIEF UNDER 42 U.S.C. § 1983 AGAINST LOCAL 18.

To establish a claim under 42 U.S.C. § 1983, Deering must show that Local 18 and JSTI "[(a)] deprived him of a right secured by the Constitution and [(b)] acted 'under color of state law.'" *Belgau v. Inslee*, 975 F.3d 940, 946 (9th Cir. 2020), *cert. denied*,

141 S. Ct. 2795 (2021) (quoting *Collins v. Womancare*, 878 F.2d 1145, 1147 (9th Cir. 1989). "'Dismissal of a § 1983 claim following a Rule 12(b)(6) motion is proper if the complaint is devoid of factual allegations that give rise to a plausible inference of either element.'" *Quezambra v. United Domestic Workers of Am. AFSCME Loc. 3930*, 445 F.Supp.3d 695, 702 (C.D. Cal. 2020) (quoting *Naffe v. Frey*, 789 F.3d 1030, 1036 (9th Cir. 2015)).

Dismissal is proper because Deering cannot plead sufficient factual allegations that give rise to a plausible inference of a constitutional violation or state action.

**A.**    **Plaintiff does not allege sufficient facts to support a plausible inference that Local 18's alleged conduct amounted to state action.**

Plaintiff fails to establish a plausible theory of state action under any accepted theory of attribution to the state. "'[M]ost rights secured by the Constitution are protected only against infringement by governments . . .'" *Naoko Ohno v. Yuko Yasuma*, 723 F.3d 984, 993 (9th Cir. 2013) (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 936-37 (1982) (alteration in original). "The Supreme Court has long held that 'merely private conduct, however discriminatory or wrongful,' falls outside the purview of the Fourteenth Amendment." *Belgau*, 975 F.3d at 946 (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1002 (1982) (citation omitted)). "Thus, courts 'start with the presumption that private conduct does not constitute governmental action.'" *Bain v. California Tchrs. Ass'n*, 2016 WL 6804921, *5 (C.D. Cal. May 2, 2016) (quoting *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 835 (9th Cir. 1999). "A private entity may bear liability for a constitutional deprivation under [§ 1983] where a plaintiff demonstrates that 'the conduct allegedly causing the deprivation of a federal right [was] fairly attributable to the State,'" i.e., that the private party's conduct is "state action." *Quezambra*, 445 F.Supp.3d at 702-03 (quoting *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1139 (9th Cir. 2012) (quoting *Lugar*, 457 U.S. at 937) (alteration in original)). "[C]onstitutional standards are invoked only when it can be said that the State is *responsible* for the specific conduct of

which the plaintiff complains." *Ohno*, 723 F.3d at 994 (quoting *Blum*, 457 U.S. at 1004) (emphasis in original).  If the challenged action "is not so attributable, then there is no 'state action' and no violation" of the Constitution.  *Id.* at 993.

The Supreme Court has established a two-part test under *Lugar* to determine whether a public entity's "involvement in private action is itself sufficient in character and impact that the government fairly can be viewed as responsible for the harm of which plaintiff complaints." *Belgau*, 975 F.3d at 946 (quoting *Ohno*, 723 F.3d at 994) (citing *Lugar*, 457 U.S. at 937 (two-prong "*Lugar* test")).  To satisfy the first prong, a plaintiff must show that "claimed constitutional deprivation resulted from 'the exercise of some right or privilege created by the state or by a rule of conduct imposed by the state or be a person for whom the State is responsible." *Id.* (quoting *Ohno*, 723 F.3d at 994; *Lugar*, 457 U.S. at 937.)  The second prong determines "whether the party charged with the deprivation could be described in all fairness as a state actor." *Id.* at 947 (quoting *Ohno*, 723 F.3d at 994.)  "Both elements under *Lugar* must be met for there to be state action." *Collins*, 878 F.2d at 1151 (citing *Lugar*, 457 U.S. at 937-39).

"[A] bare allegation of such joint action will not overcome a motion to dismiss; the plaintiff must allege 'facts tending to show that [the private party] acted 'under color of state law or authority.'" *Smith v. Teamsters Loc. 2010*, 2019 WL 6647935, *4 (C.D. Cal. Dec. 3, 2019) (quoting *Degrassi v. City of Glendora*, 207 F.3d 636, 647 (9th Cir. 2000) (citation omitted); *see also Dietrich v. John Ascuaga's Nugget*, 548 F.3d 892, 900 (9th Cir. 2008).

Here, Deering cannot plead sufficient factual allegations the requisite state action because Local 18 is a private actor and its alleged conduct cannot be attributed to the City in such a manner.

13

**1.     Plaintiffs has not alleged sufficient facts to show that the Local 18's enforcement of the dues deduction authorization was state action.**

Plaintiff does not make a plausible claim of state action because he has not alleged the City determined the terms of the dues deduction authorization he voluntarily signed and or that his membership in Local 18 was not a condition of his public employment.

In applying the first prong if the *Lugar* test, the Ninth Circuit and this district court have rejected § 1983 claims by voluntary union members who have challenged their unions' membership and dues rules, policies, and internal decisions on the ground that such union conduct was not an exercise of state authority. *Belgau*, 975 F.3d at 946-47; *Smith*, 2019 WL 6647935 at *5-6; *Quirarte v. United Domestic Workers AFSCME Loc. 3930*, 438 F.Supp.3d 1108, 1115-16 (S.D. Cal. 2020); *Labarrere v. Univ. Pro. & Tech. Emps., CWA 9119*, 493 F. Supp. 3d 964, 969-70 (S.D. Cal. 2020), *aff'd sub nom. PABLO LABARRERE; SAM DOROUDI, Plaintiffs-Appellants, v. UNIVERSITY PROFESSIONAL AND TECHNICAL EMPLOYEES (UPTE) CWA 9119; MICHAEL V. DRAKE, M.D., in his official capacity as President of the Univ. of California, Defendants-Appellees.*, No. 20-56173, 2022 WL 260868 (9th Cir. Jan. 27, 2022).  In these cases, "the gist of Employees' claim against the union is that it acted in concert with the state by authorizing deductions without proper consent in violation of the First Amendment." *Belgau*, 975 F.3d at 946.  The Ninth Circuit has stated that in these cases,

> [i]t is important to unpack the essence of employees constitutional challenge: they do not generally contest the state's authority to deduct dues according to a private agreement.  Rather, the claimed constitutional harm is that the agreements were signed without a constitutional waiver of rights.  Thus, the 'source of alleged constitutional harm' is not a state statute or policy but the particular private agreement between the union and Employees.

*Id.* at 946-47; *see also Smith*, 2019 WL 6647935 at *5 ("harm that Paintiffs complain of actually stems from the Membership Agreements they signed"); *Quirarte*, 438 F.Supp.3d at 1115 ("The crux of Plaintiff's alleged harm in this case results from the dues deduction assignments that Plaintiffs voluntarily signed with the Union."); *Labarrere*, 493 F.Supp.3d at 970 (quoting *Belgau*, 975 F.3d at 947). In these types of cases, Courts have found that the plaintiffs could not meet the first prong of the *Lugar* test because "the harm that Plaintiffs complain of actually stems from the [dues deduction agreements] they signed—which [are] wholly private agreement[s] that cannot be traced back to 'the exercise of some right or privilege created by the State or by a rule of conduct imposed by the state." *Smith*, 2019 WL 6647935 at *5 (quoting *Ohno*, 723 F.3d at 994). "The fact that the state performs a ministerial function of collecting Plaintiffs' dues deductions does not meant that Plaintiffs' alleged harm is the result of state action" for the purposes of the first prong of the *Lugar* tests. *Id.* at *5; *Quirarte*, 438 F.Supp.3d at 1115-16; *Labarrere*, 493 F.Supp.3d at 969-70.

As in *Belgau* and these district court cases, here, Deering cannot plead sufficient facts that meet the first prong of the *Lugar* test. He generally does not challenge the City's authority to deduct dues based on the dues deduction agreement with Local 18. *See* Compl. ¶¶ 81-88, 94, 103-107, 114-122; *Belgau*, 975 F.3d at 946-47; *Smith*, 2019 WL 6647935 at *5-6; *Quirarte*, 438 F.Supp.3d at 1115-16; *Labarrere*, 493 F.Supp.3d at 969-70. Instead, the essence of Deering's claim against Local 18 is that it acted "jointly" with the City in establishing "deduction schemes" to authorize deductions without his "affirmative consent." *See ibid.* Therefore, the source of Deering's alleged constitutional harm is his dues deduction agreement with Local 18 and its authorization of deductions for dues, which cannot be traced back to 'the exercise of some right or privilege created by the [City] or by a rule of conduct imposed by the [City]." *Smith*, 2019 WL 6647935 at *5 (quoting *Ohno*, 723 F.3d at 994).

**2.** **The City's ministerial processing of dues deductions does not transform those deductions into state action.**

Federal courts have further established that the City's ministerial processing of dues deductions does not transform a union authorizing payroll deductions into a state actor under the second prong of the *Lugar* test. *Belgau*, 975 F.3d at 947-50; *Smith*, 2019 WL 6647935 at *6-8; *Semerjyan v. Serv. Emps. Int'l Union Loc. 2015*, 489 F. Supp. 3d 1048, 1056-59 (C.D. Cal. 2020); *Quezambra*, 445 F.Supp.3d at 702-05; *Quirarte*, 438 F.Supp.3d at1116-18; *Labarrere*, 493 F.Supp.3d at 970-71. In *Belgau*, the Ninth Circuit found that a union's authorization of payroll deductions and their ministerial processing by the state does not constitute state action under the joint action test, or any test, where the union and employees enter into membership and dues deduction agreements without coercion or oversight by the state. *Id.* at 947-48; *id.* at 947, fn.2; *see Bain*, 2016 WL 6804921 at *8 ("Automatic payroll deduction are the sort of ministerial act that do not convert the Union Defendants' membership dues and expenditures decisions into state action.") (citing *Hallinan v. Fraternal Ord. of Police of Chicago Lodge No. 7*, 570 F.3d 811, 817-18 (7th Cir. 2009)). Where a union and employees "enter[] into bargained-for agreement without any direction, participation, or oversight by [the state]" and "'[t]he decision' to deduct from Employees' payrolls was 'made by concededly private parties, and depended on the 'judgments made by private parties without standards established by the State,'" then "[t]he state's role [] was to permit the private choice of the parties, a role that is neither significant nor coercive." *Id.* (quoting *Am. Mfrs. Mut. Insu. Co. v. Sullivan*, 526 U.S. 40, 54 (1999)); *see Smith*, 2019 WL 6647935 at *6-8; *Quirarte*, 438 F.Supp.3d at 1116-18; *Labarrere*, 493 F.Supp.3d at 970-71. Where a public employer is required by state law to "enforce the membership agreement" but "it ha[s] no say in shaping the terms of that agreement[, t]he state cannot be said to provide significant assistance' to the underlying acts that [an employee] contends constitute the core violation of its First Amendment rights . . ." *Belgau*, 975 F.3d at 947-48. "At best, [the state]'s role in the

16

allegedly unconstitutional conduct was ministerial processing of payroll deductions pursuant to Employees' authorizations.  But providing a 'machinery' for implementing the private agreement by performing an administrative task does not render [the state and union] joint actors." *Id.* at 948 (quoting *Sullivan*, 526 U.S. at 54).  Instead, "[m]uch more is required; the state must have so 'significantly encourage[d] the private activity as to make the State responsible for' the allegedly unconstitutional conduct." *Id.* (quoting *Sullivan*, 526 U.S. at 53).

Nor does it mean that the state has "insinuate[d] itself into a position of interdependence with" the Union.  *Belgau*, 975 F.3d at 948 (citation omitted).  "A merely contractual relationship between the government and the non-governmental party does not support joint action; . . . . no significant interdependence exists unless the 'government in any meaningful way accepts benefits derived from the allegedly unconstitutional actions.'"  *Id.* (citations omitted).  "Far from acting in concert, [a union and public employer] oppose[] one another at the collective bargaining table." *Id.* (citing *Nat'l Collegiate Athletic Ass'n v. Tarkanian*, 488 U.S. 179, 196 (1988) (where the private actor "acted much more like adversaries than like partners," the private actor is "properly viewed as . . . at odds with the State").

Here, because Deering's membership in Local 18 was not a condition of his public employment and because the City did not determine the terms of his dues deduction agreement with Local 18, under the second prong of the *Lugar* test, Deering has not alleged and cannot allege sufficient facts to make a plausible claim that Local 18 was a state actor under the joint action test or any test.  *See Belgau*, 975 F.3d at 947-50; *Smith*, 2019 WL 6647935 at *6-8; *Semerjyan*, 489 F.Supp.3d at 1056-59; *Quezambra*, 445 F.Supp.3d at 702-05; *Quirarte*, 438 F.Supp.3d at 1116-18; *Labarrere*, 493 F.Supp.3d at 970-71.  Deering admits in his Complaint that, when the City hired him in 2005, he voluntarily joined Local 18 by "executing an IBEW 18 membership agreement and dues authorization."  Compl., ¶¶ 20-25, Ex. A.  Deering does not allege any facts even

suggesting that the City participated in, much less oversaw or coerced, his voluntary decision to join Local 18 by signing a dues deduction agreement. *Ibid*. Instead, Deering's factual allegations establish that the City's role, much like the state of Washington in *Belgau*, was limited to the ministerial processing of payroll deductions pursuant to his authorization under state law. *Belgau*, 975 F.3d at 948. Deering alleges in his Complaint that "[u]nder Cal. Gov't Code § 1157.12 and the terms of the MOU between the Department and IBEW 18, the Department is responsible for deducting dues from public employee's wage and remitting the dues to IBEW 18, based on IBEW 18's representation of whether employees have affirmatively consented to monetary deductions." Compl., ¶ 17; *see Belgau*, 975 F.3d at 948. But there are no sufficient factual allegations that Government Code section 1157.12 "facilitates joint action" between Local 18 and the City and the MOU's "plain language does not provide a sufficient basis to [establish] joint action." *Smith*, 2019 WL 6647935 at *7; *see Belgau*, 975 F.3d at 947-48; *Semerjyan*, 489 F.Supp.3d at 1058, *Quezambra*, 445 F.Supp.3d at 703-04. Nor has Deering pleaded sufficient facts that would establish that the City has "insinuate[s] itself into a position of interdependence with" the Union. Compl. ¶¶ 20-25; *Belgau*, 975 F.3d at 948 (citation omitted). As *Belgau* and other federal district court cases have shown, these facts are insufficient to support a plausible inference of the type of cooperation that is necessary to create joint action, or state action under any other test. *See Belgau*, 975 F.3d at 947-50; *Smith*, 2019 WL 6647935 at *6-8; *Semerjyan*, 489 F.Supp.3d at 1056-59; *Quezambra*, 445 F.Supp.3d at 702-05; *Quirarte*, 438 F.Supp.3d at 1116-18; *Labarrere*, 493 F.Supp.3d at 970-71.

    **3.**    **The window period provided in the MOU does not change the analysis.**

    Deering alleges the deduction of dues after he cancelled his authorization violated his First Amendment rights because the "opt-out period" was not contained in the dues deduction authorization card he signed in 2005. Compl., ¶¶ 20-25, Exhibit A, 33-42, Exs. B, C, D, 43-47, Exs. E, F. But this does not change the Court's analysis because Deering

does not and cannot plead sufficient facts showing the City was responsible for any alleged discrepancies or violations.

In his Complaint, Deering alleges that the "opt-out period" under Article 8.5 of the MOU was not included in the dues deduction agreement he signed in 2005.  Compl., ¶¶ 24-25, Ex. A, 33-40, Exs. B, C, 44-47, Exs. E, F).  Even if the window-period provision was not included in the dues deduction authorization, courts, including this Court, have repeatedly held that a union's internal policies and practices, including changes in dues assessments, do not meet any of the tests for state action.  *See Bain*, 2016 WL 6804921 at *8 (unions' rules requiring full dues as a condition of receiving union benefits and voting rights); *Knox v. Westly*, 2006 WL 2374763 (E.D. Cal.  Aug. 16, 2006) (union's decision to increase dues without providing members with an opportunity to object did not involve state action); *Laboy v. Seabrook*, 1996 WL 417523, *3 (S.D.N.Y. July 25, 1996) (same; "[t]he issue of membership dues is an entirely internal matter in which the state cannot be implicated"); *Kidwell v. Transportation Commc'ns Int'l Union*, 946 F.2d 283, 299 (4th Cir. 1991) (union's decision over the requirements for membership does not constitute state action); *Hallinan*, 570 F.3d at 818 (union's internal act of expelling plaintiffs from membership in the organization did not involve state action) (citing *Messman v. Helmke*, 133 F.3d 1042, 1044 (7th Cir. 1998)).

Moreover, Deering does not allege that the City was in any way involved in, much less coerced or significantly encouraged, any alleged decision by Local 18 to not include the window period provision in the dues deduction authorization.  Compl., ¶¶ 20-25, Ex. A, 33-42,  Exs. B, C, D, 43-47, Exs. E, F.  Nor does the adoption of the provision as a term in the MOU establish state action.  "The government's ministerial obligation to deduct dues for members . . . under a collective bargaining agreement does not transform decisions about membership requirements into state actions."  *Bain*, 2016 WL 6804921 at *8.  Instead, Article 8.5's requirement that Local 18 "indemnify and hold the harmless the Department and City against all claims . . . arising from the implementation of the

provisions of this section (8.5) shows that the "parties opposed one another at the collective bargaining table" and further shows Deering is unable to allege sufficient facts to establish state action.  Ex. A at 17-18 (MOU); *Belgau*, 975 F.3d at 948 (citing *Tarkanian*, 488 U.S. at 196).

### 4.    The City and Local 18's agreement in collective bargaining to deduct employee contributions to fund JSTI was not state action.

Deering alleges that the deduction of employee contributions to fund JSTI was "joint action" by Local 18 and the City that establishes the requisite state action.  Compl., ¶¶ 89-94, 103-107, 114-122.  Deering's claims related to the deduction of contributions to fund JSTI cannot meet the first prong of the *Lugar* test for the same reason as his claims regarding dues deductions.  As with the deduction for dues, he does not challenge the City's authority to deduct contributions to fund JSTI.  Compl., ¶¶ 89-94, 103-107, 114-122; *Belgau*, 975 F.3d at 946-47.  Instead, the essence of Deering's claim against Local 18 is that it acted "jointly" with the City in establishing "deduction schemes" to authorize deductions without his "affirmative consent."  *See ibid.*  Therefore, like *Belgau*, the source of Deering's alleged constitutional harm is a deduction of 43 cents per hour worked to fund JSTI.  *Ibid.*

Moreover, as with the dues deductions, because Deering has not sufficiently alleged facts that would show that the City coerced or significantly encouraged Local 18's negotiation in collective bargaining of payroll deductions to make contributions to fund JSTI, it has not alleged a plausible claims that Local 18 was a state actor under the second prong of the *Lugar* test.  Courts have repeatedly held that decisions and actions taken by unions in fulfilling their duties and obligations as exclusive bargaining representatives do not constitute state action where employees were not required to join the union and did not allege other facts establishing state action.  *See Farrell v. Int'l Ass'n of Firefighters, AFL-CIO, Loc. 55*, 781 F. Supp. 647 (N.D. Cal. 1992) (union's decision to finance litigation and deduct fees); *Tom Beu Xiong v. Fischer*, 787 F.3d 389 (7th Cir.

2015) (union's refusal to arbitrate plaintiff's grievance and grievance procedure in CBA jointly negotiated with county not sufficient on its own to establish state action); *Jackson v. Temple Univ. of Com. Sys. of Higher Educ.*, 721 F.2d 931 (3d Cir. 1983) (union's decision not to bring plaintiff's grievance to arbitration); *Loftus v. Se. Pennsylvania Transp. Auth.*, 843 F. Supp. 981 (E.D. Pa. 1994) (same).  In *Farrell*, the Northern District found that a public sector union's decision to finance litigation by assessing a monthly fee of $25 did not involve state action because plaintiffs did not allege sufficient factual allegations that they were required to join the union or any other basis for state action. 781 F.Supp. at 648-50.  Similarly, here, Local 18's decision to assess members a monthly $15.00 deduction to fund JSTI does not constitute state action because Deering has failed to sufficiently allege any facts that the City coerced or significantly encouraged Local 18's decision to deduct fees for contributions to JSTI.  (Compl., ¶¶ 64-74)

Instead, Deering's factual allegations show that the City's role was limited to the ministerial processing of payroll deductions pursuant to the MOU.  He alleges that "the Department and IBEW 18, *acting jointly*, began deducting $15.00 from [his] lawfully earned wages and *remitting it to JSTI* without his affirmative consent."  *Id.*, ¶ 64 (emphasis added), ¶¶ 67, 68, 69, 70, 71, 72 ("acting through their control and use of JSTI"), 74.  As with City's deduction and remittance of his dues to Local 18, "At best, [the City]'s role in the allegedly unconstitutional conduct was ministerial processing of payroll deductions pursuant to the MOU [which] does not render [the City and Local 18] joint actors."  *Belgau*, 975 F.3d at 948 (quoting *Sullivan*, 526 U.S. at 54).  Nor does Local 18's agreement with the City in the MOU to establish JSTI and deduct employee contributions to fund the trust mean that the City "insinuated itself into a position of interdependence with" with Local 18.  *Id.* at 948 (citation omitted).  "A merely contractual relationship between the government and the non-governmental party does not support joint action" and Deering has not pleaded any sufficient factual allegations to lead to the conclusion that the City "in any meaningful way accept[ed] benefits derived

from" the deduction of employee contributions to fund JSTI that would establish state action. *Id.* at 948 (citations omitted); Compl., ¶¶ 64-74. Far from acting in concert with the City, Local 18 decided to deduct contributions from employees' pay for contributions to JSTI while at odds with the City across the bargaining table. *Belgau*, 975 F.3d at 948 [a union and public employer] oppose[] one another at the collective bargaining table.") (citing *Tarkanian*, 488 U.S. at 196 (where the private actor "acted much more like adversaries than like partners," the private actor is "properly viewed as . . . at odds with the State").

**B.    Plaintiff has not alleged sufficient facts to show that the Local 18's conduct impaired his freedom of speech under the First Amendment.**

**1.    Plaintiff has not alleged sufficient facts to show that the Local 18's conduct in enforcing the dues deduction authorization impaired his freedom of speech under the First Amendment.**

Even if Deering could allege state action, he still has not and cannot allege that his First Amendment rights have been violated. The Ninth Circuit confirmed in *Belgau* and joined "the swelling chorus of courts recognizing that *Janus* does not extend a First Amendment right to avoid paying dues" and does not apply to cases, like the instant case, where a plaintiff voluntarily joins a union and consents to dues deductions. *Belgau*, 975 F.3d at 951 (collecting 18 cases); *see Janus,* --- U.S. ---, 138 S.Ct. 2448 (2018).

To the contrary, the Ninth Circuit and its district courts, including this Court, have repeatedly held that unions' post-membership deduction of dues in accordance with dues deduction authorizations' irrevocability provisions do not violate the First Amendment rights of former members who voluntarily agreed to join a union and pay dues. *Belgau*, 975 F.3d at 950-51 (dues deductions irrevocable for a period of one year); *Fisk v. Inslee*, 759 F.App'x 632 (9th Cir. 2019); *Smith*, 2019 WL 6647935 *1; *Seager v. United Tchrs. Los Angeles*, 2019 WL 3822001, *1 (C.D. Cal. Aug. 14, 2019), *aff'd*, 854 F.App'x 927 (9th Cir. 2021); *Anderson v. Serv. Emps. Int'l Union Loc. 503*, 400 F. Supp. 3d 1113 (D.

1  Or. 2019), *aff'd sub nom. Anderson v. Serv. Emps. Int'l Union (SEIU) Loc. 503*, 854

2  F.App'x 915 (9th Cir. 2021); *Cooley v. California Statewide L. Enf't Ass'n*, 385 F. Supp.

3  3d 1077 (E.D. Cal. 2019); *Smith v. Bieker*, 2019 WL 2476679, *1 (N.D. Cal. 2019), *aff'd*,

4  854 F.App'x 937 (9th Cir. 2021).  In *Belgau*, the Ninth Circuit reconfirmed that

5  membership and dues deduction agreements are binding contracts between unions and

6  their members.  The Court stated that provisions authorizing the withholding of dues and

7  making that authorization irrevocable for certain periods are "promise[s] made in the

8  context of a contractual relationship" between the union and its members; i.e. binding

9  contracts.  *Belgau*, 975 at 950; *see Fisk*, 759 F.App'x at 633-34; *Smith*, 2019 WL

10  6647935 at *8.  "When 'legal obligations . . . are self-imposed,' state law, not the First

11  Amendment, normally governs."  *Belgau*, 975 F.3d at 950 (citing *Cohen v. Cowles Media*

12  *Co.*, 501 U.S. 663, 671 (1991) (other citation omitted); *see Fisk*, 759 F.App'x at 633-34;

13  *Smith*, 2019 WL 6647935 at *8.  "The First Amendment does not support Employees'

14  right to renege on their promise to join and support the union . . . . Nor does the First

15  Amendment provide a right to 'disregard promises that would otherwise be enforced

16  under state law.'"  *Id.* (quoting *Cohen*, 501 U.S. at 671); *see Fisk*, 759 F.App'x at 633-34;

17  *Smith*, 2019 WL 6647935 at *8.  "Although [plaintiffs] resigned their membership in the

18  union and object to providing continued financial support, the First Amendment does not

19  preclude the enforcement of 'legal obligations' that are bargained-for and 'self-imposed'

20  under state contract law."  *Smith*, 2019 WL 6647935 at *8 (quoting *Fisk*, 759 F.App'x at

21  633-34).

22        Here, Local 18's continued deduction of dues in accordance with the dues

23  irrevocability provision does not violate Deering's First Amendment rights.  Deering

24  does not allege any facts showing that joining a union was a condition of his employment

25  or that he was coerced into signing a membership agreement or the dues deduction

26  authorization card.  Compl., ¶¶ 20-25.  To the contrary, Deering admits in the Complaint

27  that when he "began employment with the Department in 2005, he voluntarily xecuted an

28

IBEW 18 membership agreement and dues authorization." Compl. ¶ 20. Deering further admits that he was aware at the time that dues were deducted "[u]nder the applicable MOU between IBEW 18" and dues authorization card and that he had the option of being a "nonmember" but elected to become member and sign the dues authorization card anyway. *Id.*, ¶¶ 21-25. There is also no dispute that Article 8.5 of the 2005-2010 MOU, which was the collective bargaining agreement that Deering alleges in his Complaint was in effect when he signed his dues authorization card, states that "employees' requests to cancel their dues withholding authorization agreement shall be processed by the Department to be effective on the ending of the first complete pay period following April 1of each calendar year." Compl., ¶¶ 5 fn.1, 6, 21, 36-40; *see generally* 20-25, 33-42; Ex. A at 17-18 (MOU). Because Deering voluntarily became a member of Local 18 and signed the dues deduction authorization, Local 18's deduction of dues after he resigned his membership did not violate his First Amendment rights.

**2.    Plaintiffs has not alleged sufficient facts to show that Local 18's negotiation of employee contributions to fund JSTI violated his freedom of speech under the First Amendment.**

Deering also has not and cannot allege sufficient factual content that would allow the court to draw the reasonable inference that deduction of contributions to fund JSTI violated his freedom of speech under the First Amendment. Deering alleges that the deduction of contributions to fund JSTI violates his First Amendment rights based on similar factual allegations and legal theories under *Janus* regarding dues deductions. Compl., ¶¶ 89-94. *Janus* is also distinguishable and does not apply to these deductions because its holding was limited to fees that are deducted from nonmembers' wages and are paid *to unions*. *Janus*, --- U.S. ---, 138 S.Ct. at 2486. Specifically, *Janus* held that "States and public-sector unions may no longer extract agency fees from nonconsenting employees." *Id.* "Neither an agency fee nor any other payment *to the union* may be deducted from a nonmember's wages, nor may any other attempts be made to collect

1    such a payment, unless the employee affirmatively consents to pay." *Id.* (emphasis

2    added).

3    **II.    THE COMPLAINT DOES NOT STATE A PLAUSIBLE CLAIM FOR**

4         **RELIEF UNDER 42 U.S.C. 1983 AGAINST JSTI.**

5         **A.    Plaintiff lacks standing to assert his claims against the JSTI Trustees.**

6         A plaintiff bears the burden of demonstrating standing under Article III of the

7    United States Constitution. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

8    To satisfy the standing requirements of Article III, a plaintiff bears the burden of showing

9    that: "(1) [he] has suffered an injury-in-fact, (2) the injury is fairly traceable to the

10   challenged action of the defendant, and (3) the injury is likely to be redressed by a

11   favorable decision." *Loritz v. U.S. Ct. of Appeals for Ninth Cir.*, 382 F.3d 990, 991-92

12   (9th Cir. 2004); *see also United States v. Hays*, 515 U.S. 737, 743 (1995) (party seeking

13   the exercise of jurisdiction in his favor bears burden). "At the core of the standing

14   doctrine is the requirement that a plaintiff allege personal injury fairly traceable to the

15   defendant's allegedly unlawful conduct and likely to be redressed by the requested

16   relief." *Cty. of Riverside v. McLaughlin*, 500 U.S. 44, 51 (1991) (quotations and citations

17   omitted); *see Raines v. Byrd*, 521 U.S. 811, 819 (1997) (plaintiff's complaint must

18   establish that he has a personal stat and the alleged injury suffered is particularized as to

19   him).

20        Deering lacks standing to sue the JSTI Trustees because he has not alleged and

21   cannot allege that he suffered an injury-in-fact traceable to their actions. The gravamen of

22   Plaintiff's claims against the JSTI Trustees is that he was allegedly injured by the

23   deduction of employee contributions to fund JSTI. However, Deering alleges that it was

24   Local 18 and the City were responsible making the deductions. According to the

25   Complaint, "*the [City] and Local 18, acting jointly,* began deducting $15.00 from

26   Deering's lawfully earned wages and remitting it to JSTI without his affirmative consent"

27   and continued the deductions after he resigned from membership in Local 18.

28

Complaint, ¶ 64; *see also id.*, ¶¶ 65-72, 74, 81-83, 89-94, 103-107, 115-122.  Therefore, Deering has not alleged an injury that is "traceable" to the conduct of the JSTI Trustees. *Ibid.*; *see Lortiz*, 382 F.3d at 991-92.  Nor is the alleged injury by JSTI redressable.  A decision in Deering's favor agsinst JSTI's Trustees would not cure the alleged injury because it was Local 18 and the City who implemented and carried out the deductions for contributions to fund JSTI.  *Ibid.*  Therefore, the Court lacks subject matter jurisdiction to decide Deering's claims against the JSTI Trustees.

**B.    The DWP's appointment of trustees to the JSTI Board of Trustees does not constitute state action.**

The Complaint alleges that the JSTI Board of Trustees is jointly appointed by the Department and IBEW 18, with equal representation for both entities, establishes state action.  Compl., ¶ 62.  Deering may argue that DWP's appointment of trustees to the Board of Trustees of JSTI constitutes state action or make the joint labor-management trust a state actor. Courts, however, have repeatedly found that the mere presence of public officials on the boards of private institutions does not establish state action, especially where that presence constitutes less than a majority of the board.  *Vandemark*, 855 F.2d at 317 (no state action where state law required one-third of board of directors of nonprofit corporation to be public officials); *Anderson*, 754 F.2d 202 (no state action where for-profit corporation Amtrak's nine-member board includes six members of the federal government who can control appointment of seventh member); *Crowder*, 740 F.2d at 452 (no state action where two members out of thirteen-member board of trustees of private hospital were state officials); *Aasum*, 395 F. Supp. 363 (D.Ore, 1975) (state action did not result from the presence of three state-appointed members of private nonprofit hospital's seven-person corporate board), *aff'd*, 542 F2d 792 (9th Cir. 1976).  "Rather than looking to the number of public officials who serve on the governing board of a private institution . . . the proper focus concerns whether the State has exercised 'coercive power or has provided such significant encouragement, either overt or covert,

that the choice must in law be deemed to be that of the state.'" *Crowder*, 740 F.2d at 452 (quoting *Blum*, 457 U.S. at 1004).

To determine whether the state has exercised coercive power or provided significant encouragement, courts consider the presence of public officials in conjunction with other factors, such as whether the institution receives government funding, is extensively regulated by the state, leases public facilities, and state is significantly involved in its daily operations. *Adams v. Vandemark*, 855 F.2d 312, 315-17 (6th Cir. 1988) (non-profit corporation also received government funding, was extensively regulated, and used public facilities); *Anderson v. Nat'l R.R. Passenger Corp. (AMTRAK)*, 754 F.2d 202, 204 (7th Cir. 1984) (for-profit corporation attempting to minimize government subsidies, not subject to close government supervision, and daily affairs not conducted by federal employees); *Crowder v. Conlan*, 740 F.2d 447, 453 (6th Cir. 1984) (private hospital also received considerable government funding, was subject to extensive regulation, and leased facility from the county); *Aasum v. Good Samaritan Hosp.*, 395 F. Supp. 363, 368 (D. Or. 1975), *aff'd*, 542 F.2d 792 (9th Cir. 1976) (private nonprofit hospital also received government funding and federal and state tax exemptions and was extensively regulated).

"In order to invoke the doctrine of 'state action,' a complaining party must demonstrate a sufficient nexus between the challenged action and the regulatory scheme alleged to be the impetus behind the private action." *Crowder*, 740 F.2d at 451 (citing *Blum*, 457 U.S. at 1004-05). Without a sufficient nexus to the challenged action, courts have repeatedly found that the presence of state officials on the boards of private institutions, even when they constitute a majority of its composition, does not involve state action. *Id.* (presence of public officials "insufficiently linked to the challenged actions . . . and therefore, does not warrant a finding of state action); *Vandemark*, 855 F.2d at 317 (no color of law where "board's only link to the challenged actions, the discharges, is the board's adoption of the personnel policies); *Anderson*, 754 F.2d at 205

1  (plaintiff "has not alleged any nexus between the federal government's involvement with

2  Amtrak and Amtrak's decision to terminate plaintiff").

3        Here, the Complaint merely alleges that Local 18 and the City jointly appoint the

4  JSTI Board of Trustees with equal representation but nowhere alleges that DWP-

5  appointed trustees exercised coercive power or provided significant encouragement to

6  Local 18's decision to deduct employee contributions to fund JSTI, JSTI's receipt of

7  those contributions, or JSTI's alleged use of those contributions for political speech.

8  (Compl., ¶¶ 50-52, 60-72, 74; *see Crowder*, 740 F.2d at 452 (quoting *Blum*, 457 U.S. at

9  1004.)  Nor does Deering allege any other factors, such as government funding, extensive

10  regulation, leasing or use of public facilities, or significant involvement by the City in

11  JSTI's daily operations that could, along with the presence of City officials on JSTI's

12  Board of Trustees, establish a significant nexus between the City and Local 18's decision

13  to deduct fees for contributions to the trust.  Compl., ¶¶ 50-52, 60-72, 74; *see Vandemark*,

14  855 F.2d at 315-17; *Anderson*, 754 F.2d at 204; *Crowder*, 740 F.2d at 453; *Aasum*, 395

15  F.Supp. at 368.  Instead, Deering admits in his allegations that JSTI does not receive

16  government funding, but, rather is funded by employees' contributions.  Compl., ¶ 61.

17  The Complaint's other factual allegations regarding the City and JSTI's predecessors are

18  irrelevant because they do not establish a sufficient nexus to the challenged action, which

19  is the deduction of employee contributions to fund JSTI, and should be stricken from the

20  Complaint.  Compl., ¶¶ 53-59.

21        **C.    Plaintiff has not alleged sufficient facts to support a plausible inference**

22               **that JSTI is controlled by or an agent of Local 18 used to fund political**

23               **communications.[2]**

24        Deering alleges that he "did not affirmatively consent to the continuing

25  withdrawal of monies from his lawfully earned wages for use by the Department and

26

27  [2] Paragraphs 55-59 of the Complaint allege "immaterial, impertinent, or scandalous

28  material" drawn from a discredited newspaper article that have no bearing on the issues

IBEW 18 *through JSTI* " (Compl., ¶¶ 89-91)(emphasis added) He thus alleges that JSTI was a sham conduit entity used to "funnel" funds deducted from his pay to Local 18 and the DWP.

Other allegations of Deering's Complaint and the JSTI Trust Agreement itself,[3] however, make clear that JSTI is a bona fide labor-management trust created in collective bargaining between Local 18 and the DWP and is a separate independent organization that neither DWP nor Local 18 control. In his Complaint, Deering admits that JSTI "was created by the Department and IBEW [Local] 18 . . . for the benefit of [DWP] employees represented by IBEW in all aspects of safety on the job." (Compl., ¶ 50, 51, 60)  He further admits: (1)"The JSTI Board of Trustees is jointly appointed by the Department and IBEW Local 18, with equal representation for both entities" (Compl. ¶62) and (2) "The JSTI trustees representing the Department and IBEW 18 are fiduciaries who have the exclusive authority and discretion to control and manage the assets, operation, and administration of the JST." (Compl. ¶62)

These allegations are references to the JSTI Trust Agreement. The Trust Agreement provides, JSTI is joint labor-management trust created in collective bargaining between Local 18 and the DWP for the benefit of the DWP employees represented by Local 18 with respect to "all aspects of safety and training on the job." (JSTI Trust Agreement at 1) It is an "*independent advisory body* that promotes joint labor-management activities designed to improve labor-management relations and communications with respect to issues of health, safety, and training." (*Id.*)

---

presented in this case and should be stricken. Local 18 will file contemporaneously with this motion a Rule 12(f) motion to strike these false and sensationalist allegations.

[3] The Court may consider documents outside the complaint if they are incorporated into the complaint by reference. Exhibit B, the "Agreement and Declaration of Trust between Local 18 International Brotherhood of Electrical Workers, AFL-CIO and the Department of Water and Power of the City of Los Angeles for the Joint Safety and Training Institute" is incorporated by reference into Deering's complaint because he "refers extensively to the document [and] the document forms the basis of the plaintiff's claim." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).

JSTI is governed by a Board of Trustees consisting of an equal number of trustees, four appointed by DWP and four by Local 18, who are authorized to make decisions or take action only at a duly convened meeting of the Board at which a quorum is present. (Art. IV, Sec 1) At such meetings, the trustees appointed by DWP and the trustees appointed by Local 18 each have one vote, and any deadlock between them must be resolved by a neutral arbitrator. The trustees are "fiduciaries" who may exercise their authority with the "care, skill, prudence and caution under the circumstances then prevailing that a prudent person acting in a like capacity would use." (Art.V, Sec. 3) Furher, "No Trustee shall deal with the assets of the Institute for his or her own interest or account, nor shall a Trustee act in his or her individual or any other capacity other than as a Trustee in any transaction involving the Institute." (Art.VI, Sec.3) And, most relvant here, JSTI "is an independent body, and not the agency, subsidiary, or affiliate of either the DWP or Local 18 that "shall not exercise any authority that may be lawfully delegated by the DWP  or the City Council." (Art. XIII, Sec. 4).

Deering admits that the deductions from his pay to fund JSTI were paid to JSTI and not Local 18.  (Compl., ¶ 20, 64-72, 74). Even if these deductions for employee contributions to JSTI fall under the purview of *Janus* (they do not), Deering's allegations that JSTI used these contributions for political speech are conclusory and insufficient. (Compl., ¶¶ 68, 70, 72, 74, 78, 89, 92-94); *see Janus,* --- U.S. ---, 138 S. Ct. 2448. Therefore, Deering cannot state a claim that the deductions for contributions to JSTI violate his First Amendment rights under *Janus* or any other case or theory.  *Janus*, --- U.S. ---, 138 S.Ct. at 2486.

30

**CONCLUSION**

For the foregoing reasons, the Court should dismiss the Complaint, and each cause of action, in its entirety.

DATED:  February 1, 2022

Respectfully submitted,

D. WILLIAM HEINE
ALEJANDRO DELGADO
SCHWARTZ, STEINSAPIR,
DOHRMANN & SOMMERS LLP

_____
ALEJANDRO DELGADO

Attorneys for Defendants IBEW Local 18 and JSTI Trustees

# EXHIBIT A

# M E M O R A N D U M

# O F

# U N D E R S T A N D I N G

Between

CITY OF LOS ANGELES

THE LOS ANGELES DEPARTMENT OF
WATER AND POWER

and

LOCAL 18 OF
THE INTERNATIONAL BROTHERHOOD OF
ELECTRICAL WORKERS

**Clerical Unit**

**October 1, 2005**

**through**

**September 30, 2010**

# TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................1

**ARTICLE 1**.....................................................................**6**

DEPARTMENT - UNION RELATIONSHIP............................................. 6

**ARTICLE 2**.....................................................................**7**

RECOGNITION................................................................ 7

**ARTICLE 3**.....................................................................**7**

LANGUAGE................................................................... 7

**ARTICLE 4**.....................................................................**8**

NON-DISCRIMINATION......................................................... 8

**ARTICLE 5**.....................................................................**8**

GRIEVANCE PROCEDURE........................................................ 8

**ARTICLE 6**....................................................................**14**

MANAGEMENT RIGHTS......................................................... 14

**ARTICLE 7**....................................................................**14**

UNION RIGHTS.............................................................. 14

**ARTICLE 8**....................................................................**15**

UNION ACTIVITY............................................................ 15

**ARTICLE 9**....................................................................**23**

OVERTIME.................................................................. 23

**ARTICLE 10**...................................................................**30**

ABSENCE FROM DUTY......................................................... 30

**ARTICLE 11**..............................................................**34**

REST PERIODS............................................................. 34

**ARTICLE 12**..............................................................**35**

LUNCH PERIODS........................................................... 35

**ARTICLE 13**..............................................................**35**

HOURS OF WORK AND WORK SCHEDULES......................................... 35

**ARTICLE 14**..............................................................**40**

REPORTING LOCATIONS AND TRAVEL TIME...................................... 40

**ARTICLE 15**..............................................................**43**

HOLIDAYS AND VACATIONS................................................... 43

**ARTICLE 16**..............................................................**47**

INCLEMENT WEATHER........................................................ 47

**ARTICLE 17**..............................................................**47**

PAY DIFFERENTIALS........................................................ 47

**ARTICLE 18**..............................................................**48**

EXPENSES................................................................. 48

**ARTICLE 19**..............................................................**57**

WORK CLOTHING AND TOOLS.................................................. 57

**ARTICLE 20**..............................................................**58**

SPECIAL WORKING CONDITION RULES FOR CAMPS................................ 58

**ARTICLE 21**..............................................................**58**

PERSONNEL FILE........................................................... 58

**ARTICLE 22**..........................................................................................**59**

EMPLOYEE LIST.................................................................... 59

**ARTICLE 23**..........................................................................................**60**

MAINTENANCE OF EXISTING CONDITIONS......................................... 60

**ARTICLE 24**..........................................................................................**61**

JOINT SAFETY COMMITTEE......................................................... 61

**ARTICLE 25**..........................................................................................**61**

SAVINGS CLAUSE.................................................................. 61

**ARTICLE 26**..........................................................................................**62**

TERM............................................................................ 62

**ARTICLE 27**..........................................................................................**62**

OBLIGATION TO SUPPORT.......................................................... 62

**ARTICLE 28**..........................................................................................**63**

HEALTH AND DENTAL PLANS........................................................ 63

**ARTICLE 29**..........................................................................................**64**

SUPPLEMENTAL BENEFITS.......................................................... 64

**ARTICLE 30**..........................................................................................**66**

SALARIES........................................................................ 66

**ARTICLE 31**..........................................................................................**67**

SCOPE OF IMPLEMENTATION........................................................ 67

**ARTICLE 32**..........................................................................................**67**

MAINTENANCE OF RATE DIFFERENTIALS............................................. 67

**ARTICLE 33**..........................................................................................**68**

TEMPORARY REASSIGNMENT......................................................... 68

**ARTICLE 34**.................................................... **69**

LICENSE FEES................................................... 69

**ARTICLE 35**.................................................... **69**

JOB SECURITY.................................................. 69

**ARTICLE 36**.................................................... **70**

JOINT LABOR/MANAGEMENT RESOLUTION BOARD...................... 70

**ARTICLE 37**.................................................... **72**

EMPLOYEE'S RETIREMENT PLAN.................................... 72

**ARTICLE 38**.................................................... **74**

EMPLOYEE RELEASE TIME......................................... 74

**ARTICLE 39**.................................................... **75**

JOINT SAFETY INSTITUTE........................................ 75

**ARTICLE 40**.................................................... **76**

JOINT TRAINING INSTITUTE...................................... 76

**APPENDIX A-1**.................................................. **78**

SALARY RANGES EFFECTIVE OCTOBER 1, 2005...................... 78

**APPENDIX A-2**.................................................. **79**

SALARY RANGES EFFECTIVE OCTOBER 1, 2006...................... 79

**APPENDIX A-3**.................................................. **80**

SALARY RANGES EFFECTIVE OCTOBER 1, 2007...................... 80

**APPENDIX A-4**.................................................. **81**

SALARY RANGES EFFECTIVE OCTOBER 1, 2008...................... 81

**APPENDIX A-5**.................................................. **82**

SALARY RANGES EFFECTIVE OCTOBER 1, 2009...................... 82

**FOOTNOTES** ........................................................................ **83**

CLERICAL UNIT.................................................................... 83

**APPENDIX B**........................................................................ **85**

CONTRACTING OUT.................................................................. 85

**APPENDIX C**........................................................................ **87**

PARKING FEES AND SUBSIDIES...................................................... 87

**APPENDIX D**........................................................................ **89**

FOCUSED SEPARATION PROGRAM (FSP) OF 1995......................................... 89

**APPENDIX E**........................................................................ **91**

CLERICAL BID PROCEDURE........................................................... 91

**APPENDIX F**........................................................................ **96**

ERGONOMICS....................................................................... 96

**EXHIBIT A**......................................................................... **97**

SHOP STEWARDS CLERICAL UNIT...................................................... 97

**INDEX** ............................................................................. **98**

ARTICLE 1

## **DEPARTMENT - UNION RELATIONSHIP**

A. Continuity of Service to the Public and Mutual Pledge of Accord

The Department of Water and Power is engaged in public services requiring continuous operations that are necessary to maintain the health and safety of the Department's customers.  The obligation to maintain these public services is imposed upon both the Department and the Union during the term of this Memorandum of Understanding (MOU) and the certification of the Union as the exclusive representative of the employees in this representation unit.

To continue the viability of the Department as the provider of choice for energy, water, and related services, the parties mutually agree to work through a Joint Labor/Management process. The goal of this process is to ensure Department competitiveness and maintain employment security.

Inherent in the relationship between the Department and its employees is the obligation of the Department to deal justly and fairly with its employees and of the employees to cooperate with their fellow employees and the Department in the performance of their public service obligation.

It is the purpose of this Memorandum to promote and ensure harmonious relations, cooperation and understanding between the Department and the employees represented by the Union and to establish and maintain proper standards of wages, hours and other terms and conditions of employment.

B. No Strike - No Lockout

In consideration of the mutual desire of the parties to promote and ensure harmonious relations and in consideration of the Mutual Pledge of Accord, the Department agrees that there shall be no lockout or the equivalent of members of the Union, and the Union and its members agree that there shall be no strike or other concerted action resulting in the withholding of service by the members during the term of this MOU.  Should such a strike or action by Union members occur, the Union shall immediately instruct its members to return to work.  If they do not report to work immediately upon instructions of the Union, they shall be deemed to have forfeited their jobs without recourse of any kind against the Department or the Union.  The curtailing of operations by the Department in whole or part for operational or economic reasons shall not be construed as a lockout.

The provisions of this Paragraph B shall not detract in any way from the restrictions imposed by law on strikes and other types of work stoppages by public employees.  The Union agrees that

should the aforementioned legal restrictions on strikes and work stoppages be removed, the provisions of this article shall remain in effect.  The Department agrees that the enactment of more stringent laws regarding Union activities shall likewise not affect the terms of this Paragraph B.

# ARTICLE 2

## RECOGNITION

Pursuant to the provisions of the Employee Relations Ordinance of the City of Los Angeles and applicable State law, Local 18 of the International Brotherhood of Electrical Workers, was certified on October 11, 1974, by the Employee Relations Board of the City of Los Angeles as the majority representative of employees in the Department of Water and Power Clerical Unit (hereinafter referred to as "Unit") as found to be appropriate by said Employee Relations Board.  Department Management hereby recognizes Local 18, as the exclusive representative in said Unit.

# ARTICLE 3

## LANGUAGE

Throughout this Memorandum of Understanding, hereinafter referred to as "MOU," the terms management or employer shall be understood to refer to the General Manager of the Department of Water and Power hereinafter referred to as "Department or DWP."  The term "Board" shall be understood to refer to the Board of Water and Power Commissioners, and the terms "Union or Local 18" shall be understood to refer to Local 18 of the International Brotherhood of Electrical Workers, AFL-CIO.

The term "parties" shall be understood to refer jointly to the City of Los Angeles and the Union.

The term "employee" shall be understood to refer to an employee in this Unit as established and/or modified by the Los Angeles City Employee Relations Board.

The term "annual rate" shall apply to all positions in this Unit except those, which are subject to an hourly or daily rate of pay and are so identified on the respective Duties Description Records.

The use of plural nouns shall be understood to include the singular and vice versa, where appropriate.

# ARTICLE 4

## NON-DISCRIMINATION

The parties mutually recognize and agree to protect those employee rights granted in the Employee Relations Ordinance of the City of Los Angeles and applicable State and Federal laws, including the rights of all employees covered herein to join and participate in the activities of the Union.

The parties mutually recognize and agree that the provisions of this MOU shall be applied equally to all employees in the Unit without discrimination because of disability, race, color, sex, age, religious creed, union activity, national origin, ancestry, political belief or sexual orientation.

# ARTICLE 5

## GRIEVANCE PROCEDURE

**Definition**

A grievance is defined as any dispute concerning the interpretation or application of this written MOU and/or Departmental rules and regulations governing personnel practices or working conditions applicable to employees covered by this MOU. An impasse in meeting and conferring upon the terms of a proposed MOU is not a grievance.

**General Provisions**

a.     Nothing in this grievance procedure shall be construed to apply to matters for which an administrative remedy is provided before the Civil Service Commission. Where a matter within the scope of this grievance procedure is alleged to be both a grievance and an unfair labor practice under the jurisdiction of the Employee Relations Board, an employee may elect to pursue the matter either under the grievance procedure herein provided, or by action before the Employee Relations Board. The employee's election of either procedure shall constitute a binding election of the remedy chosen and a waiver of the alternative remedy.

b.     No grievant shall lose the right to process a grievance because of Department-imposed limitations in scheduling meetings.

c.     Grievants have the responsibility to discuss their grievances informally with their immediate/appropriate supervisor. The supervisor is obligated, upon request of a grievant, to discuss the grievance at a mutually satisfactory time. Grievants may be represented by a

representative of their choice in the informal discussion with their immediate supervisor, and in all formal review levels.

d.  The time limits hereinafter provided between steps of the grievance procedure may be extended only by mutual agreement.  In addition, by mutual agreement, any level of review may be waived from this grievance procedure. Agreements under this section shall be made between the Labor Relations Office and the employee's representative or the employee if unrepresented.

All written grievances and appeals must be either received in the Labor Relations Office or postmarked by the U. S. Postal Service within time limits set forth in this Grievance Procedure.

e.  Management shall notify the Union of any formal grievance filed that involves the interpretation and/or application of the provisions of this MOU, and a full-time Union Staff Representative shall have the right to be present and participate in the discussion at any formal grievance meeting concerning such a grievance. If a full-time Union Staff Representative elects to attend said grievance meeting, the representative shall inform the Labor Relations Office of that fact.  The Union is to be notified of the resolution of all formal grievances.

f.  It is understood and agreed that Section 3502 of the California Government Code grants to public employees the right to represent themselves individually in their employment activities, which includes grievances. Nothing in this MOU shall be construed as to abridge, limit or restrict that right.

g.  Employees who file a grievance and elect representation by the Union shall be permitted to be present and testify at any step of the grievance procedure if their attendance is requested by either the Union or Management.

h.  Expedited arbitration and/or a bench decision may be used by mutual agreement.

**Union Procedure**

**Preamble**

The purpose of this Procedure is to solve problems fairly and as expeditiously as possible at the lowest possible level.  This Procedure is a problem solving process.  At each step, a good faith effort will be made to resolve the issue.

I.   Informal Step (Step I)

- The grievant and/or the Union will meet informally with the appropriate supervisor/manager to resolve all issues within their level of authority.

- The grievant and/or the Union will notify the appropriate supervisor/manager within fourteen (14) calendar days of the date of the grievable incident or within fourteen (14) calendar days of the date the grievant and/or the Union should have reasonably been aware of the incident.

- The grievance shall be considered waived if not presented within the fourteen (14) day time limit.

- It is the intent of the parties that responses be given to the grievant and/or the Union as soon as possible, but, due to special circumstances or length of investigations, supervisors/managers will have up to fourteen (14) calendar days to respond.

- If the grievance is not resolved at the informal step, a formal intent to file a grievance may be filed within fourteen (14) calendar days of the response.

II.   Formal Step (Written Grievance filed by the Union Step II)

- The Union and Management will designate representatives to be members of a local Joint Labor/Management Investigatory Committee (JLMIC) to establish the facts and participate in discovery of relevant information.

- The Committee should consist of the Labor Relations Representative, the appropriate Manager, the Union Representative, and the Shop Steward.

- The JLMIC has the authority to resolve the issue(s).

- A joint statement of facts and/or decision will be rendered within twenty-one (21) calendar days from the receipt of the written grievance.

- If the grievance is not resolved at this step, the grievance may be appealed to the next step within fourteen (14) calendar days of the response.

III. <u>Review (Division Level Step III)</u>

- Union representatives and the appropriate Division Managers/Line Managers will meet on a regular basis to review unresolved cases forwarded to them by the JLMIC.

- Minutes of these meetings will be kept and written reports will be prepared for each issue dealt with.

- A decision and report will be issued within thirty (30) calendar days from the date of the appeal.

- The parties have the authority to resolve all issues forwarded to them.

- If the grievance is not resolved at this step, the grievance may be appealed to the next step within fourteen (14) calendar days of the response.

IV. <u>Review (Department Level Step IV)</u>

- The IBEW Local 18 Business Manager and the DWP General Manager will meet on a monthly basis to review and resolve cases referred to them from the Division level.

- There will be a written record of their decision.

V. <u>Arbitration (Step V)</u>

- If the issue is not resolved at the Department level, the Union may file to arbitration within twenty-one (21) calendar days from the date of the written decision at the Department level.

- The grievance shall be considered waived if the Union does not file within the twenty-one (21) day time limit.

If such written notice is filed, the parties shall meet for the purpose of selecting an arbitrator from a list of seven (7) arbitrators furnished by the Employee Relations Board, within seven (7) calendar days following receipt of said list.

Arbitration of a grievance hereunder shall be limited to the issues raised in the formal grievance as originally filed by the Union to the extent that said grievance has not been satisfactorily resolved.  The proceedings shall be conducted in accordance with applicable rules and procedures adopted or specified by the Employee Relations Board, unless the parties hereto agree to other rules or procedures for the conduct of such arbitration.  The fees and expenses of the arbitrator shall be shared equally by the parties involved, it being understood that all other expenses including, but not limited to, fees for witnesses, copies of transcripts,

-11-

and similar costs incurred by the parties during such arbitration, will be the responsibility of the individual incurring same.  The determination of an arbitrator resulting from any arbitration of a grievance hereunder shall not add to, subtract from, or otherwise modify the terms and conditions of this MOU and shall be binding on the parties.

**Individual Procedure**

The Grievance Procedure for employees covered by this MOU who are not represented by the Union in the filing of their grievance shall be as follows:

Initial Step - Informal Discussion

The grievant shall discuss the grievance with the employee's immediate supervisor on an informal basis in an effort to resolve the grievance.  It is the responsibility of the grievant to indicate that the subject of the discussion is a grievance.  Said grievance shall be considered waived if not so presented to the immediate supervisor within fourteen (14) calendar days from the date of the occurrence upon which the grievance is based or fourteen (14) calendar days following the date when the grievant should have reasonably been aware of the occurrence of the grievance.

The immediate supervisor shall respond within fourteen (14) calendar days following the meeting with the grievant.  Failure of the immediate supervisor to respond within such time limit shall entitle the grievant to process the grievance to the first level of review within the time limits prescribed in Step 1.

Step 1 - First Level of Review

If the grievance is not settled at the initial step, the grievant may serve written notice of the grievance, on a form to be provided by the Department, upon the Labor Relations Office within fourteen (14) calendar days of receipt of the grievance response or the expiration of time limits if no response is received at the initial step.  Failure of the grievant to serve such written notice shall constitute a waiver of the grievance.

If such written notice is served, the person designated by Management to review the grievance at Step 1 shall meet with the grievant, and a written decision shall be rendered to the grievant within twenty-one (21) calendar days from the date of service.  Failure of Management to respond within such time limit shall entitle the grievant to process the grievance to the second level of review, within the time limits prescribed in Step 2.

Step 2 - Second Level of Review

If the grievance is not settled at Step 1, the grievant may file an appeal with the Labor Relations Office on the form provided by the Department within fourteen (14) calendar days of receipt of the Step 1 grievance response or the expiration of time limits if no response is received. Failure of the grievant to serve such written notice shall constitute a waiver of the grievance.

If such written notice is served, the person designated by Management to review the grievance at Step 2 shall meet with the grievant within twenty-one (21) calendar days of the date of service. A written decision shall be rendered to the grievant within twenty-eight (28) calendar days of the date of service. Failure of Management to respond within such time limit shall entitle the grievant to process the grievance to the third level of review, within the time limits prescribed in Step 3.

Step 3 - General Manager's Review (Third Level of Review)

If the grievance is not settled at Step 2, then the grievant may file an appeal with the Labor Relations Office on the form provided by the Department within fourteen (14) calendar days following receipt of the grievance response or expiration of time limits if no response is received at Step 2. Upon request, the time limits will be automatically extended to twenty-one (21) calendar days. Failure of the grievant to serve such written notice or make such request shall constitute a waiver of the grievance.

If such notice is served, the grievance shall be heard by the General Manager or a designated representative within twenty-one (21) calendar days from the date of such notice. Upon request, the time limits will automatically be extended to thirty-five (35) calendar days. The General Manager or the designated representative will afford the party(s) an opportunity to present oral and/or written arguments on the merits of the grievance. The General Manager or the designated representative shall render to the grievant, a written decision within twenty-one (21) calendar days from the date said arguments were submitted. Upon request, the time limits will automatically be extended to thirty-five (35) calendar days.

Step 4 - Board of Water and Power Commissioners' Review

In the event a grievant is not satisfied with the written decision of the General Manager or the designated representative, then said grievant may seek review by the Board of Water and Power Commissioners (Board). The grievant must serve upon the Labor Relations Office a written notice of appeal on the form provided by the Department within seven (7) calendar days following receipt of the grievance decision in Step 3. Failure of the grievant to file such appeal shall constitute a waiver of the grievance.

If such notice is served, the Board shall afford both parties an opportunity to present oral and/or written arguments on the issues of the grievance that have not been satisfactorily resolved.  It is the intent of the Board to render a decision within thirty-five (35) calendar days from the day said arguments were concluded.

The foregoing Article is intended to replace Section 8.2 of the Working Rules for all employees covered by this MOU.

## ARTICLE 6

### MANAGEMENT RIGHTS

Responsibility for Management of the Department and direction of its work force is vested in the Board of Water and Power Commissioners and the General Manager, whose powers and duties are specified by law.  In order to fulfill this responsibility, it is the exclusive right of Department Management to determine its mission, to set standards of service to be offered to the public and to exercise control and discretion over the Department's organization, staffing, assignment of work and workload, scheduling requirements and operations.  It is also the exclusive right of Department Management to take disciplinary action for proper cause, to relieve Department employees from duty because of lack of work or other legitimate reasons, to determine the methods, means and personnel by which the Department's operations are to be conducted and to take all necessary action to maintain uninterrupted service to its customers and carry out its mission in emergencies; provided, however, that the exercise of these rights does not preclude employees or their representatives from consulting or raising grievances about the practical consequences these decisions have had on wages, hours and other terms and conditions of employment.

## ARTICLE 7

### UNION RIGHTS

The Union is the exclusive representative of all employees as set forth in Article 2 in matters concerning wages, hours, or other working conditions.

The Union shall be notified and shall be permitted to participate in meetings between the Department and any employee or group of employees when changes in the terms and conditions of this MOU are being considered.

In the event an employee elects self-representation in a grievance, the Union shall be notified of the grievance and shall be privy to written material submitted as a part of the

grievance.  The Union shall be permitted to be present at all meetings between the Department and the grievant(s) to be sure that the terms and conditions of this MOU are complied with.

# ARTICLE 8

## UNION ACTIVITY

### 8.1 - Access of Union Staff Representatives

Full-time Union Staff representatives shall have access to work locations during working hours for the purpose of assisting employees covered under this MOU.

Such access shall be authorized for the purpose of consulting with Union shop stewards, investigating grievances or complaints, observing working conditions, and posting bulletins.  Said representatives shall receive access authorization from the designated Management representative at the location involved. If working conditions make it impractical to permit access, the designated Management representative shall inform the Union representative(s) when that access can be authorized.

The Union shall provide the Labor Relations Office of the Department with a list of authorized staff representatives, which list shall be kept current by the Union.

The Labor Relations Office shall provide the Union with a list of designated Management representatives' telephone numbers.

The Union may use Department facilities on prior approval, subject to the provisions of this Article, for the purpose of holding meetings to the extent that such facilities are available, and to the extent that such use of the facility will not interfere with normal Departmental operations.  Participating employees will attend said meetings on their own time.

Approval for use of the facility may be granted by mutual agreement between a staff representative of the Union and the individual who has control of the facility.  If an agreement is not reached, the Union representative may appeal to the appropriate Assistant General Manager.  Article 5 (Grievance Procedure) shall not be applicable to this paragraph of the MOU.

It is understood that if the use of a facility normally requires a fee for rental or special setup, security, and/or cleanup service, the Union will provide or assume the cost of such service(s) or facility.

8.2 - Shop Stewards

The Union shall have the right to appoint shop steward(s) at each work location.  If the Union desires to appoint additional shop stewards, it shall notify the Department of the name(s) of the shop steward(s) and the location(s) where the shop steward(s) will serve.  The locations of such additional shop stewards shall require mutual agreement between the parties.

8.2(1)

Shop stewards shall request of their supervisor and be given reasonable time during work hours to investigate and process specified grievances and to attend grievance meetings.

8.2(2)

Shop stewards shall request of their supervisor and be given reasonable time during work hours to investigate other specified complaints arising out of the interpretation or application of this MOU in order to more effectively resolve problems that could become grievances.

8.2(3)

The shop steward shall be permitted to be present at all counseling sessions, which could result in disciplinary action when requested by an employee.  If a shop steward's presence is requested by the employee, the meeting will not be conducted until the shop steward is present.

8.2(4)

The shop steward shall be permitted to be present at any meeting in which any disciplinary action is to be taken, unless the employee requests that the shop steward not be present.  If a shop steward's presence is requested by the employee, the meeting will not be conducted until the shop steward is present.

8.2(5)

In speaking to employees on the job, the shop steward, on entering a work location, shall inform the supervisor of the steward's desire to talk to an employee or group of employees concerning a specified complaint or grievance. Permission to leave the job will be granted promptly to the employee(s) involved unless such absence would cause an undue interruption of work.  When permission is requested in order to process a grievance, denial of permission to speak to employees, or perform any of the other duties of the shop steward shall automatically constitute an extension of the limits of the Grievance Procedure, equal to the amount of the delay.  If the employee(s) cannot be made available, the

shop steward shall be immediately informed when the employee(s) will be made available.

## 8.3 - Leaves of Absence

It is recognized that the granting of leaves of absence are subject to Civil Service Rules and policies. It is therefore agreed that to the extent possible, the Department shall grant and recommend for Civil Service approval, leaves of absence for no more than five (5) employees in this Unit. It is understood that these employees should be hired by the recognized employee organization certified to represent the employees in this Unit on a full-time basis. Such leaves of absence may be for periods of up to one year, but in no event shall the Department recommend for any one employee an accumulation of more than three (3) years continuous leaves of absence. In order to be eligible, an employee must have completed three (3) years of continuous service with the Department.

Employees, upon returning from such a leave of absence, shall be entitled to return to their former classification and salary range in accordance with Civil Service Rules and policies.

Employees on such a leave of absence shall be permitted to maintain membership in an existing health care plan, and/or a dental plan, if any, on condition that said employees pay the full cost of said plan(s).

## 8.4 - Paid Time Off for Negotiating Committee Members

The negotiations of successor MOUs are recognized as a part of the employee's rights under prevailing statutes and ordinances. For this reason, the Department shall provide necessary time off during regular working hours without loss of pay or other benefits to employees who are designated by the Union to be part of a negotiating committee. The number of employees granted such time off shall be based on a ratio of one for each one hundred (100) employees in the representation unit, provided that the number shall not be less than two (2) nor more than seven (7). Subject to the operating needs of the section, an employee on the negotiating committee may be assigned to a five-and-two-day shift during negotiations or may receive a work-hour change to attend individual bargaining sessions provided agreement is made to such change without notice or penalty.

## 8.5 - Dues Deduction

The Department hereby agrees to deduct the dues and/or other fees set forth below only on behalf of the exclusive representative designated in Article 2.

Upon receipt of a dues deduction authorization agreement from an employee, the Department agrees to deduct from the wages of an employee within the Unit, the dues in the amount set forth in the

schedule on file with the Department.  Such dues deductions shall be subject to the provisions of the authorization agreement, which has been agreed to by the parties.  The Department agrees to continue its policy of submitting to the Union a monthly listing of dues-paying employees.  The Department further agrees to remit the amounts so deducted directly to the Union.

Notwithstanding any provisions of this MOU that may conflict:

> Employees' requests to cancel their dues withholding authorization agreement shall be processed by the Department to be effective on the ending of the first complete pay period following April 1 of each calendar year.

> Employees in this Unit who occupy positions, which are designated confidential, may rescind their dues deduction authorization agreements at any time after such designation occurs.

> The Union agrees to indemnify and hold harmless the Department and the City against all claims, including costs of suits and reasonable attorneys' fees and/or other forms of liability arising from the implementation of the provisions of this Section (8.5).

8.6 – Agency Shop

The following Agency Shop provisions shall apply to all permanent employees of this Unit.

> 8.6(A) – Dues/Fees

>> 8.6(A)(1)(a)

>> Permanent employees* in this unit (who are not on leave of absence) shall, as a condition of continued employment, become members of the certified representative of this Unit, or pay the Union a service fee in an amount not to exceed periodic dues and general assessments of the Union for the term of this MOU, or a period of three (3) years from the operative date of this article, whichever comes first.  Such amounts shall be determined by the Union and implemented by the Department in the first payroll period,  which starts 30 days after written notice of the new amount is received by the Department.

>> (*Permanent employees are defined as those who have completed six continuous months of City service from their original date of appointment and who are members of the Department of Water and

-18-

Power Employees' Retirement, Disability and Death Benefit Insurance Plan.)

8.6(A)(1)(b)

Notwithstanding any provisions of Article 2, Section 4.203 of the Los Angeles Administrative Code to the contrary, during the term of this MOU, payroll deductions requested by employees in this Unit for the purpose of becoming a member and/or to obtain benefits offered by a qualified organization other than Local 18, will not be accepted by the Department. For the purpose of this provision, qualified organization means any organization of employees whose responsibility or goal is to represent employees in the Department's meet and confer process.

8.6(A)(2)

The Department and the Union shall jointly notify all members of the representation unit that they are required to pay dues or a service fee as a condition of continued employment, and that such amounts will be automatically deducted from their paychecks. The religious exclusion will also be explained. The cost of this communication and the responsibility for its distribution shall be borne by the Department.

8.6(A)(3)

The provisions of this Article are inapplicable to those Department employees who are permanently assigned to work locations in Nevada and who are residents of the State of Nevada.

8.6(B) - Exceptions

8.6(B)(1) - Management or Confidential Employees

In accordance with Section 3502.5(c) of the Government Code, the provisions of this Article shall not apply to management or confidential employees.

8.6(B)(1)(a)

Management and confidential employees shall be as defined in Section 4.801 and designated in accordance with Section 4.830D of the Los Angeles Administrative Code.

<u>8.6(B)(1)(b)</u>

*Language moved to Article 23 (2008)*

<u>8.6(B)(2) - Religious Objections</u>

Any employee who is a member of a bona fide religion, body, or sect, which has historically held conscientious objections to joining or financially supporting public employee organizations shall not be required to join or financially support the organization.  Such employees shall, in lieu of periodic dues or agency shop fees, pay sums equal to said amounts to a non-religious, non-labor charitable fund exempt from taxation under Section 501(c)(3) of the Internal Revenue Code, which has been selected by the employee from a list of such funds designated by the parties hereto in a separate agreement.  Such payments shall be made by payroll deduction as a condition of continued exemption from the requirements of financial support to the Union and as a condition of continued employment.

<u>8.6(C) - Management Responsibilities</u>

<u>8.6(C)(1)</u>

The Department shall cause the amount of the dues or service fee to be deducted monthly from the payroll checks of each employee in this unit as specified by the Union under the terms contained herein.  "Dues" as distinct from "service fee" shall be the result of voluntary consent in the form of a payroll deduction card signed by the individual employee.

<u>8.6(C)(1)(a)</u>

Remittance of the aggregate amount of all dues, fees and other proper deductions made from the salaries of employees hereunder shall be made to the Union by the Department within thirty (30) working days after the conclusion of the month in which said dues, fees and/or deductions were deducted.

<u>8.6(C)(2)</u>

The Department shall also apply this provision to every permanent employee who, following the operative date of this article, becomes a member of this representation unit within sixty (60) calendar days of such reassignment or transfer.  Such deduction shall be a condition of continued employment.

8.6(C)(3)

Management will provide the Union with the name, home address, and employee number of each permanent employee.

8.6(C)(4)

The Department shall notify the organization within sixty (60) calendar days of any employee who, because of a change in employment status, is no longer a member of the representation unit or subject to the provisions of this article.

8.6(D) - Union Responsibilities

8.6(D)(1)

The Union shall keep an adequate itemized record of its financial transactions and shall, by March 1 of each year, make available to the City Clerk, the Department and to all Unit employees, a detailed written financial report for the fiscal year ending the preceding December 31 in the form of a balance sheet and an operating statement, certified as to its accuracy by its president and the treasurer or corresponding principal officer, or by a certified public accountant.

8.6(D)(2)

The Union certifies to the Department that it has adopted, implemented and will maintain procedures in accordance with the decision of the United States Supreme Court in Chicago Teachers Union, Local No. 1, AFT, AFL-CIO, et al. v. Hudson, 106 S. Ct. 1066 (1986), and any other applicable legal authority.

8.6(D)(3)

The Union agrees to indemnify and hold harmless the Department for any loss or damage arising from the operation of this Article.  It is also agreed that neither any employee nor the Union shall have any claim against the Department for any deductions made or not made, as the case may be, unless a claim of error is made in writing to the Department within thirty (30) calendar days after the date such deductions were or should have been made.

8.6(E) - Rescission

The agency shop provisions herein may be rescinded in accordance with the procedures contained in Rule 12 of the Employee Relations Board adopted January 11, 1982.

In the event that this Article is overturned by the employees in this representation unit, all other articles of the MOU shall remain in full force and the prior agreement, rules, regulations and past practices relating to organizational dues deductions authorizations shall be reinstated until a successor MOU or amendment shall have been approved.

8.7 – Bulletin Boards

8.7(1)

The Department agrees to provide bulletin boards, or to assign adequate space on existing bulletin boards, to be used by the Union for the purpose of posting:

    a.    Notices of Union meetings.

    b.    Notices of Union elections and their results.

    c.    Notices of official Union business.

    d.    Notices of Union recreational and social events.

    e.    Any other written material, which has received the prior oral or written approval of the Department by the Director of Labor Relations or a designated representative.

8.7(2)

In the John Ferraro Building (JFB), bulletin board space shall be on the "A" level and at designated rest areas.

In all other permanent locations where members of the Unit are employed, a minimum of 20 inches by 24 inches of bulletin board space shall be provided for Union use.

8.7(3)

In the event that the Union raises an objection as to the adequacy of bulletin board space, the Department agrees to meet and confer with the Union to attempt to rectify the situation.  If a dispute arises over the issue of bulletin board space or material, which the Union wishes to place on the boards, such a dispute may be resolved through the normal Grievance Procedure.

8.7(4)

A copy of all material to be posted shall be delivered to the Director of Labor Relations.  A specified date for removal shall be affixed to any material posted in accordance with this Article.

# ARTICLE 9

## OVERTIME

9.1(a) - Definition of Overtime

Overtime is hereby defined as:

9.1(a)(1)

The time worked outside of the normal work schedule of the employee;

9.1(a)(2)

The time worked on holidays or holiday equivalents outside of the normal work schedule of the employee;

9.1(a)(3)

The time worked continuously within the employee's normal workday when eight (8) hours of overtime have been worked continuously immediately preceding the commencement of the normal workday, provided that one (1) hour or less off duty immediately preceding the commencement of the normal workday and time off duty for meal periods as provided in Article 12 and Article 18.2 shall not be considered as interruptions of continuous work; however, such off duty time shall not be reported or considered as time worked unless authorized elsewhere in this MOU; and

9.1(a)(4)

The time worked within that portion of the employee's normal workday when a change of normal shift allows less than eight (8) consecutive hours off duty between normal shifts as provided in Article 13(d). This overtime shall terminate when eight (8) hours have elapsed since the end of the preceding normal workday.

9.1(a)(5)

Scheduled overtime is any overtime other than a holdover or a call out.

<u>9.1(b) - Authorization, Recording and Reporting of Overtime</u>

<u>9.1(b)(1)</u>

Any overtime work shall be approved in accordance with such procedures as shall be prescribed by the General Manager; but in no event shall employees be deprived of pay for overtime work actually performed under direction of their supervisor.  The authorization of any overtime shall be predicated entirely upon the operating needs of the Department, and the procedure prescribed by the General Manager shall be designed to eliminate excessive or unnecessary use of overtime.

<u>9.1(b)(2)</u>

Overtime worked shall be reported and recorded to the closest one-tenth (1/10) hour.

<u>9.1(c) - Definition of Day</u>

With respect to this Article 9.1, a day shall be deemed to be from 12:01 A.M. to 12:00 midnight.

A normal shift shall be considered, for timekeeping and pay purposes, to fall within the day in which it commences. Except that shifts that begin at 10:00 P.M. or later shall be deemed to fall within the day in which the shift terminates for timekeeping and pay purposes.  (Also in Article 13.)

<u>9.1(d) - Overtime for Hourly and Daily-Rate Temporary</u>
<u>          Construction Positions</u>

When the Board so provides on the Duties Description Record, employees to whom an hourly or daily rate is applicable shall be compensated for authorized overtime in accordance with provisions as set forth on such Duties Description Record.

The parties expressly intend that nothing in this MOU be interpreted or construed as authorizing hourly or daily-rate employees to accumulate overtime.

<u>9.1 (e) – Overtime, Overtime Accumulation, and Overtime Use</u>
<u>     for Annual-Rated Employees</u>

Except as otherwise expressly provided for, employees to whom an annual rate is applicable shall be compensated for authorized overtime in accordance with the following provisions:

9.1(e)(1)

Except as provided in Article 9.1(e) (3) and the first paragraph of Article 9.1(e) (6), below, employees in this Unit shall be paid for each hour of overtime worked on Sundays (or Sunday equivalents) and holidays (or holiday equivalents), for each hour worked continuously after eight (8) hours of overtime have been worked continuously, and for each hour worked continuously after sixteen (16) hours have been worked continuously, at the double-time rate which shall be computed by dividing the appropriate annual rate by 1044; and shall be paid for each hour of all other overtime worked at the time and one-half rate which shall be computed by dividing the appropriate annual rate by 1392.

9.1(e)(2)

Double time shall be the maximum rate applied to any hour of overtime worked.

9.1(e)(3)

Except as provided in the first paragraph of Article 9.1(e) (6) below, continuous-operation, shift and cumulative-hour employees in this Unit who are required to work within the hours of their normal workdays on holidays or holiday equivalents as part of their normal work schedule shall, in addition to the pay provided in Article 15 (c)(2)(bb), be paid for each such hour so worked at the time and one-half rate to a maximum of eight (8) hours, and for each hour worked on such days outside of the hours of their normal workday shall be paid at the double-time rate.

9.1(e)(4)

Continuous-operation and shift employees in this Unit who are required to work three eight-hour scheduled shifts, at the straight time rate of pay, within a forty-hour period for the convenience of the Department shall, in addition to the applicable rate of pay, be credited for an additional one-half hour of pay for each hour so worked during the third scheduled shift, based on the straight-time rate.

9.1(e)(5)

When an employee receives insufficient notice of a schedule change and is paid a penalty payment in addition to straight-time pay for the first 8 hours worked of such change, and when such employee is then held over at the end of that first 8-hour shift, the

employee shall be paid for such holdover in accordance with Paragraph 9.1(e)(1).

9.1(e)(6)

Employees in this Unit may elect, at the time overtime work is performed, to be compensated in accumulated overtime credits for such work. An employee so electing shall be compensated for each hour of authorized overtime worked at the time and one-half rate. An employee who does not so elect shall automatically be compensated in money for authorized overtime.

Any employee working authorized overtime hours to which the double-time rate applies shall be paid at the double-time rate unless that employee elects, at the time the work is performed, to accumulate overtime credits, in which case overtime credits shall be accrued at the rate of one and one-half hours for each hour worked.

Employees in this Unit who accrue accumulated overtime shall be entitled to accrue no more than 240 hours of overtime. All overtime approved and worked in excess of 240 accrued hours shall be paid in cash. It is the understanding of the parties that such accrued hours include both hours accrued under the provisions of the MOU and under the provisions of the Fair Labor Standards Act.

Employees in this Unit who, at the time of this Amendment, have accrued in excess of 240 hours shall promptly be paid for all such excess hours following approval of this Amendment.

Unused accumulated overtime credits, whether earned pursuant hereto or previously earned under the Working Rules may, with supervisor approval, be compensated as provided in sub-parts (a) through (d) below:

    (a)   For personal reasons, in any amount, with the approval of supervision.

    (b)

          (1)   During the time that employees are absent on account of illness or injury, the employee may be paid the difference between their net salary and the disability benefit to which the employee may be entitled under the Water and Power Employees' Retirement Disability and Death Benefit Plan, or under Workers' Compensation Laws:  and there shall be charged against their overtime credit the number of hours calculated to

the nearest one-tenth (1/10) of an hour, required to account for the payment of such difference;

(2)    For recuperation or rest;

(3)    For any purpose which the Board may approve upon recommendation of the General Manager in each individual case;

(c)    Immediately prior to retirement, employees may elect to be compensated in paid time off or cash or any combination thereof for all unused accrued overtime hours.

(d)    At the time of their separation from the Department for any reason, e.g., death, transfer, resignation, retirement, or termination, employees in this Unit shall be paid promptly for all unused accumulated overtime hours at the hourly rate of their then-current salary.

In cases of separation due to death, the payment shall be paid to the heirs.

(e)    Management shall not unreasonably withhold permission in granting requests for the use of accumulated overtime, and should deny or modify such requests only, when undue hardship to the Department can be shown.

9.1(f)

When employees have worked sixteen (16) hours or more, exclusive of travel time, during the period of twenty-four (24) consecutive hours immediately prior to the regular shift, the supervisor shall determine, subject to the provisions of paragraph 9.1(b)(1), whether or not the employees shall work during the regularly scheduled hours of their next succeeding normal workday, unless eight (8) consecutive hours off duty shall have elapsed during the prior twenty-four (24) consecutive hours; however, where eight (8) consecutive hours off duty shall not have so elapsed, such employees shall not be required to work during such normal workday unless their services are required in connection with emergency work of the Department.

9.1(g)

When employees, subject to paragraph 9.1(f) above, are not required to work during all or part of the hours of their next succeeding normal workday, the employees shall be paid

for such regularly scheduled hours at the straight-time rate.

When eight (8) consecutive hours off duty shall not have elapsed as provided in paragraph 9.1(f), and the operating needs of the Department require such employees to return to duty or continue on duty at the start of their regular shift, such regular shift hours not otherwise defined as overtime as found in paragraph 9.1(a), such employees shall be paid at a premium rate, equal to the straight-time hourly rate plus an amount equal to one-half the straight-time hourly rate, for such hours of their regular shift which when added together with time off duty immediately prior to the start of their regular shift will equal eight (8) hours. At the conclusion of such 8.0 hour period, the employees will be paid at the straight-time hourly rate for the remainder of their regular shift.  Should there be no time off duty immediately prior to the start of their regular shift, the premium rate will continue throughout the eight (8) hour regular shift.

9.2 - Scheduled Overtime Cancellation

When scheduled overtime, other than a continuation of the regular workday, is cancelled less than eight (8) hours prior to the time the scheduled overtime is to start, the employee shall receive a penalty payment equivalent to two (2) hours at the applicable overtime rate.

9.3 - Call Out

9.3(a)

A call out is a communication to an employee who is off duty directing the employee to report for overtime work.

Employees in this Unit who are called out shall receive a minimum of two (2) hours pay at the double-time rate.

For those employees who are called out and directed to immediately report for overtime work, paid time is to start from the time the call is received.  Additional calls received within the two-hour minimum period shall not establish an additional minimum period of double time.

Hours worked after the two-hour minimum shall continue to be paid at the double-time rate until the start of the employee's regularly scheduled hours.  Should the two-hour minimum overlap into an employee's regularly scheduled work hours, the straight-time pay for the regularly scheduled hours shall commence after the close of the two-hour minimum period.

A communication received by an employee who is off duty, to report for overtime work twenty-four (24) hours or more from the time the communication is received, shall not be considered a "Call Out."

9.3(b)

The provisions of Article 9.3(a) shall not apply to cumulative-hour employees.

9.4 - Restrictions on Overtime

9.4(a)

Overtime shall be divided as equally as possible among those persons available for work in the same position at the same location or reporting to the same immediate supervisor.

(The election of location or immediate supervisor will be solely at the discretion of management and unless the parties agree otherwise shall be for periods of at least one calendar year.)

9.4(b)

Overtime assignments shall be made to the employees in the classification that normally performs the work.

9.4(c)

The Department shall have a policy of offering overtime to those persons with the least amount of accumulated overtime first, except in emergencies or call outs.  Persons with the least amount of accumulated overtime are those within 40 hours of the lowest accumulated total on the Accumulative Overtime Log (A.O.T.L.).

9.4(d)

An overtime log, called "Accumulative Overtime Log" (A.O.T.L.), shall be kept and adhered to as follows:

9.4(d)(1)

The amount of overtime, excluding call outs, worked by the employee each calendar year, shall be entered in the A.O.T.L. by the local supervisor at each station. (For this purpose, "calendar year" coincides with the calendar year as used for reporting employees' withholding to the Internal Revenue Service.)

<u>9.4(d)(2)</u>

This A.O.T.L. shall not show holiday hours.  It shall show overtime hours worked, excluding call out, outside of the normal working shift.

<u>9.4(d)(3)</u>

All overtime hours worked except call outs shall be entered in the A.O.T.L. as the number of hours paid.

<u>9.4(d)(4)</u>

The current A.O.T.L. shall be easily available for inspection at all times.  Audited copies will be posted monthly on bulletin boards.

<u>9.4(d)(5)</u>

All overtime declined except call outs shall be entered in the A.O.T.L. toward the accumulated overtime total.

<u>9.4(d)(6)</u>

Employees returning from leave of absence, temporary or emergency appointment, disability, or vacation of more than thirty (30) days and any qualified new employee shall receive an overtime total equivalent to the average of all employees on their A.O.T.L.

<u>9.5 - Disturbance Calls</u>

Whenever an employee is contacted by the Department, while on off-duty status, to furnish information needed to maintain the continuity of Department business, without the necessity of having to personally report for duty, such employee shall receive compensation at the rate of one hour at the appropriate overtime rate for each instance.

# ARTICLE 10

## ABSENCE FROM DUTY

Except as otherwise expressly provided by the Board, all employees shall be allowed to be absent from duty with pay under the circumstances and to the extent indicated in the following:

<u>10(a)(1)</u>

While on vacation as provided in Article 15.1 hereof.

10(a)(2)

For the purpose of voting at the polls or casting an absentee ballot in any election referred to in this paragraph, to the extent that there is not sufficient time outside of Department working hours for such purposes, provided that such allowance when necessary, shall not be for more than:

10(a)(2)(aa)

Two (2) hours for any election held in the State of California.

10(a)(2)(bb)

The time allowed by the statutes of the State of Nevada for elections held in that state; provided that this section shall not be construed as prohibiting the allowing of additional time off without pay when necessary for such purposes; and provided further that no absence from duty, with or without pay, shall be allowed therefor when voting time outside of Department working hours is sufficient for such purposes.

10(a)(3)

For the amount of time required to file for or take examinations given by the Personnel Department of the City of Los Angeles for classes to which positions in the Department are allocated and examinations for certificates or licenses required as prerequisites to take such Civil Service examinations and for the time required incidental to the filing and hearing of protests in connection with all such examinations, provided proper arrangements are made with the immediate supervisor, and provided further that any continuous absence from work for this purpose of more than eight (8) hours, or cumulatively more than eighteen (18) hours in any calendar year, may be allowed only with the approval of the General Manager.

10(a)(4)

For the amount of time required to make application for, or take examinations for certificates or licenses, which the Department requires of employees subsequent to appointment, and to renew all required certificates or licenses, provided proper arrangements are made with the immediate supervisor.

10(a)(5)

For the amount of time required for interviews and examinations in connection with prospective service in the

armed forces of the United States; provided proper arrangements are made with the immediate supervisor.

10(b)(1) - Additional Absence with Pay

In addition to the holidays provided for in Article 15 and the absences with pay hereinabove in this Article 10 provided for, each employee to whom an annual rate is applicable, who shall have completed the period of continuous service which is required for membership in the Water and Power Employees' Retirement, Disability and Death Benefit Plan, may, with the approval of the appropriate supervisor, be allowed to be absent from duty with pay to a cumulative maximum of forty (40) hours, reported through prescribed procedure, in any calendar year under the following circumstances:

10(b)(1)(aa)

For personal reasons, provided that adequate arrangements can be made to take care of the employee's duties without undue interference with the normal routine of work, an employee shall be allowed to be absent if the appropriate supervisor is notified three (3) calendar days prior to the absence.

Where an unforeseeable event occurs, the three-day notice provision may be waived.

Time off under the terms of this Article shall be with the approval of the immediate supervisor and shall not be denied for any reason other than operating needs.

An employee may take time off under this Article in any increment they request.  However, when such a request would result in the employee working less than two (2) hours of their shift, the employee must request the entire day off.

10(b)(1)(bb)

Employees shall be paid for up to forty (40) hours of unused time off under the provisions of Article 10(b)(2).

Employees shall be paid at their current rate for any unused personal time remaining at the end of the last payroll period prior to the end of each calendar year. Payment for such unused time shall be made in an expeditious manner.

<u>10(b)(2) - Jury Duty</u>

    <u>10(b)(2)(aa)</u>

    Employees to whom an annual rate is applicable, who are required to attend, or to attend and serve, as juror in any state where they are assigned by the Department shall be allowed to be absent from duty for the period of time necessary for such attendance or for such attendance and service.  Each such absence shall be with pay less an amount equal to the per diem to which the employee is entitled by law for such attendance or for such attendance and service.  The General Manager shall prescribe the procedures for reporting and verifying such attendance, service and per diem.

    <u>10(b)(2)(bb)</u>

    Employees to whom an annual rate is applicable, who are required to appear for examination to determine their qualifications for jury duty, shall be allowed to be absent from duty with pay for the period of time necessary for such examination provided such examination cannot be taken during non-working hours or on a normal day off.

<u>10(c) - Absences With Pay Applicable to Employees Paid by the Day or Hour</u>

Employees paid on the basis of daily or hourly rates shall be allowed no absences with pay other than the Christmas holiday provided in Article 15 and the absences with pay provided in subsection (a) of this section.

<u>10(d) - Absences Without Pay</u>

Any employee shall be allowed to be absent from duty without pay:

    <u>10(d)(1)</u>

    During the course of any disability.

    <u>10(d)(2)</u>

    During the course of any military leave, as provided in Section 1023 of the Charter of the City of Los Angeles and the Military and Veterans Code of the State of California.

    <u>10(d)(3)</u>

    To take advantage of any educational benefits of the State or Federal Government offered as a veteran of the Armed Forces.

<u>10(d)(4)</u>

For special assignment to other governmental agencies and for other urgent or substantial personal reasons, provided that in the judgment of the General Manager, adequate arrangements can be made to take care of the employee's duties without undue interference with the normal routine of work.

<u>10(d)(5)</u>

For a period of up to four consecutive months following either the birth of a child or the placement in the employee's home of an adopted child.  This leave shall supplement pregnancy-related disability leave, if any.  However, a family leave shall terminate no later than six months after the birth of a child or the placement in the home of an adopted child.  Upon return from such leave, the employee shall be returned to the same classification and pay step occupied prior to taking the leave.  This subsection shall be limited to natural parents, adoptive parents or legal guardians and shall apply only to annual-rated full-time employees.

<u>10(e) - Disability Benefits</u>

The work conditions with respect to absence necessitated by disability are predicated upon the benefits for temporary disability to which employees are entitled under the Department of Water and Power Employees' Retirement, Disability and Death Benefit Insurance Plan and the State Workers' Compensation laws.

<u>10(f) - Authorized Absences</u>

No employees shall be absent from duty during their regular working hours except when properly authorized to do so, in accordance with this MOU, the Rules and Regulations of this Department and of the Board of Civil Service Commissioners.

<u>10(g) - Unauthorized Absences</u>

Absence from duty in violation of this MOU, the Rules and Regulations of this Department or of the Board of Civil Service Commissioners shall be sufficient cause for disciplinary action, up to and including discharge.

# ARTICLE 11

## <u>REST PERIODS</u>

Each employee, other than those employees whose lunch period is credited as time worked, shall be granted a minimum of fifteen (15) minutes rest period in each four-hour period,

provided, however, that no such rest period shall be taken during the first or last hour of any employee's working day nor in excess of fifteen (15) minutes without the express consent of the designated supervisor.  The restriction on the first or last hour shall not apply to field crews when waived by the immediate supervisor.  Management reserves the right to suspend the rest period or any portion thereof during an emergency.  Any rest period so suspended or not taken at the time permitted shall not be accumulated or carried over from one day to any subsequent day, or compensated for in any form.

The taking of rest periods by continuous-operation or shift employees is declared to be a privilege and not a right.

# ARTICLE 12

## LUNCH PERIODS

12(a)

A minimum of thirty (30) minutes and a maximum of one hour shall be scheduled each normal workday as a lunch period, which shall commence not earlier than three (3) hours nor later than five (5) hours after the scheduled time for reporting.  The lunch period shall not be credited as time worked, provided that continuous-operation and shift employees who are scheduled to perform eight (8) consecutive hours shall be permitted to eat one meal for which a maximum of thirty (30) minutes shall be allowed during working hours without any deduction being made therefor.

12(b)

It is recognized that for those employees whose lunch period is not credited as time worked pursuant to paragraph 12(a) above but who remain on the job site, certain restrictions on the free time activities of such employees may be necessary.  Such restrictions would relate to, but not be limited by, considerations for public safety, job safety and the maintenance of a favorable public image for the Department.

# ARTICLE 13

## HOURS OF WORK AND WORK SCHEDULES

13(a) - Working Hours

Except as otherwise expressly provided by the Board, forty (40) hours shall constitute a week's work for every full-time employee.  Any employee who is regularly scheduled to work fewer than these required hours shall be paid on a part-time basis. The regular working hours shall be so scheduled that the greatest number of employees possible shall work from Monday to Friday,

inclusive, with Saturdays, Sundays and holidays off, with the
time of reporting for work not earlier than 6:00 A.M., and the
time of ending work not later than 6:00 P.M.; provided that the
General Manager shall establish such other work schedules as may
be necessitated by the Department.

13(b) - Regular Working Day

Except as otherwise expressly provided herein, or as set forth in
resolutions creating specific positions, a minimum of eight (8)
hours of actual attendance on duty shall constitute a day's work
and a minimum of forty (40) hours shall constitute a week's work
for every full-time employee.  Any employee who works fewer than
these required hours per week shall be paid on a part-time basis,
account being taken, however, of duly authorized absences with
pay.

13(c) - Normal Workday for Non-shift Employees

    13(c)(1)

    Except as provided herein, a normal workday for full-time
    employees, other than continuous-operation, shift or
    cumulative-hour employees, shall consist of eight (8) hours
    of work, scheduled to be performed within a period of not
    more than nine (9) consecutive hours, commencing with the
    scheduled time of reporting for duty.

    13(c)(2)

    A workday other than that provided above shall be applicable
    to employees in daily-rate positions, when said employees
    are performing work on more than one (1) shift, and the
    Board expressly fixes a different workday for any specified
    shift, by a provision incorporated on the Duties Description
    Record for such positions.

    Employees in positions to which a daily rate is applicable
    shall not be deemed to be shift employees for the purposes
    of any other provisions of the Position Evaluation and
    Compensation Plan.

13(d) - Normal Workday for Continuous-Operation and Shift
      Employees

When the Department must provide for an operation, service or
other activity on Saturdays, Sundays or holidays, or for
sixteen (16) consecutive hours or more in a period of twenty-
four (24) consecutive hours, employees assigned to perform such
operation, service or other activity during their schedule of
normal workdays shall be known as:

    (1) continuous-operation employees, and as

(2) shift employees if they are scheduled to start their normal shift at or after 2:00 P.M. but before 4:00 A.M.

A normal workday for continuous-operation and shift employees shall consist of eight (8) hours of work, scheduled to be performed within a period of not less than eight (8) consecutive hours nor more than nine (9) consecutive hours, provided that, whenever possible, a minimum of eight (8) consecutive hours shall elapse between the end of one normal workday and the commencement of the next normal workday.

13(e)(1) - Normal Workday for Cumulative-Hour Employees

When the duties assigned to any employee are of such an intermittent nature that they cannot ordinarily be performed during consecutive working hours, such employee for the purposes of these rules, shall be known as a cumulative-hour employee.

A normal workday for cumulative-hour employees shall consist of the performance of all necessary work within the scope of their assigned duties, provided that the cumulative working time required of any such employee shall not normally be more than eight (8) hours per day.

13(e)(2) - Work Periods

A work period shall consist of either:  1) five (5) consecutive normal workdays with the following two days off; or 2) any combination of scheduled normal workdays and days off which during a maximum period of eight (8) weeks, averages the number of normal workdays and days off per week upon which wages are based, provided that in any work period provided for herein, a day off shall mean at least twenty-four (24) consecutive hours off duty.

13(f) - Issuance of Work Schedules

13(f)(1)

Employees shall be furnished a written notice of their normal work schedule and such schedule shall indicate the distribution of each employee's working time by the days of the week and the hours of the day.  In addition, such schedule shall be posted at the normal working locations.

13(f)(2)

The normal work schedule of each employee assigned to work other than Monday through Friday shall indicate which days off are equivalent to Saturday and which days off are equivalent to Sunday.  Each employee's Saturday equivalents shall continuously alternate with their Sunday equivalents, regardless of the assigned schedule.

-37-

<u>13(f)(3)</u>

A work schedule shall not be changed with respect to working hours unless employees affected are notified thereof at least four (4) hours before the end of their last normal workday preceding such change or the employee agrees to the change without such notice, provided, however, that employees assigned to emergency and relief shifts shall not be entitled to such notice.  Violation of this provision shall invoke a penalty payment equivalent to 4 hours at the straight-time rate in addition to any pay received for the first 8 hours worked of such change.

<u>13(f)(4)</u>

A work schedule shall not be changed with respect to scheduled days of work unless employees affected are notified at least forty (40) consecutive hours before the time for their reporting for work under the changed schedule or the employee agrees to the change without such notice. Violation of this provision shall invoke a penalty payment equivalent to 4 hours at the straight-time rate in addition to any pay received for the first 8 hours worked of such change.

<u>13(f)(5)</u>

A relief shift employee whose shift is changed and who reports to work and is not required by the Department to work that shift, shall receive a minimum of eight (8) hours pay at the straight-time rate.

<u>13(f)(6)</u>

No work schedule shall be changed unless it is predicated entirely upon the operating needs of the Department, and shall not be for the purpose of avoiding the payment for overtime work.

<u>13(g) - Reporting for Duty</u>

<u>13(g)(1)</u>

Except in case of disability or unforeseen emergency, employees to whom an annual rate is applicable shall report for duty on each of their scheduled working days unless permission not to report has been previously approved by their immediate supervisor.  In case of disability or unforeseen emergency, employees to whom an annual rate is applicable shall make every reasonable effort to notify their immediate supervisor as early as possible of their inability to report for duty.

<u>13(g)(2)</u>

Except in case of disability or unforeseen emergency, employees to whom a daily or an hourly rate is applicable shall report for duty on each of their scheduled working days unless permission not to report has been previously approved by their immediate supervisor or unless previously instructed by their immediate supervisor not to so report, provided, however, that the absence occasioned by such instruction, together with normal days off, shall not extend for more than six (6) calendar days.  In case of disability or unforeseen emergency, employees to whom a daily or an hourly rate is applicable shall make every reasonable effort to notify their immediate supervisor as early as possible of their inability to report for duty.

13(h) - Attendance Before Court or Public Agency

Time spent by employees in 1) attending a proceeding before a court or public agency at the direction of the Department, or 2) attending such a proceeding as a witness under subpoena ordering such attendance when such attendance arises out of and is related to their employment by the Department, shall be counted as time worked.

13(i) - Daylight Saving Time

Each year Daylight Saving Time shall begin at 1:00 A.M. on the first Sunday of April and shall end at 2:00 A.M. on the last Sunday of October; except as modified by legislative action or presidential proclamation.

13(i)(1)

With the beginning of Daylight Saving Time, all clocks, at 1:00 A.M. shall be set ahead one hour to 2:00 A.M. Employees at work on a regularly scheduled basis when the clock is changed, shall have their time reported as a normal eight-hour shift.  Shift differentials, if applicable, shall be paid as provided for in Article l7.

13(i)(2)

With the ending of Daylight Saving Time, all clocks, at 2:00 A.M. shall be set back one hour to 1:00 A.M.  Employees at work on a regularly scheduled basis when the clock is changed, shall work an actual nine-hour shift.  Their time shall be reported as a normal eight-hour shift plus one hour of overtime and the overtime premium shall be as provided for in Article 9.  Shift differentials, if applicable, shall be as provided for in Article 17.

<u>13(i)(3)</u>

Beginning and ending clock times of regularly assigned work schedules shall not be affected by clock change.

<u>13(i)(4)</u>

Time for employees working prior to or beyond their regularly assigned work schedule shall be reported as overtime as provided for in Article 9.

<u>13(i)(5)</u>

Actual hours of overtime worked shall be reported for employees who are working overtime when the clock is changed or immediately thereafter and the overtime premium shall be as provided for in Article 9.

<u>13(j) - Shift Swaps</u>

Management shall give favorable consideration to temporary shift swaps mutually agreed on by employees where such swap will not result in overtime and does not affect the operating efficiency of the facility or quality of service to the public.

<u>13(k) - Normal Shift and Calendar Day</u>

A normal shift shall be considered, for timekeeping and pay purposes, to fall within the day in which it commences.  Except that shifts that begin at 10:00 P.M. or later shall be deemed to fall within the day in which the shift terminates for timekeeping and pay purposes.

<u>13(l) - Alternate Work Schedules</u>

Nothing in this Article shall preclude Management and the Union from entering into written agreements establishing alternate work schedules.

# ARTICLE 14

## <u>REPORTING LOCATIONS AND TRAVEL TIME</u>

<u>14(a) - Permanent Reporting Locations</u>

<u>14(a)(1)</u>

A permanent reporting location shall mean an office, shop, station, or other facility established by the Department for continuing use and which is designated as the place at which an employee reports regularly for work.  The Department shall assign employees to permanent reporting locations to the extent that such assignments can be made without

impairing efficient Department administration and operation. The Department may require employees, as a part of their regular work schedule, to report for work at different permanent locations.  The availability of economical and convenient transportation for employees shall be considered in the selection of reporting locations.

14(a)(2)

Employees may be assigned to report for work at a different reporting location only if they are notified of such change at least forty (40) hours prior to reporting for work at the different location, or if the employees agree to the change without such notice, provided that employees may be assigned to emergency maintenance or repair work without such notice or agreement on their part.

14(a)(3)

Seniority shall be given due consideration in assigning and changing reporting locations.

14(b) - Temporary Headquarters

14(b)(1)

Temporary headquarters is defined as a building established by the Department for temporary use of not less than two (2) weeks and which is designated as the place at which employees report for work.

14(b)(2)

Temporary headquarters shall afford shelter, be equipped with lavatory facilities, and be available to convenient and economical public transportation, provided that such transportation need not be available where the Department furnishes free transportation between such temporary headquarters and a designated public transportation point.

14(b)(3)

An employee having a permanent reporting location, shall not be assigned to report for work at a temporary headquarters if such headquarters is more than twelve (12) airline miles from such permanent location or if such assignment is for less than two (2) weeks.

14(c) - Travel Time

The following provisions shall be applied to employees to whom an annual rate is applicable.

-41-

14(c)(1)

Where the work of employees who have been assigned a permanent reporting location require travel to and between other work locations and/or return to their permanent reporting location, the time consumed by the employees in such travel shall be counted as time worked.

14(c)(2)

Where the work of employees preclude their assignment to one or more permanent reporting locations and require that they commence their day's work at different places, the time consumed in travel between their regular residence and such places shall not be counted as time worked except to the extent that such travel time is determined by the appropriate Assistant General Manager or by the Chief Financial Officer (as to employees under their respective jurisdictions), with the approval of the General Manager, to be in excess of the comparable time normally consumed by employees having permanent reporting locations.  The travel time consumed by such employees in connection with the actual performance of their duties shall be counted as time worked.

14(c)(3)

When employees are notified while off duty to report for work at a time, which is outside of their normal work schedule, the amount of travel time required in traveling from where such notice is received to a work location shall be counted as time worked.  If employees are released from such work before the commencement of their next normal work day, the amount of travel time required in traveling from the work location to their regular residence shall be counted as time worked.

14(c)(4)

Where the work of employees who have been assigned to a temporary headquarters require that the time be consumed in traveling between such headquarters and the work location, the time so consumed shall be counted as time worked.

14(c)(5)

In the case of maintenance and repair jobs or construction jobs not at permanent locations, for which camps are not established, the Department may elect to furnish transportation to and from permanent locations and the job sites, in which event any time consumed in necessary travel between such locations and the job sites shall be counted as time worked.  The Department may also elect to furnish housing facilities in permanent structures or in mobile

units, in which event any time consumed in necessary travel between the location of such housing facilities and the job sites shall be counted as time worked. The provisions with respect to temporary headquarters as set out in paragraph 14(c)(4) shall not be applicable to arrangements established by the Department pursuant to this paragraph.

14(c)(6)

When employees are assigned to work temporarily, or from time to time at such a distance from their permanent reporting location that it prevents their daily return thereto, the time required for the employees to travel by the most economical and appropriate method of transportation from their permanent reporting location to the temporary work location or locations and return therefrom shall be counted as time worked.

If the temporary work location or locations are not on the Department's system, compensation for travel time when required outside the employee's normal work schedule shall be at straight time, or where Article 9 does not provide for compensation in money for overtime worked, by allowing time off as provided for in that Article.

## ARTICLE 15

### HOLIDAYS AND VACATIONS

15 - Holidays

15(a)

All days herein declared to be holidays shall be observed by closing, except in cases of emergency, all functions of Department business, which are not essential to provide continuous-operation service to customers. Only shift, cumulative-hour, and continuous-operation employees may be required to work on such holidays as part of their schedule of normal workdays.

15(b)

The following days, together with such additional days as are designated by special action of the Board are hereby declared to be holidays:

| 1 | New Year's Day | January 1st |
| 2 | Martin Luther King's Birthday | 3rd Monday in January |
| 3 | Presidents' Day | 3rd Monday in February |
| 4 | Memorial Day | Last Monday in May |
| 5 | Independence Day | July 4th |
| 6 | Labor Day | 1st Monday in September |

| 7 | Columbus Day | 2nd Monday in October |
|---|---|---|
| 8 | Veterans Day | November 11th |
| 9 | Thanksgiving Day | 4th Thursday in November |
| 10 | Day after Thanksgiving Day | 4th Friday in November |
| 11 | Christmas Day | December 25th |
| 12 | Two unspecified holidays may be observed on any scheduled workday within the calendar year, provided that requests for said holidays are approved by the employee's supervisor, subject to the operating needs of the Department. Management Bulletin No. 620 dated August 12, 1974, as amended, is automatically incorporated herein and made a part of this MOU. | |

All full-time employees whose salaries or wages are based upon an annual rate and who are neither on vacation nor absent from duty without pay on their last normal workday preceding the Christmas holiday shall be allowed four (4) hours off with pay on said last normal workday, provided that all days, if any, intervening between said last normal workday and the Christmas holiday are normal days off, determined as of said last normal workday.  If such employees are required to work more than four (4) hours on said last normal workday, the employees shall be compensated for the time so worked in excess of four (4) hours in the manner and in accordance with the provisions of Article 9 relating to compensation for overtime worked other than on a Sunday or holiday.

### 15(c) - Holiday Allowance - Annual-Rate Employees

#### 15(c)(1)

All annual-rate employees, other than continuous-operation, shift or cumulative-hour employees scheduled to work normal workdays as normal workdays, shall be entitled to all holidays off with pay and to be scheduled a normal workday off with pay for each holiday which is observed on one of their normal days off, subject to the following provisions:

##### 15(c)(1)(aa)

When a holiday falls on a Sunday, such an employee shall be scheduled the following normal workday off instead, as such holiday.

##### 15(c)(1)(bb)

When a holiday falls on a Saturday, such an employee shall be scheduled either the last normal workday preceding or the first normal workday following such holiday instead, as such holiday,

-44-

in accordance with procedures to be prescribed by
the General Manager; provided, however, that if
such a day off is not scheduled for the last
normal workday preceding, then the first normal
workday following such a holiday is hereby fixed
as such day off.

15(c)(2)

All annual-rate continuous-operation, shift and
cumulative-hour employees scheduled to work holidays as
normal workdays shall be compensated for each holiday
as provided below:

15(c)(2)(aa)

When a holiday falls on a normal workday of such
employees, the calendar holiday is, for
timekeeping and pay purposes, the holiday for said
employees.  When a holiday falls on one of their
normal days off, their next normal workday
following the calendar holiday is, for timekeeping
and pay purposes, the holiday equivalent for said
employees.  If both a holiday and holiday
equivalent fall on the same day, then, for
timekeeping and pay purposes, the holiday
equivalent for said employees shall be their next
normal workday.

15(c)(2)(bb)

When such employees are required to work on a
holiday or holiday equivalent as a part of their
schedule of normal workdays, the employees shall
not be entitled to a normal workday off for such
holiday but instead shall be paid at their
scheduled salary for such day and, in addition,
shall be paid for time worked as provided in
Article 9.1(e)(3).

15(c)(2)(cc)

When such employees are not required to work on a
holiday or holiday equivalent, the employees shall
be scheduled the day off with pay.

<u>15(d) - Holiday Allowance - Daily-Rate Employees</u>

<u>15(d)(1)</u>

Employees paid a daily rate shall be entitled to the Christmas Holiday off with pay whether or not it falls on a calendar Saturday, if they have worked within the seven-day period before and the six-day period following Christmas.

<u>15(d)(2)</u>

Notwithstanding any other provision of the Position Evaluation and Compensation Plan in conflict herewith, when the Board so provides on the Duties Description Record, an employee to whom an hourly or daily rate is applicable shall be compensated for authorized work performed on a holiday or holiday equivalent in accordance with the provisions as set forth on such Duties Description Record.

<u>15(e) - Holiday Overtime Pay</u>

All employees who work on a calendar holiday which occurs during their schedule of normal workdays and all employees who work on a holiday equivalent which has been assigned, as provided herein, in lieu of a calendar holiday which occurs during their schedule of normal days off shall be compensated therefor in accordance with the provisions relating to overtime for holidays.  If an employee works on a calendar holiday for which a holiday equivalent has been assigned, such employee shall not be compensated therefor in accordance with holiday overtime provisions, though other overtime provisions may apply to such work.

<u>15.1 - Vacations</u>

<u>15.1(a)</u>

The vacation rights of Department employees are governed by ordinance adopted by the Los Angeles City Council and are described in Division 4, Chapter 6, Article 1, of the Los Angeles Administrative Code.

<u>15.1(b)</u>

*Language deleted (2008)*

<u>15.1(c)</u>

Additionally, Management and the Union agree that, after the addition of vacation days as provided in 15.1(b), the following chart accurately reflects the vacation entitlement and accrual rates to be effective October 1, 1996:

| Years of Service Completed | Total Number of Vacation Days Effective 10/1/96 | Monthly Accrual Rate In Hours/Minutes Effective 10/1/96 |
|---|---|---|
| 1 to 4 | 11 | 7.20 |
| 5 to 12 | 17 | 11.20 |
| 13 | 18 | 11.20 |
| 14 | 19 | 11.20 |
| 15 | 20 | 11.20 |
| 16 | 21 | 11.20 |
| 17 | 22 | 14.40 |
| 18 | 23 | 14.40 |
| 19 to 24 | 24 | 16.00 |
| 25+ | 25 | 16.40 |

## ARTICLE 16

### INCLEMENT WEATHER

Annual-rated employees reporting for work on normal scheduled working days shall not suffer any loss of regular pay because of weather conditions when Management directs that no field work be undertaken.  Inclement weather may include any weather condition, which adversely affects an employee's health or safety.  During such day, they may be held pending emergency calls, and may be given first aid, safety or other instructions or may be required to perform miscellaneous work in the yard, warehouse or in any sheltered location.

## ARTICLE 17

### PAY DIFFERENTIALS

Employees to whom an annual rate is applicable, except cumulative-hour employees, who are regularly scheduled to start their normal shift at or after 2:00 P.M. but before 9:00 P.M., shall receive, in addition to other compensation, a pay differential of 4% of the applicable rate for each hour worked during any such normal shift.

Employees to whom an annual rate is applicable, except cumulative-hour employees, who are regularly scheduled to start their normal shift at or after 9:00 P.M. but before 4:00 A.M. shall receive, in addition to other compensation, a pay differential of 7% of the applicable rate for each hour worked during any such normal shift.

Employees to whom an annual rate is applicable, except cumulative-hour employees, who are regularly scheduled to start their normal shift at or after 2:00 P.M. but before 4:00 A.M. shall not be entitled to receive a pay differential during any absences from work.

Employees to whom an annual rate is applicable, except cumulative-hour employees, who work all or part of the normal shift of another employee, shall receive the pay differential (either 4% or 7%) which would have been applicable to the other employee's shift.  The dollar value of any such pay differential shall be calculated on the applicable rate of the employee who actually performs the work.

Employees to whom an annual rate is applicable, except cumulative-hour employees, who are regularly scheduled to start their normal shift at or after 2:00 P.M. but before 9:00 P.M. and who perform overtime work in continuation of their normal shift but who are not working all or part of the normal shift of another employee shall continue to receive a pay differential of 4% of the applicable rate for each hour of such overtime worked.

Employees to whom an annual rate is applicable, except cumulative-hour employees, who are regularly scheduled to start their normal shift at or after 9:00 P.M. but before 4:00 A.M. and who perform overtime work in continuation of their normal shift but who are not working all or part of the normal shift of another employee shall continue to receive a pay differential of 7% of the applicable rate for each hour of such overtime worked.

# ARTICLE 18

## EXPENSES

### 18.1 - Mileage Allowances

#### 18.1(a)

When employees use their personal automobile to conduct Department business as authorized by the General Manager, such employees shall be paid compensation for such use during each calendar month in accordance with the following schedule:

1. All miles driven - $.405 per mile (effective January 1, 2006);
2. Necessary parking fees or charges, exclusive of the DWP facilities.

18.1(b)

When employees are required to have their personal automobile available for use to conduct Department business, such employees shall be paid compensation for such availability or use during each calendar month as authorized by the General Manager in accordance with the following schedule:

1.  For each day during which the automobile is required to be available and is available but not actually driven on Department business - $9.24;
2.  For each day driven on Department business - $9.24;
3.  All miles driven - $.405 per mile (effective January 1, 2006); and
4.  Necessary parking fees or charges exclusive of DWP facilities.
5.  The automotive per diem referenced above in Article 18.1(b) 1. and 2. shall be based on 80 percent of average ownership costs, as calculated by the Automobile Club of Southern California (AAA), as specified in the February 11, 2002 Letter of Intent.

18.1(c)

The parties agree that when the standard mileage rate (as issued by the Internal Revenue Service for computing the deductible cost of operating a vehicle for business purposes) changes, the $.405 per mile rate (effective January 1, 2006) provided above shall be changed to the same amount.

Appropriate changes, if required, will become effective in the payroll period following January 1, April 1, July 1, and October 1, of each contract year.

The parties agree that automotive per diem shall be calculated and adjusted on an annual basis.  To effect implementation in the first pay period of the calendar year the current year's per diem will be based on the previous year's AAA ownership cost factors.

The Department retains the right to review the mileage allowance program and may assign transportation in lieu of compensation under such circumstances as it deems necessary.

## 18.1(d) - Department Self Insurance

All employees in this Unit are covered by the provisions of Working Rule 8.5 - Department Self Insurance, contained in the Administrative Manual-Policy. (Copies of Working Rule 8.5 are available upon request from the Labor Relations Office.)

## 18.2 - Overtime Meals

### 18.2(a)

When the Department requires an employee, to whom an annual salary rate is applicable, to work overtime, it shall pay the employee an overtime meal allowance of $10.00 for each designated meal period, as provided in Paragraph 18.2(c).

### 18.2(b)

Department may, in lieu of any overtime meal allowance, provide meals for employees.

### 18.2(c)

Meal periods shall be fixed at two (2) hours after the beginning of any overtime period, which commences outside the hours of the employee's normal workday and at the end of each 5-hour interval thereafter. Except that while working scheduled overtime on an employee's Saturday, Sunday or holiday or other normal day off, overtime meal periods shall be fixed at 4 hours after the beginning of any overtime period and at the end of each 5-hour interval thereafter. However, during periods of emergencies, adjustments to this schedule may be made by the immediate supervisor.

### 18.2(d)

The time allowed to eat an overtime meal shall be thirty (30) minutes or less.

### 18.2(e)

Time allowed to eat an overtime meal shall be reported as time worked.

### 18.2(f)

Employees who are not provided an opportunity to eat an overtime meal shall receive a penalty payment equal to thirty (30) minutes at the applicable overtime rate for each meal period missed. Except that this provision shall not apply to continuous-operation employees who eat overtime meals while continuing to perform their normal duties.

<u>18.2(g)</u>

Employees who are called out and work for a minimum 2-hour call out only shall be paid one overtime meal allowance but not for the time to eat such meal.

<u>18.2(h)</u>

Employees who work overtime, which commences two (2) hours or less prior to the start of their normal workday, shall be paid one overtime meal allowance but not for the time to eat such meal.

<u>18.2(i)</u>

Employees who work overtime while assigned to a 9/80 alternate work schedule, shall receive one overtime meal allowance that will be paid when 1.0 hour of overtime is worked in continuation of the regularly scheduled normal 9.0 hour day. One overtime meal allowance will be paid when 2.0 hours of overtime is worked in continuation of the regularly scheduled normal 8.0 hour day. Should the overtime continue, one additional overtime meal allowance will be paid for each five hours worked continuously thereafter.

Employees who work overtime while assigned to a 4/10 alternate work schedule, shall receive one overtime meal allowance that will be paid when 1.0 hour of overtime is worked in continuation of the regularly scheduled normal day. Should the overtime continue, one additional overtime meal allowance will be paid for each five hours worked continuously thereafter.

Employees who work overtime while assigned to either a 9/80 or 4/10 alternate work schedule on regularly scheduled days off or holidays shall receive one paid overtime meal allowance after 4.0 hours of overtime have been worked continuously and for each five hours worked continuously thereafter.

<u>18.3 - Meals and Lodging Away from Home</u>

The Department shall bear the expense of meals and lodging away from home for annual-rate employees under the following circumstances:

<u>18.3(a)</u>

When employees are given an assignment or accept a limited or emergency appointment and are required to work temporarily, or from time to time, at such a distance from their home or regular work location that it prevents their daily return thereto, such expense shall be borne by the Department commencing with the time the employees leave home

or their regular work location and ending when the employees return to their home or regular work location, as the case may be.

18.3(b)

It is the intent of the Department that whenever possible, employees on temporary assignments out of town reside in Department-provided lodging or in lodging designated by the Department.

Should an employee be unable through no fault of the Department to stay in Department-provided lodging, or designated lodging, the Department may reimburse the employee for lodging in an amount not to exceed the cost of Department-provided or designated lodging only when the employee provides a proper paid receipt.

18.3(c)

Notwithstanding any other provisions of this MOU in conflict herewith, time spent in travel between Department-provided or designated lodging and a temporary reporting location shall be counted as time worked.

18.3(d)

When employees are transferred permanently to work at such a distance from their home that it prevents their daily return thereto, (unless such transfer is between points located south of an east-west line drawn through the southernmost boundary of the town of Newhall and west of the north-south line drawn through the easternmost boundary of the city of Ontario); the Department shall bear such expense en route and for the first fifteen (15) calendar days of such assignment commencing with and including the day of arrival at the location to which the employee is permanently transferred, or, until a suitable dwelling is available, whichever is the shorter period of time; provided that under special circumstances the General Manager may authorize the extension of the above period of time beyond fifteen (15) calendar days.

18.3(e)

The Department may, in lieu of any meal allowances, provide meals for employees.

18.3(f)

Supplemental to this section, the following rates of compensation for meals away from home shall apply, effective July 1, 2007:

```
Breakfast  (including tax and tip)  $12.16
Lunch      (including tax and tip)  $15.67
Dinner     (including tax and tip)  $22.60
                            TOTAL   $50.43
```

Effective July 1, of each contract year:

Each rate above shall be modified by a percent equal to the April to April movement in the food-away-from-home component of the Consumer Price Index (CPI) Urban Consumers Los Angeles-Anaheim-Riverside Area (1982-84=100).

## 18.4 - Moving Allowances

### 18.4(a)

When the reporting or work location of employees are changed to a permanent reporting or work location at such a distance from their regular place of residence that it prevents their daily return thereto, the Department shall bear all expenses of moving the household and personal effects of the employees to such new location, except that it shall not bear any of such expense when either of the following conditions is present:

#### 18.4(a)(1)

When such change is between points located south of an east-west line drawn through the southernmost boundary of the town of Newhall, and west of a north-south line drawn through the easternmost boundary of the city of Ontario.

#### 18.4(a)(2)

When such change is made at the request and for the convenience of employees; provided that when such change is the immediate result of employees' appointment to a position from a Civil Service register of eligibles or their transfer to a vacant position as a consequence of their bidding therefor under an established bidding procedure, it shall be deemed not to be at their request or for their convenience.

### 18.4(b)

When the services of employees are terminated, or the employees retire from an involuntary assignment and at the time of termination or retirement the employees are reporting at a permanent location to which the employees were transferred from another permanent reporting or working location which transfer necessitated their change of residence, the Department shall bear all expenses of moving

their household and personal effects from the location at which their services were terminated to any location on its system, except that it shall not bear any of such expense when any one of the following conditions is present:

### 18.4(b)(1)

When such change is between points located south of an east-west line drawn through the southernmost boundary of the town of Newhall, and west of a north-south line drawn through the easternmost boundary of the city of Ontario.

### 18.4(b)(2)

When employees are discharged for cause after at least six months of continuous service at their location immediately preceding the time of such discharge.

### 18.4(b)(3)

When an employee resigns from the Department.

## 18.5 – Establishment of Maximum Allowances

All allowances provided for by this Article shall be subject to maximums fixed by the General Manager, except that the provisions of this subsection shall not apply where the amount of such allowances is specified in this Article 18.

## 18.6 – Housing and Mess Facilities

### 18.6(a)

Whenever the Department, for its convenience in connection with its operating needs, requires that an employee working at a specified location shall occupy housing or dormitory facilities furnished by the Department at or near such location, no charge shall be made for such housing or dormitory facilities.  Such requirements may be exercised at locations where such housing and dormitory facilities are provided at or near transmission lines, switching stations, pumping plants, aqueducts, reservoirs, and power plants, including Boulder City and Hoover Dam.

### 18.6(b)

Whenever housing or dormitory facilities are otherwise provided by the Department, an employee occupying the same shall pay therefor in accordance with such schedule of charges as the General Manager may from time to time prescribe.

<u>18.6(c)</u>

Whenever the Department furnishes mess facilities, employees using the same shall pay therefor in accordance with such schedule of charges as the General Manager may from time to time prescribe.

<u>18.7 - Transportation and Travel Expense Allowances</u>

<u>18.7(a) - Local Transportation</u>

Employees shall be paid for taxi, streetcar, bus, and other necessary local transportation expenses incurred by them in the performance of Department work.

<u>18.7(b) - Transportation on Ordered Trips</u>

Employees who are directed or ordered to travel in connection with Department business shall be provided transportation as follows:

<u>18.7(b)(1)</u>

Transportation on a public carrier, including sleeping accommodations, where available, for overnight travel.

<u>18.7(b)(2)</u>

Transportation in a Department-owned passenger vehicle when the use of such transportation is authorized by the General Manager.

<u>18.7(b)(3)</u>

Transportation by taxi, streetcar, bus, and other local facilities.

<u>18.7(b)(4)</u>

At the request of employees and when authorized in advance by the General Manager, such employees may use their personal car for part or all of an official trip in lieu of the transportation provided in paragraphs (1) and (2) of this subsection, and the Department shall pay such employee therefor the amount it would be required to pay if transportation were provided under paragraph (1) of this subsection using the fastest and most direct travel accommodations available, except that where such trip is to a point within a radius of 300 miles of the Department's John Ferraro Building at 111 North Hope Street, Los Angeles, it shall pay such employees therefor at the rate of .405 cents per mile.

<u>18.7(b)(5)</u>

If the nature of the work on an official trip will require the use of a car to best serve the Department's interest, arrangements may be made with such employees to use their personal car upon the same terms and conditions as those from time to time prescribed by resolution for the use of personal cars on Department business in lieu of the transportation allowances provided in paragraphs (1), (2) and (3) of this subsection.

<u>18.7(c) - Other Allowances on Ordered Trips</u>

Subject to such maximum as may be set in the authorization for such trip, employees who are directed or ordered to travel in connection with Department business shall be entitled to reimbursement for the following expenses in addition to transportation:

<u>18.7(c)(1)</u>

Meals and lodgings, subject to the provisions of Article 18 hereof.

<u>18.7(c)(2)</u>

Tips for services in connection with meals, lodging and travel.

<u>18.7(c)(3)</u>

Valet service.

<u>18.7(c)(4)</u>

Baggage checking and transfer costs.

<u>18.7(c)(5)</u>

Telephone, telegraph, and mailing charges.

<u>18.7(c)(6)</u>

Such other expenses as may be approved by the General Manager.

<u>18.7(c)(7)</u>

Notwithstanding the foregoing provisions of Article 18.7(c), where employees use their personal car pursuant to Article 18.7(b)(4) for part or all of an official trip to a point not on the Department's system and not within a radius of 300 miles of the

Department's John Ferraro Building at 111 North Hope Street, Los Angeles, the employees shall be reimbursed for such expenses only to the extent that they would have been incurred had the employees used the fastest and most direct travel accommodations available.

18.7(d) - Allowances on Authorized Trips

Employees who are authorized to travel in connection with Department business but who are not directed or ordered to do so shall not be entitled to transportation or to other allowances on account of such travel, except as may be determined and approved in advance by the General Manager.

18.7(e) - Use of Personal Cars in Department Work

Nothing contained herein shall in any way limit, or conflict with, the practice of compensating employees for the authorized use of their personal cars in the performance of Department work.

# ARTICLE 19

## WORK CLOTHING AND TOOLS

19(a) - Uniforms

The Department shall furnish uniforms, which the General Manager requires employees to wear and it shall arrange and pay for all normal cleaning, repairing and replacement required by the use of such uniforms while performing work for the benefit of the Department.

19(b) - Protective Clothing, and Equipment, and Safety Glasses

The Department shall furnish protective clothing and equipment in all cases where they are required by law or where the Department determines that such protective clothing and equipment are essential to the adequate protection or the safety or the health of employees.

The Department shall provide and pay for prescription safety eyewear for its employees. The benefit shall apply to all IBEW, Local 18 represented Department employees who wear corrective prescription glasses and whose job assignment requires the use of safety eyewear.

19(c) - Tools

The Department shall provide all tools required for the performance of its employees' duties, except that if it is common practice in a particular trade or craft for employees to provide

their own tools, employees engaged in such trade or craft shall provide such tools required in the performance of their duties.

In the event that, through no negligence or other fault of employees, any tools so provided are damaged, destroyed, or lost through fire or theft, while employees are engaged in the performance of their duties either on or off Department premises or while such tools, though not in use in the performance of the employees' duties, are on Department premises with the consent of the employees' supervisor, the Department shall reimburse such employees for the loss or damage sustained.

In the event the Department requires modification or conversion of the tools normally furnished by the employee, the Department shall furnish the modified or converted tools.

# ARTICLE 20

## SPECIAL WORKING CONDITION RULES FOR CAMPS

### 20(a) - Definition of Camp

A "Camp" is defined to mean a temporary facility established in connection with a maintenance, repair, or construction job and designated as a camp by the General Manager, at which camp the meals and lodging are made available to employees by the Department for such charges as the General Manager may prescribe.

### 20(b) - Working Conditions Applicable to Camps

Prior to the establishment of a camp, the Department and the Union shall hold a Joint Conference to determine what changes in, and additions to, the working conditions prescribed are necessary to make such requirements suitable for application to such camp. The working conditions as determined by the Joint Conference shall be incorporated into the rules for the operation of the camp.

# ARTICLE 21

## PERSONNEL FILE

Employees shall be entitled to review the contents of their personnel files at reasonable intervals.  Such review shall be permitted, upon request, only during hours when their personnel office is regularly open for business and within three (3) days of their request, except when an employee is assigned to a remote area.  No materials, which may be the basis for future disciplinary actions, shall be placed in employees' personnel files until the employees have had an opportunity to discuss with their supervisor such material.  Employees shall be supplied with a copy of said material.  In the event employees object to the

inclusion of such materials in their files, they may file a grievance with regard to the placement of such material in their personnel files.  Any such material shall not automatically disqualify an employee's transfer, reassignment or promotion.

Any material which could be the basis for disciplinary action, excluding Notices to Correct Deficiencies (NTCDs) and suspensions, shall be assigned an expiration date not more than two (2) years subsequent to the effective date of such material. Nothing in this Article shall prevent the removal of such material from an employee's personnel files prior to the expiration date upon approval of Management.

The Department shall evaluate each NTCD before including it as a supporting document in any succeeding disciplinary action.

Prior to entering an NTCD into the employee's personnel files, each offense cited on such NTCD shall be classified as to the seriousness of the infraction and assigned an expiration date. Such expiration date shall be not more than two (2) years subsequent to the date of the infraction.  In order to minimize administrative problems, an NTCD may be removed from the employee's files upon request of the employee, provided that such request must be made subsequent to the expiration date, as set forth on the NTCD.  NTCDs in an employee's file past the expiration date shall not be referenced in, nor form the basis for any disciplinary action, provided, that the employee has not been given any other NTCDs or disciplinary action prior to the expiration date.  Nothing in this Article shall prevent the removal of an NTCD from an employee's personnel files prior to the expiration date upon the approval of Management.

In the event that the NTCD is issued for such things as poor work performance or tardiness, the supervisor will review with the employee, at reasonable intervals, the employee's progress in correcting the deficiency.

## ARTICLE 22

### EMPLOYEE LIST

22.1

The Department shall provide the Union in writing within thirty (30) days from the effective date of this MOU, an alphabetized list of all employees subject to this MOU.  This list shall include the payroll and section number, Civil Service classification and effective date, date of hire, range number and the Union membership status.  The Department shall provide a similar list every three (3) months.

<u>22.2</u>

Each thirty (30) days after the effective date of this MOU, the Department shall provide the following:

1.    A list of all employees hired in the Unit during the preceding month.  This list shall include the payroll and section number, classification, range number and date of hire.

2.    A list of all employees in the Unit who have been terminated or retired during the preceding month.

## ARTICLE 23

### MAINTENANCE OF EXISTING CONDITIONS

1.    All present written rules including the Working Rules and all present established practices, and Management and employee rights, privileges and benefits, shall remain in full force and effect unless specifically altered by the provisions of this MOU.

2.    The parties hereby agree to be bound by the provisions of the Water and Power Employees' Retirement, Disability and Death Benefit Plan.

3.    Working Rule 5 is inapplicable to employees covered by this MOU.

4.    Supervisory employees shall be defined as follows: "Supervisory employee" means any individual, regardless of the job description or title, having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibility to direct them, or to adjust their grievances, or effectively to recommend such action, if, in connection with the foregoing, the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.  Employees whose duties are substantially similar to those of their subordinates shall not be considered to be supervisory employees.

Management shall designate supervisory employees.  Said designation or claim shall be reviewed jointly by the City and the Union.  Any dispute shall be referred to the Employee Relations Board for resolution.

## ARTICLE 24

### JOINT SAFETY COMMITTEE

The Joint Safety Committee shall be composed of an equal number of representatives of the Department and the Union.  This Committee may meet every three months on a regular basis as determined by said Committee.  It shall also meet on urgent situations at the request of either the Department or the Union.

It shall be the responsibility of the Joint Safety Committee to review the causes of serious accidents revealed by the investigation of such accidents and to recommend rules for the safety of the employees in the performance of their work.  The present safe working rules and practices shall be considered a part of this MOU and changes in the Safety Rules shall be subject to negotiations between the parties and in conformance with applicable City, State or Federal regulations.  The Joint Safety Committee shall utilize consultants from the City, State or Federal agencies in the event an interpretation of City, State or Federal regulations is involved.

It shall be the responsibility of the Department to administer the Safety Program and to make every reasonable effort that Safety Rules are carried out by all employees.  It shall be the responsibility of the employees to make every reasonable effort to ensure that they act in a safe manner.

Should a dispute arise over the application or interpretation of a Safety Rule, such dispute shall be resolved by use of the Grievance Procedure.


## ARTICLE 25

### SAVINGS CLAUSE

If any term or provision of this MOU is found to be in conflict with any City, State or Federal law, the parties agree to meet promptly, and as often as necessary, to expeditiously renegotiate this term or provision.

All other terms and provisions of this MOU shall remain in full force and effect during the period of such negotiations and thereafter until their normal expiration date.

The parties understand that many of the employees covered by this MOU may also be covered by the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. Section 201 et seq (FLSA).  To the extent that any provision herein conflicts with the FLSA, employees covered by the FLSA shall receive benefits required thereunder and any additional benefits set forth herein if compatible with the FLSA.

## ARTICLE 26

### TERM

This MOU is effective as of the date of execution with the exception of any special provisions setting forth dates for compliance.  The term of this MOU shall continue until the 30th day of September 2010, and for additional periods of one year thereafter, with the provision that should either party desire to terminate this MOU, or to modify any portion of the terms hereof, it shall notify the other party not later than ninety (90) days prior to the 30th day of September 2010, or the end of any other subsequent yearly period.  If such notice of termination is given, this MOU shall terminate on the 30th day of September 2010, or September 30 of any other subsequent yearly period.


Negotiations upon proposed amendments or changes of the terms of this MOU, as set forth in the notice of desire to amend, shall begin not later than ninety (90) days prior to the expiration date, or expiration date of any subsequent yearly period.

The parties acknowledge that during negotiations which resulted in this Agreement, each had unlimited right and opportunity to make demands and proposals with respect to any subject or matter not removed by City ordinance or State law from the meet-and-confer process and that the understanding and agreements arrived at by the parties after the exercise of that right are set forth in this Agreement.  IBEW Local 18, therefor, without qualification, waives the right and the Department shall not be obligated to meet and confer as to any request for any improvement or other changes in wages, hours or other conditions of employment for any of the employees covered by this MOU.

The waiver of any term or condition of this MOU by either party shall not constitute a precedent in the enforcement of any of its provisions.

The parties, during the terms of this MOU may mutually agree to consider other specific proposals.


## ARTICLE 27

### OBLIGATION TO SUPPORT

The parties agree that prior to the implementation of the MOU and during the period of time it is being considered by the Board, neither the employee organization nor the Department, nor any of their authorized representatives, shall appear before said Board, the Mayor, the City Council, or individual members of said Board or Council individually to advocate any addition to or deletion from the terms and conditions of this MOU.  However, this Article shall not preclude the parties from appearing before the Board,

the Mayor or any other elected official to advocate or urge the adoption and approval of this MOU.

# ARTICLE 28

## HEALTH AND DENTAL PLANS

28.1 - Health Plan

The Department will contribute on behalf of eligible employees in this Unit, to whom an annual salary rate is applicable, and who are members of the Water and Power Employees' Retirement, Disability and Death Benefit Plan, and on behalf of their eligible dependents, if any, a sum not to exceed $823.76 a month, through June 30, 2006, toward the cost of any one of the following health insurance programs:

    a.    DWP Kaiser Medical Plan
    b.    DWP Health Plan of Nevada
    c.    DWP PacifiCare Medical Plan
    d.    The plan established by the IBEW-Local 18
          Health and Welfare Trust

Said sum will be applied and limited by the employee's election, if any, to coverage under one of the health insurance programs listed in (a), (b), (c), and (d) above.  In the event eligible employees elect to cover their eligible dependents as provided for in these programs, the unused portion of said sum will be applied toward such dependent coverage under the same plan.

The parties hereto agree to the following formula for arriving at the Department's maximum contribution, based on the present level of benefits, to these health insurance programs for each eligible employee in this Unit:

    Effective July 1, of each contract year:

    For each eligible employee in the Unit, the Department will
    contribute an amount calculated by adding to the $823.76
    monthly subsidy an amount not to exceed the dollar value of
    the Kaiser Family Plan rate increases or rate decreases
    during the term of this MOU.

In order to obtain employee input regarding health plan benefits, and to stabilize health insurance costs at or near their present levels, the Department will meet with Local 18 prior to negotiating new agreements with health insurance carriers.  In conformance with DWP Board Resolution No. 985 of June 29, 1972, as amended, any increases in cost due to negotiated improvements in benefits shall be borne solely by the employees.

The parties acknowledge that rapidly escalating health care costs are a mutual concern.  Containing the escalation of these costs

is essential to both parties.  Therefore, the parties agree to develop health care proposals that achieve control over and limit escalating health care costs, which may include financial participation by both parties.

28.2 - Dental Plan

The Department will provide an indemnity-type dental plan, a group-type dental plan, and a dental plan offered by the IBEW-Local 18 Health and Welfare Trust open to all eligible employees in this Unit.  The Department's maximum contribution for the period from October 1, 2005 to June 30, 2006, will not exceed $125.25 per month for family coverage.

Effective July 1, 2003, the Department's maximum contribution will be set to match the rate for family coverage by Delta Dental.

Thereafter, if family rates for the current level of benefits are increased or decreased by Delta Dental, the Department's maximum contribution will increase or decrease by the same amount.

An employee must be a member of the Water and Power Employees' Retirement, Disability and Death Benefit Insurance Plan to be eligible to receive the Department's dental plan contribution.

The Union agrees to indemnify and hold harmless the Department for any loss or damages including costs of suits and reasonable attorney fees arising from the operation of this Article.


# ARTICLE 29

## SUPPLEMENTAL BENEFITS

29.1 - Sick Benefits

All provisions of the Department's Disability Plan and all practices concerning sick days shall be continued with the following exceptions:

 (a)  Disability benefits for a temporary disability of ten (10) work days or less shall be calculated at the gross salary base rate and the appropriate federal and state taxes withheld and paid to the Internal Revenue Service and the State Franchise Tax Board.

 (b)  Disability benefits for a temporary disability which exceeds ten (10) work days shall be calculated at the level of benefits to which the member is entitled (i.e., 85%, 60%, etc.) by reason of the length of service and at the gross salary base rate.  For disability benefit purposes, the definition of "net salary" shall be deleted.

(c)    In addition to the benefits provided in Section VD (3)
       of the Plan, pay for unused sick time shall be made
       under the following circumstances:

       At the end of the last payroll period prior to
       January 1 of each calendar year, employees' unused sick
       time compensation shall be calculated at the 100% rate
       for any portion of such entitlement which they cannot
       carry forward into the current calendar year (i.e., any
       hours in excess of 80).  The Department shall
       compensate employees for unused sick time in an
       expeditious manner.

(d)    Additionally, partial days sick shall be deducted from
       the annual forty-hour entitlement provided in
       Section VD (3) of the Plan but shall not alter the
       present practices for determining an employee's
       eligibility for other sick or disability benefits.

(e)    The payments described in paragraphs (a), (c) and (d)
       herein shall be administered by the Department rather
       than by the Board of Administration.

## 29.2 - Disability and Death Benefit Contributions

The employee's total contribution to the Disability and Death
Benefit portions of the Department of Water and Power Employees'
Retirement, Disability and Death Benefit Insurance Plan shall be
fixed at the following levels:

Temporary Disability Benefits------------- $1.00 per pay period
Permanent and Total Disability Benefits--- $1.00 per pay period
Death Benefits---------------------------- $1.00 per pay period

## 29.3 - Family Death Benefits

The present monthly level of family death benefits ($416.00 per
survivor, $1,170.00 family maximum) shall remain in the Plan as
currently provided.  A higher amount shall also be available to
any member who enrolls for such benefit, provided said member
makes a contribution of $2.25 per pay period for as long as the
member desires such coverage.  Additionally, the benefit shall
not be effective until the member has made contributions for
thirty-nine (39) continuous payroll periods after enrollment or
re-enrollment for this coverage.

The increased monthly benefit level for those who enroll shall be
$936.00 per survivor and $2,236.00 family maximum.

## 29.4 - Family/Domestic Partner Sick Leave

1. Each Department employee shall be permitted to use, in any
   calendar year up to forty (40) hours of his or her available

-65-

annually accrued forty (40) hour sick time bank [provided in accordance with Article 29 of the MOU and Section VD (1) (b) (ii) of the Water and Power Employees' Retirement Plan] to attend to the illness of his or her child, parent, spouse, or domestic partner.  Such use shall not extend the maximum period of leave to which an employee is entitled under Section 12945.2 of the Government Code or under the Federal Family and Medical Leave Act of 1993 (29 U.S.C. Sec. 2606, et seq.).  In addition, such use will not initiate temporary disability benefits provided in accordance with Article 29 of the MOU and Section VD(1) of the Water and Power Employees' Retirement Plan.

2. All conditions and restrictions, such as medical certification, placed upon each Department employee relative to his or her use of sick leave shall also apply to the use of sick leave for the purpose of attending to the illness of his or her child, parent, spouse, or domestic partner in accordance with Section 100-10 of the DWP Administrative Manual.

3. In order for an employee to apply this benefit to a domestic partner, employee must have on file a confidential affidavit with the DWP Health Plans Administration office.

# ARTICLE 30

## SALARIES

30.1 - Salaries

The parties agree to jointly recommend that the Board forward to the City Council with a recommendation for approval, the salary ranges as established in Appendices A-1, A-2, A-3, A-4, and A-5.

The salary ranges as established in Appendix A-1 shall become effective October 1, 2005.

The salary ranges as established in Appendix A-2 shall become effective October 1, 2006.

The salary ranges as established in Appendix A-3 shall become effective October 1, 2007.

The salary ranges as established in Appendix A-4 shall become effective October 1, 2008.

The salary ranges as established in Appendix A-5 shall become effective October 1, 2009.

30.2 - Application of Administrative Code

Except as otherwise provided herein, the provisions of Division 4, Chapter 9 of the Los Angeles Administrative Code shall apply to employees in this Unit.

30.3 - Right to Consolidate DDRs

The Department reserves the right to and may at its option consolidate, without changing salary levels, any group of duties descriptions listed in Appendices A-1, A-2, A-3, A-4, and A-5 that are in the same Civil Service class and at the same wage level.


# ARTICLE 31

## SCOPE OF IMPLEMENTATION

This Amendment constitutes a jointly drafted recommendation of the City and Local 18, and shall not become binding in whole or in part, unless and until all of the following have occurred.

-   Local 18 has notified the Board that this Amendment was ratified in its entirety by the Union's membership, as evidenced by Local 18's authorized representative affixing his or her signature hereto; and,

-   The Board has by adoption of an appropriate Resolution notified Local 18 that this Amendment is approved in its entirety by the Department, as evidenced by the General Manager affixing his signature hereto; and,

-   The City Council has taken appropriate action approving and setting the salaries agreed to herein.

The effective date of this MOU is the date on which the last event in time occurs.


# ARTICLE 32

## MAINTENANCE OF RATE DIFFERENTIALS

The Board has, in certain instances, authorized compensation, known as an "H" rate, which is in excess of the position grade for the position occupied by an employee.  Employees benefiting from such "H" rates shall henceforth receive that difference in salary between the amount of the "H" rate and the position grade for the position occupied on July 4, 1977.  Said difference shall be maintained only during the time such employee occupies or reoccupies the same position.

Additionally, during the term of this MOU, said difference shall be increased by the appropriate percent (%) increases granted the employee's Duties Description Record (DDR).  The implementation dates of this provision shall coincide with the implementation of general salary increases.

# ARTICLE 33

### TEMPORARY REASSIGNMENT

### 33.1 - Temporary Assignment to Another Position Within the Same Civil Service Class

Employees who are directed to temporarily perform the duties of a higher paid position in the same Civil Service class, shall be placed on the lowest step rate of the higher level salary range which will result in a salary increase of at least five percent (5%), not to exceed the top step of the higher range, effective the first day those duties are performed.  If such temporary reassignment lasts longer than six (6) months, Department management shall meet with the Union to determine what steps need to be taken to permanently fill the position in a way that meets the interests of both parties.  Upon reassignment from a permanent position to a temporary position at a higher pay level, in accordance with the provisions of this Article, there will be no change in the employee's anniversary date.  Upon reassignment from a temporary position, made under the provisions of this Article, back to an employee's permanent position or to another temporary position at a higher pay level, there will be no change in the employee's step or anniversary date.

### 33.2 - Temporary Assignment to Another Position in Another Civil Service Class (Includes 1-5 Day Special Emergency, Emergency, Trainee, Apprenticeship and Limited Appointments)

Employees reassigned on a temporary basis to a higher level position shall be placed on the lowest step rate within the appropriate range which will result in a salary increase of at least five percent (5%) not to exceed the top step of the salary range and shall not have their salary anniversary date changed as a result of such reassignment.

Upon reassignment from one temporary position to another temporary position at a higher pay level, an employee shall be placed on the lowest step rate within the appropriate range, which will result in a salary increase of at least five percent (5%) not to exceed the top step of the salary range, and the employee's salary anniversary date shall not change.  Upon return to a permanent position from a temporary position, the employee shall be placed on the step of the salary range that he/she would have occupied had the temporary assignment(s) not been made.

## 33.3 – Temporary Assignment to a Higher Paid Position in Class Series

Employees who are directed by Management to temporarily perform the duties of a higher paid position in the class series shall be placed on the lowest step rate, within the appropriate salary range, which would result in a salary increase of at least five percent (5%), effective the first day those duties were performed.  Such assignment shall not exceed six months and there shall be no change in the employee's anniversary date.

Employees assigned under this provision shall neither serve nor complete probation, and seniority will not be accrued in the class so occupied.  Notwithstanding Section 4.902(a)(3) of the Los Angeles Administrative Code, the employee shall be returned to the same step in the pay range of the class in which he/she was legally employed prior to the temporary assignment.  Step advances consistent with the employee's anniversary date, which shall remain unchanged, shall apply.

# ARTICLE 34

## LICENSE FEES

Subject to such rules and regulations as the City Controller has established, the Department of Building and Safety shall waive its usual fee or charge for any license or permit employees of this Unit are required to possess to operate equipment in the performance of their duties.  Such license or permit shall be limited to cover work performed for the City.

Any employee in this Unit, who is required by the Department to maintain a valid license, excepting a Class C Drivers License or other license required by a Civil Service bulletin for initial appointment to a classification, shall be reimbursed for the initial cost (fee) for such a license.  All fees for renewals of Department required licenses, except a Class C driver's license will be reimbursed by the Department.

# ARTICLE 35

## JOB SECURITY

No regular annual-rated, Civil Service bargaining unit employee within the classification and major division affected by the contracting out of bargaining unit work will be laid off or placed on a lower level DDR.

# ARTICLE 36

## JOINT LABOR/MANAGEMENT RESOLUTION BOARD

**(1)  SCOPE**

A Joint Labor/Management Resolution Board (JRB) shall be established to deal with items typically brought up in the meet-and-confer process and other issues as mutually agreed to by Union and Management.

The JRB and the Labor/Management Committees are not intended to subordinate or abrogate in any way the collective bargaining rights and obligations of either party.

**(2)  MEMBERSHIP**

- The JRB shall be comprised of equal numbers of Union and Management participants.
- It may be necessary to create more than one JRB.

**(3)  PROCESS**

Mutual Gains Bargaining is the process to be used in resolving issues brought to the JRB.  An impartial facilitator will be used as deemed necessary by the parties.

**(4)  TRAINING**

Any person appointed to the JRB, or any other joint labor/management committee, shall be trained in the mutual gains bargaining process prior to participating in the process.  In addition to this training, all Union shop stewards and all levels of management beginning with first-level supervisors shall be trained in the mutual gains bargaining process.

**(5)  COMMUNICATION**

- The scope of the JRB and the process it uses will be communicated to all employees and managers.  The resolution, results and reasons, and the plan for implementation will be published and provided to all affected employees and managers.  The JRB will regularly keep the General Manager of Water and Power and the Business Manager of Local 18 informed of its progress.

- The Union and Management will work in cooperation to jointly inform the political leadership (i.e., Mayor, Executive Employee Relations Committee, members of City Council) of the process being used to jointly resolve disputes.  There will be a joint recommendation to the political leadership when their approval is needed for implementation of a resolution.

**(6)  RULES OF THE JOINT RESOLUTION BOARD**

- The JRB shall set its own ground rules.
- Mutual Gains Bargaining shall be utilized to resolve issues.
- All members are to be considered to have the same level of authority and responsibility.
- The JRB may establish subcommittees or utilize existing committees as necessary.
- The JRB may bring in experts on particular subject matters or issues.
- The JRB may recommend remedies for disputes related to issues, which have been submitted.
- The JRB will recommend resolutions that are within its scope.
- The JRB shall set time limits for resolutions and their implementation.
- The JRB has the authority to make recommendations, which will be submitted simultaneously to the General Manager of Water and Power and the Business Manager of Local 18 for their joint consideration and response.

**(7)  COMMITTEES**

Joint Labor/Management committees may be established locally upon mutual agreement for the purpose of resolving local issues not addressed by the MOU.  They may also be utilized for informal screening and/or researching of issues prior to submission to the JRB.

**(8)  PROCESS FOR SUBMISSION OF ISSUES TO THE JOINT RESOLUTION BOARD**

- The general criteria for screening and prioritizing issues will be established by the Board.
- The Union and Management will have their own internal processes to determine which issue(s) will be submitted to the JRB.
- Any Union or Management JRB member may bring an issue to the JRB.

## ARTICLE 37

### EMPLOYEE'S RETIREMENT PLAN

37.1 – Early Retirement Option

    37.1(a)

Water and Power Employees' Retirement Plan (PLAN) members
who have reached age 50 and who have at least 30 years of
service (50/30) shall be eligible for an unreduced formula
retirement, calculated at 2.1% of the member's highest
year's salary for each year of retirement service credit.

    37.1(b)

This option will terminate September 30, 2005. However,
subject to the adoption of a Plan Amendment by the
Retirement Plan Board of Administration, any employee fully
eligible for the 50/30 retirement option as of September 30,
2005, may exercise the option until January 1, 2006,
provided that they:

- have filed by November 1, 2005 for retirement on or
  before January 1, 2006, and
- are separated from employment no later than December
  31, 2005 (benefits accrued through the last pay period
  in 2005).

Employees exercising the 50/30 retirement option between
September 30, 2005 and January 1, 2006 may use vacation,
accumulated overtime, or floating holidays, during such
period.

Meet and confer will continue concerning technical
adjustments to the Retirement Plan that may be necessitated
by discontinuance of 50/30.

37.2 – Enhancement of Employees' Retirement Plan Pension Formula
    Rate

    37.2(a)

PLAN members who have reached age 55 and who have at least
30 years of service (55/30) shall be eligible for an
unreduced formula retirement calculated at 2.3% of the
member's highest year's salary for each year of retirement
service credit.

    37.2(b)

This enhanced formula pension rate (2.3%) does not apply to
those who retire under the terms of any other early

retirement option, including the 50/30 early retirement option.

## 37.3 - Retirement Formula Pension Cap

Eligible PLAN members may retire with a formula pension allowance not to exceed 100% of their highest year's salary.

## 37.4 - Spouse/Domestic Partner Optional Death Benefit Allowance

Spouses or Domestic Partners of those PLAN members who are eligible to retire with a formula pension but who die while still actively employed, shall be entitled to receive an Optional Death Benefit Allowance commensurate with the Option D Retirement Benefit.

## 37.5 - Favored Nations Clause for Retirement Benefits in DWP Plan or in Los Angeles City Employees' Retirement Plan

The parties hereby agree that during the term of this MOU, should other bargaining units receive (under the Department of Water and Power Employees' Retirement Plan or the Los Angeles City Employees' Retirement System) benefit(s) that would be more favorable to the individuals covered by this MOU, the more favorable benefits shall, with the Union's concurrence, be incorporated into this MOU, as if set forth fully herein.

## 37.6 - Deferred Retirement Option Program

The parties agree to establish a Deferred Retirement Option Program (DROP) generally consistent with the principles and structure of the existing program for Fire and Police personnel. The proposed DROP is anticipated to contain the following minimum features:  cost neutrality; eligibility for all members of the Retirement Plan who qualify for an unreduced retirement formula; five-year eligibility window; and re-evaluation after three (3) years.

Articles 37.1 through 37.6 constitute a jointly drafted recommendation of the City and Local 18, and shall not become binding in whole or in part, unless and until finally adopted by the Retirement Plan's Board of Administration.

## 37.7 - Retirement Plan Contributions

The Department will make its Retirement Plan Contributions on behalf of the employees in bargaining units represented by Local 18 by the end of the first work day following the 9th day of the month.  Failure to do so shall obligate the Department to pay the higher of: interest at the rate of 8% per year, or the annual rate of return on the actuarial value of assets reported in the most recent valuation by the Retirement Board Actuary.

# ARTICLE 38

## EMPLOYEE RELEASE TIME

1)     The Department may, in its discretion, grant to elected officers or appointed representatives of the International Brotherhood of Electrical Workers – Local 18 (Local 18) time off for union representation activities.  Under this Article, no more than nine (9) employees for all five (5) bargaining units collectively shall be so released at any one time.

2)     Each employee shall submit a request for release at least 21 calendar days prior to the effective date, notifying supervision of both the starting and ending dates of release.  The Department shall make every effort to grant the request as submitted, and shall deny or modify it only in the event of undue hardship.

3)     During the release period, except as provided in Section (6), the City shall pay the employee's current salary while the employee is on release to Local 18. The employee on release to Local 18 shall receive all increases in salary and benefits approved for other Department employees in the same job classification during the release period.

4)     During the release period, except as provided in Section (6), employees shall retain all of their existing benefits, including, but not limited to vacation, sick leave, compensated time off, short-term disability, life insurance, medical, dental, workers' compensation, deferred compensation plan, retirement benefits, and seniority accrual in their civil service class.

5)     Local 18 shall reimburse the City quarterly for all salary paid and benefits given under Sections (3) and (4) above.  The cost of benefits shall be based on the rates established by the MOU in effect or the actual costs of new benefits that become effective during the period of the release.

6)     Payment of any overtime worked during the release period shall be the responsibility of Local 18.

7)     Local 18 shall reimburse the Paymaster each quarter for all compensable costs identified in Sections (3), (4), and (5) above incurred during the preceding quarter.

8)     Employees on release time shall submit weekly time sheets (signed by the employee and the Local 18 Business Manager or Assistant Business Manager) to the DWP Paymaster specifying the number of hours worked,

and use of any sick leave, vacation time or other compensated time off.

9)  An employee who incurs a work-related injury while on release time shall remain on release time until the release has ended, and shall continue to be counted as one of the nine employees for the five bargaining units.

10) Employees returning from release time shall resume their last prior civil service classification and paygrade.

11) A probationary employee is not eligible for release time.

12) Local 18 shall indemnify, defend, and hold the City and DWP and their respective officers and employees harmless against any and all claims, suits, demands, or other forms of liability that might arise out of or result from any action taken by an employee in the service of Local 18 while on release from the Department.

13) The Labor Relations Office shall maintain a list of employees currently approved for release time and their respective terms.  Effective January 1, 2002, the length of the period for which employees will be released under this Article shall be one (1) year, renewable upon mutual consent of all parties.

## ARTICLE 39

### JOINT SAFETY INSTITUTE

The parties agree to establish an IBEW-DWP Joint Safety Institute (JSI).  The JSI is an independent body advocating worker safety through information sharing, training, and mentoring to promote overall safety throughout the Department. First Amendment to the Agreement and Declaration of Trust of the Joint Safety Institute adopted by the Board December 19, 2000, per Resolution No. 001-132.)

## ARTICLE 40

### JOINT TRAINING INSTITUTE

The parties agree to establish an IBEW-DWP Joint Training Institute (JTI).  The JTI is an independent body committed to creating a work environment where employees are effectively trained in jobs that are critical to the Department's core business.(Letter of Agreement and Declaration of Trust of the Joint Training Institute adopted by the Board on May 7, 2002, per Resolution No. 002-268.)

IN WITNESS WHEREOF, the parties hereto have caused their duly authorized representatives to execute this Clerical Unit Memorandum of Understanding on this _____ day of _____, 2008 to be effective as provided herein.


Local 18 of the
International Brotherhood
of Electrical Workers,AFL-CIO,       City of Los Angeles
Authorized Representatives           Representatives


_____        _____
Business Manager               Chief Executive Officer and
                               General Manager
                               Department of Water and Power


_____        _____
President                      Chief Operating Officer
                               Department of Water and Power

_____


_____


_____


_____


_____


_____

# APPENDIX A-1

## SALARY RANGES EFFECTIVE OCTOBER 1, 2005

Effective October 1, 2005, salary ranges shall be increased by a percentage equal to the percentage increase in the CPI for Urban Wage Earners and Clerical Workers as measured from August 2004 to August 2005 for U.S. City Average (1982-84=100); provided however, that if the CPI increases less than or equal to 3.25% the salary ranges shall be increased by 3.25%, and if the CPI increased by 6% or more, the salary ranges shall be increased by 6%.

## APPENDIX A-2

### SALARY RANGES EFFECTIVE OCTOBER 1, 2006

Effective October 1, 2006, salary ranges shall be increased by a percentage equal to the percentage increase in the CPI for Urban Wage Earners and Clerical Workers as measured from August 2005 to August 2006 for U.S. City Average (1982-84=100); provided however, that if the CPI increases less than or equal to 3.25% the salary ranges shall be increased by 3.25%, and if the CPI increased by 6% or more, the salary ranges shall be increased by 6%.

# APPENDIX A-3

## SALARY RANGES EFFECTIVE OCTOBER 1, 2007

Effective October 1, 2007, salary ranges shall be increased by a percentage equal to the percentage increase in the CPI for Urban Wage Earners and Clerical Workers as measured from August 2006 to August 2007 for U.S. City Average (1982-84=100); provided however, that if the CPI increases less than or equal to 3.25% the salary ranges shall be increased by 3.25%, and if the CPI increased by 6% or more, the salary ranges shall be increased by 6%.

## APPENDIX A-4

### SALARY RANGES EFFECTIVE OCTOBER 1, 2008

Effective October 1, 2008, salary ranges shall be increased by a percentage equal to the percentage increase in the CPI for Urban Wage Earners and Clerical Workers as measured from August 2007 to August 2008 for U.S. City Average (1982-84=100); provided however, that if the CPI increases less than or equal to 3.25% the salary ranges shall be increased by 3.25%, and if the CPI increased by 6% or more, the salary ranges shall be increased by 6%.

## APPENDIX A-5

### SALARY RANGES EFFECTIVE OCTOBER 1, 2009

Effective October 1, 2009, salary ranges shall be increased by a percentage equal to the percentage increase in the CPI for Urban Wage Earners and Clerical Workers as measured from August 2008 to August 2009 for U.S. City Average (1982-84=100); provided however, that if the CPI increases less than or equal to 3.25% the salary ranges shall be increased by 3.25%, and if the CPI increased by 6% or more, the salary ranges shall be increased by 6%.

## FOOTNOTES

### CLERICAL UNIT

**FOOTNOTES:**

1.  Employees occupying DDRs Nos. 91-14102, 93-14102, or 94-14102 in the class of Data Entry Operator (Class Code 1433), who are assigned to a position in the class of Data Processing Technician Trainee (Class Code 1134) shall continue to receive the pay applicable to the position they occupied in the class of Data Entry Operator if that salary is higher than the salary applicable to the position in the class of Data Processing Technician Trainee.

2.  Any employee who occupied one of the DDRs listed below between June 29, 1981 and July 24, 1981, shall receive the second premium level above the appropriate step rate in the salary range while occupying or re-occupying any DDR listed below.

Clerk (Class Code 1141)

91-11017
94-11017

3.  Any employee who occupied one of the DDRs listed below between June 29, 1981 and July 24, 1981 shall receive the third premium level above the appropriate step rate in the salary range while occupying or re-occupying any DDR listed below:

Clerk (Class Code 1141)

91-11015
94-11015

4.  Any employee who occupied one of the DDRs listed below between June 29, 1981 and July 24, 1981 shall receive the fourth premium level above the appropriate step rate in the salary range while occupying or re-occupying any DDR listed below:

| Clerk Typist Class Code 1358 | Sr. Clerk Typist Class Code 1368 | Sr. Clerk Steno Class Code 1323 | Sr. Clerk Class Code 1143 |
|---|---|---|---|
| 91-13636 | 91-13640 | 91-13139 | 91-11124 |
| 93-13636 | 93-13640 | 93-13139 | 93-11124 |
| 94-13636 | 94-13640 | 94-13139 | 94-11124 |

5.  All positions on DDR 91-12110 in the class of Customer (previously Commercial) Service Representative (Class Code 1230) shall not be filled by bid.

6.  Due to certain class consolidations conducted by the Personnel Department, City of Los Angeles, the following classifications indicated in Appendix A-1 have been abolished and are not shown in Appendix A-2.

| Data Processing Technician Trainee | 1134 |
|---|---|
| Traffic Agent | 1159 |

7.  Due to certain class consolidations conducted by the Personnel Department, City of Los Angeles, the following classification was reallocated:

| From: | Senior Teller | 1192 |
|---|---|---|
| To: | Customer Service Representative | 1230 |

8.  One person in a classification represented by IBEW, when designated to represent IBEW as the Administrator to the Joint Safety Institute, shall, while assigned to perform such JSI Administrator duties, be compensated at the fifth (5th) step of the "III" level Salary Range (DDR No. 95-52653) established for the class of Electrical Services Manager (Class Code 5265), enabling the individual to remain in the bargaining unit during such assignment while being compensated at the Electrical Services Manager III salary level.  The provisions of this footnote shall be effective October 1, 2002.

9.  One person in a classification represented by IBEW, when designated to represent IBEW as the Administrator to the Joint Training Institute, shall, while assigned to perform such JTI Administrator duties, be compensated at the fifth (5th) step of the "III" level Salary Range (DDR No. 95-52653) established for the class of Electrical Services Manager (Class Code 5265), enabling the individual to remain in the bargaining unit during such assignment while being compensated a the Electrical Services Manager III salary level. The provisions of this footnote shall be effective October 1, 2002.

## APPENDIX B

### CONTRACTING OUT

The parties agree to the following terms and conditions relative to the contracting out of bargaining unit work:

1) The Department may contract out bargaining unit work without meeting and conferring, subject to Charter Sections 1022 and/or 385, et seq., and the provisions of this Agreement.

2) Notwithstanding any provisions of this MOU to the contrary, the provisions of this Appendix are subject only to advisory arbitration with the exception of grievances raised under Article 35, Job Security, of this MOU.

3) In lieu of the meet-and-confer process specified by the Employee Relations Ordinance, the parties agree to meet and discuss, in accordance with the procedure in paragraph 4, all contracts awarded by the Board and multiple contracts let for the same service in the same division which exceed a cumulative total of $100,000 in a 12-month period, except those listed below:

   a. Contracts for expertise or contracts for services involving proprietary equipment.

   b. Contracts for rental equipment, which includes operators.

   c. Contracts required because of bona fide emergency circumstances.

4) The parties agree that the following expedited procedure shall replace the dispute resolution procedures of the Employee Relations Ordinance to resolve only those disputes arising out of the discussions occurring as a result of paragraph (3) above.

   a. The Department will notify the Union in a timely manner of all applicable proposed contracts.

   b. The Union may request to meet and discuss such contracts within five (5) working days of receipt of the contract. Failure of the Union to request a meeting within five (5) working days shall constitute a waiver of the Union's right to continue this process.

   c. Meeting(s), if requested, will be held within five (5) calendar days of notification by the Union of a desire to meet and discuss the contracts.

d.  Should the parties not agree during their meet-and-discuss session(s), the Union may request expedited arbitration at the conclusion of the five (5) calendar day period.  Failure of the Union to request arbitration within the five (5) calendar day period shall constitute a waiver of the Union's right to continue this process.  The parties will attempt to establish a mutually agreeable process for selecting arbitrators. Absent an agreement on such a process, arbitrators will be selected in accordance with the Employee Relations Ordinance Rules 11.03 and 11.04.  If the arbitrator selected is not able to serve or cannot meet the time limits in 4(e) of the Agreement, a new arbitrator shall be selected by repeating the steps in Rules 11.03 and 11.04.

e.  The hearing and issuance of an award by the arbitrator shall be concluded within thirty (30) calendar days from the request for arbitration.

f.  The arbitrator's advisory decision and recommendation shall be transmitted to the Board simultaneously with the contract proposed for adoption.

g.  The time limits in this process may be extended only by mutual written agreement.

h.  This arbitration process shall be informal.  Court reporters shall not be used; the rules of evidence shall be informal; the arbitrator's notes, exhibits (if any), and the written advisory decision and recommendation shall constitute the record of the proceedings; and post hearing briefs will not be submitted.  The parties shall each determine whether they wish to produce witnesses and/or documentary evidence.

i.  The arbitration fees shall be shared equally by the Union and Management.

5)  Disputes over the practical consequences of contracting out, other than those disputes occurring under paragraphs 3 and 4 above, shall be resolved through the grievance process starting at Step III (Division level) in accordance with the provisions in Article 5 of the MOU.

# APPENDIX C

## PARKING FEES AND SUBSIDIES

The parties agree that the following terms and conditions shall be applicable to employees who report to an Air Quality Management District (AQMD) qualifying location.

1) Employees paying a parking fee who report to an AQMD location as their permanent reporting location shall receive a $25 per month parking (transportation) subsidy.

2) Rotating shift employees are excluded from this agreement.

3) Facility parking administrators shall set local rules for parking.

4) Department Management shall set the rates for the DWP Van Pools.

5) Any employee who drives his/her personal vehicle and occasionally parks at the JFB or other central locations shall be charged $5 per day to park, subject to applicable parking regulations. The rate will be $4 at non-central locations. Such employees will have an in-and-out privilege for any said paid parking day.

6) Employees who pay monthly parking fees as members of a DWP vanpool or carpool will not be charged a daily parking fee when they drive their personal vehicle to work to accommodate scheduled overtime, unless this overtime condition exceeds five (5) days per month after which No. 5 applies.

7) A $50 subsidy will be provided to any monthly transit rider who shows evidence upon demand of a monthly transit pass and who provides an affidavit to the JFB parking coordinator of such transit use in commuting to work. Employees who normally commute by bicycle and who provide an affidavit of their daily bicycle riding and certification of this riding from their supervisor, will receive this subsidy also.

8) At AQMD qualifying locations where adequate on-site parking is available for employees, DWP management may take appropriate action to require employees to park in DWP facilities when there are complaints from residents and neighbors about employees parking in their neighborhoods.

The parties agree that the attached chart correctly states the current parking fees and subsidies.

| | JFB Scramble Other Central Locations | JFB Assign Space | Non-Central Locations | Subsidy |
|---|---|---|---|---|
| Parking Fee | $50 | $85 | $40 | $25 |
| Car Pool | $30 | N/A | $20 | $25 per person |
| DWP Van Pools | $50 | N/A | $40 | $25 per rider |
| Take-Home Vehicles | $50 | N/A | $40 | $25 |
| Employees on Mileage & Per Diem | $25 | $85 | $25 | $25 |
| Employees on Mileage Only | $50 | $85 | $40 | $25 |

NOTE:   This proposal includes only employees who start between 5:00 A.M. and 2:00 P.M. and report to an AQMD qualifying location.

## APPENDIX D

### FOCUSED SEPARATION PROGRAM (FSP) OF 1995
### FOR IBEW LOCAL 18 REPRESENTED EMPLOYEES

In no way shall Local 18's agreement to the FSP imply, infer or
conclude that Local 18 concurs with or acquiesces to the
inclusion of any classifications listed in Appendix A (of the
Focused Separation Program Agreement) as excess positions.

1.  In consideration for Local 18's agreement, the Department
    has agreed to the following terms and conditions:

    a.  The DWP shall maintain staffing of Electric Distribution
        Mechanic Trainees (EDMTs) that will result in forty (40)
        Electric Distribution Mechanics (EDMs) completing the
        program each contract year.  At the current graduation
        rate, this represents a staffing level of ninety (90)
        EDMTs per contract year.

    b.  The DWP shall maintain a core number of Electrical Craft
        Helpers (ECHs) at 310 in the Energy Distribution
        Division.  The parties shall determine a mutually
        acceptable method to facilitate 1014 transfer
        opportunities for Steam Plant Assistants to ECHs.

    c.  Before any layoff is contemplated in the Clerical
        Bargaining Unit, every effort shall be made to reassign
        employees to vacancies within the DWP and City; and
        part-time exempt clerical positions shall be eliminated.

    d.  As an alternative to contracting out, the DWP shall use
        at least ten percent (10%) overtime to meet maintenance
        and business needs.

    e.  The DWP shall maintain staffing of Electrical Mechanic
        Trainees (EMTs) which would provide for the completion
        of ten (10) Electrical Mechanics each contract year.

    f.  The DWP and Local 18 shall meet and confer for the
        purpose of facilitating a combined Electrical
        Repairer/Electrical Mechanic apprenticeship program.

2.  Joint Labor/Management Committees

    Local 18 and DWP management agree to the establishment of
    Joint Labor/Management Committees to address issues of
    mutual interest.

    The Committees shall have equal numbers appointed by the
    Local 18 and DWP management.

    All recommendations must include a majority vote; however,
    it is intended that the Committees work toward consensus.

The Charter for these Joint Labor/Management Committees will contain a commitment to work jointly to resolve problems to the mutual advantage of both parties.

These Committees are not intended to subordinate in any way the collective bargaining rights and obligations of either party, nor the established rights of management.

The DWP General Manager and the Local 18 Business Manager shall be ex-officio members of all Committees as well as the joint recipients of all Committee recommendations.

It is agreed that the following list comprises the initial subjects being addressed by these Committees, and future subjects will be established by mutual consent:

a.  Service Reliability, including considering standards for average minutes of interruption and other such standards currently before the California Public Utilities Commission (CPUC).

b.  Worker Safety, including an equal role for Local 18 in determining safety standards in the restructured utility environment.

c.  In-Basin Generation, including mutual review of any generating needs analysis and staffing.

d.  Substation Area Consolidation, including mutual review of reliability analysis and staffing.

e.  Maintenance Guarantees, including developing standards for all aspects of utility maintenance.

f.  Customer Service Satisfaction, including the issues of alternate work schedules, lead workers, and schedule changes at the Customer Call Center.

g.  Review of priority for staffing of positions and the use of personal services contracts.

# APPENDIX E

## CLERICAL BID PROCEDURE

**POLICY**

To the extent that it is consistent with efficient operation,
when filling vacant permanent positions in the Clerical Unit, and
before requesting certification from Civil Service eligible
lists, consideration shall be given to those employees desiring a
change of position, who are working in the class or have
assignment rights to the class.  In administering the following
procedure for selection of the best qualified employees, due
consideration shall be given to seniority, previous experience,
affirmative action goals, training, attendance records and
general suitability.

---

**DEFINITION**

<u>Position in the Clerical Unit</u> – are those
positions allocated to the Clerical Unit and
listed in Appendices A-1, A-2, A-3, and A-4.

<u>Most senior</u> – means the employee with the
most time in the class since original regular
appointment to a position in the class at the
Department of Water and Power, less any
continuous physical absence (excluding a
break in service) from a position in the
class of more than one year except for
military leave of absence.  In the event of
an employee's break in service of less than
one year, their seniority shall be the amount
of seniority accrued at the date of the break
in service.  In the event of an employee's
break in service of more than one year, their
seniority shall be the time in the class
since their last regular appointment to a
position in the class at the Department of
Water and Power, less any continuous physical
absence from a position in the class of more
than one year.

Notwithstanding the provisions of the above
paragraph, an employee who has a break in
service of less than five (5) years as a
result of a layoff under Charter Section 125,
shall have seniority equal to the seniority
the employee had accrued in the class at the
date of the layoff.  In the event of a break
in service of more than five (5) years as a
result of a layoff under Charter Section 125,
their seniority shall be the time in class
since their return from layoff, less any

|  | continuous physical absence from a position in the class of more than one year except for military leave of absence. |
|---|---|
| **APPLICABILITY** | This procedure shall be applicable to the filling of all positions in the Clerical Unit except entry level positions, those of a temporary nature and those to be filled because of the temporary absence of the incumbent. |
| **ANNOUNCEMENT OF POSITION** | When a position having a salary higher than the lowest paid occupied position in the same Civil Service class in a Major Division the Department is to be filled, an announcement of intention to fill such positions shall be made in writing and posted for a minimum of seven (7) working days. Such announcement shall be descriptive of the duties, location, hours, and salary of the position and shall include special skills, knowledge, and abilities, which initially are necessary for appointment to the position. Such announcement shall be in a standard form (Form 03214) and shall be posted in each work location where employees of the affected Civil Service class are assigned. |
| **EMPLOYEE'S BID FOR THE POSITION** | Employees who are eligible by reason of their status in the Civil Service class and who are interested in occupying such position shall signify their interest by submitting an Interview Data Sheet (Form 3381) to the office or person designated on the bid announcement. |

## PROCEDURE – STEP ONE

### Filling Positions By Bid

| **INTERVIEWS OF BIDDERS** | Interview from the pool of candidates from within the Department established by the following procedure: |
|---|---|

1. If the position(s) to be filled is (are) underrepresented in minorities and/or women (as determined by Division goals), establish the candidate pool as follows:

    a)   If there are ten (10) or fewer eligible bidders for each position, all bidders will be interviewed.

b)    If there are more than ten (10) eligible bidders for each position, establish a list of the most senior bidders to a maximum of nine (9) applicants in excess of the number of positions to be filled.

c)    Identify the groups that are underrepresented.

d)    If at least two applicants from the underrepresented groups (minorities and/or women) are on the list as established in (b) above, no further action shall be taken and said list will be the candidate pool for the position to be filled.

e)    If the list as established in (b) above does not contain at least two candidates from each underrepresented group, add underrepresented bidders by seniority to said list to ensure that there are two applicants in the candidate pool from each underrepresented group.

2. If the position(s) to be filled is (are) not underrepresented in minorities and/or women (as determined by Division goals), establish the candidate pool as follows:

a)    If there are ten (10) or fewer eligible bidders for each position, all bidders will be interviewed.

b)    If there are more than ten (10) eligible bidders for each position, establish a list of the most senior bidders to a maximum of nine (9) applicants in excess of the number of positions to be filled.  This list shall be the candidate pool for the position(s) to be filled.

Select from among the three best qualified. If any of the most senior of the three best qualified candidates is not selected, they will be entitled, upon written request within twenty-one (21) calendar days, to a written explanation of the reason or reasons for non-selection.

An employee shall be given at least twenty-four (24) hours notice prior to an interview.

**LIMITS TO FREQUENCY OF BID REASSIGNMENTS**

When reassigned or transferred from one position to another under this bid procedure, an employee will not normally be considered for another reassignment or transfer until the employee has served six (6) months in the new position; however, the employee may submit a bid as a Step One bidder.

This six-month tenure requirement may be waived by the Assistant General Manager and/or General Manager.

**PROCEDURE – STEP TWO**

**SELECTION FROM AN ELIGIBLE LIST**

In the event that the operation of Step One above does not result in the filling of a position, then request for certification from the Civil Service eligible list may be made provided that employees on probation in the class may be considered prior to certification from the eligible list, and further provided that no other employee who meets the eligibility requirements set forth herein is otherwise selected. For the purpose of this bid plan, if probationary employees are interviewed, they shall be considered as Step Two bidders.

Upon transfer or reversion from another City Department, an employee shall not transfer or be reassigned under this procedure for six months except that during this time period the General Manager or a designated representative may approve a waiver of this six-month requirement and allow such an employee to be interviewed as a Step Two bidder. After the six-month time period has been completed, such an employee will be considered as Step One bidder.

**ADDITIONAL FACTORS**

**Clerk and Clerk Typist Assignment**

The Letter of Agreement signed by the Department of Water and Power and Local 18 of the International Brotherhood of Electrical Works dated September 20, 1999 shall govern the bid rights of incumbent Clerks and Clerk Typists as of that date as well as

appointment and assignment procedures for employees in those classes thereafter.

### Senior Clerical Assignment

The Letter of Agreement signed by the Department of Water and Power and Local 18 of the International Brotherhood of Electrical Workers dated November 27, 2000 shall govern the bid rights of incumbent Senior Clerks, Senior Clerk Typists, and Senior Clerk Stenographers as of that date as well as appointment and assignment procedures for employees in those classes thereafter.

### For the Customer Service Representative Class Only

Prior to requesting certification of the eligible list, but subsequent to the applicable bid provisions, a communication shall be made to employees occupying positions in clerical classes which are at a level comparable to Customer Service Representative (CSR), which advises them of the opportunity to request a transfer under Charter Section 1014.

Candidates expressing an interest in a Charter Section 1014 transfer shall be considered prior to any candidates from the eligible list.  Charter Section 1014 reassignment candidates shall be considered utilizing the same interview process as candidates from the eligible list.

If selected, the Charter Section 1014 transfer will be a tentative transfer, allowing for a period of evaluation similar to a probationary period.

## APPENDIX F

### ERGONOMICS

The parties agree to maintain through the Joint/Labor Management
Workers Safety Committee an ergonomics program consistent with
principles set forth in the Letter of Agreement, entitled
"Ergonomics Tools and Training" dated April 22, 1999.

**EXHIBIT A**

<u>**SHOP STEWARDS CLERICAL UNIT**</u>

**LOCAL UNION 18, I.B.E.W.**

| <u>Name</u> | <u>Work Location</u> |
|---|---|
| Brown, Joyce | JFB/Revenue Management |
| Ferrer, Deborah | JFB/Customer Relations |
| Fullingim, Nancy | Keeler |
| Lee, Lynette | Lincoln Heights Service Center |
| Leslie-King, Kristie | JFB/Account Services |
| Lujan, Carolyn (Carol) | JFB, Rm. 856 |
| Mould, Judith | LA Filtration Plant |
| Rosas, Lorena | JFB/Utility Maint. Program |
| Sepulveda, Reuben | JFB/Customer Contact Center |
| Washington, Billie | JFB/Water Resources |

# INDEX

## A

A.O.T.L. (see also Accumulative
   Overtime Log), 38, *40*
abrogate, *94*
absence, *21*, *23*, *40*, *41*, *42*, *43*, *45*,
   *46*, *47*, *48*, *52*, *64*, 120, 121
absence with pay, *43*, *45*
absent from duty, 41, 43, 45, 47, 59
absentee ballot, *42*
access, *18*
accommodations, 73, 74, 76
Accumulative Overtime Log (see also
   A.O.T.L.), 38
Administrative Code, *23*, *24*, *62*, *90*,
   92
administrators, *114*
advisory, *111*, *112*
affidavit, 88, *114*, *115*
agency, *23*, *25*, *28*, 52
airline miles, *56*
allowance, 42, 66, 67, 68, 98
allowances, *65*, *70*, *72*, *73*, *75*, *76*
alternate work schedules, 54, *119*
anniversary date, 91, *92*
annual rate, *8*, *32*, 33, *43*, *45*, *46*,
   *52*, *56*, *59*, *60*, *63*, *64*, *69*, 99
appeal, *10*, *12*, *13*, *16*, *17*, *19*
apprenticeship, *91*, *118*
approval, *19*, *21*, *28*, *42*, *43*, 57,
   *78*, *79*, *84*, *95*
AQMD, *114*, *115*, *116*
arbitration, *11*, *13*, *14*, *111*, *112*,
   *113*
arbitrator, *13*, *14*, *112*
assign, *28*, *55*, *66*, *80*
attendance, *11*, *45*, *48*, *52*, 120
authorization, *18*, *22*, *28*, *31*, *75*
award, *112*

## B

baggage checking, *75*
bargaining, *22*, *93*, *94*, 98, 99, 100,
   110, *111*, *117*, *118*
benefit, 35, 76, 77, 86, 87, 88, 98
benefit(s), *22*, *24*, *46*, *76*, *80*, *83*,
   *85*, *86*, *87*, *88*
bicycle, *115*
bidders, 122, 123, 124
binding, *9*, *14*, *90*, 98
B-Time (see Article 10), *41*
Building and Safety, *93*
bulletin boards, *28*, *40*
business needs, *117*

## C

calendar year, *22*, *38*, *39*, *42*, *43*,
   *44*, *59*, 66, *87*, 88
call out, *30*, *37*, *38*, *40*, 68
camps, *58*, 77
cancellation, 37
carpool, *114*
carriers, *85*
certificates, *42*, *43*
charitable fund, *25*
Charter, *46*, *111*, *118*, 120, 124, 125
City Controller, *92*
City Council, *62*, *84*, 88, 90, *95*
Civil Service, *9*, *21*, *42*, 47, 71,
   *79*, 90, *91*, *93*, 120, 121, 123
Civil Service Commission, 9, 47
classification, *21*, *38*, *46*, *79*, *80*,
   *93*, 99, 100, 110, *117*
cleaning, *76*
clothing, *76*, 77
committees, *94*, *95*, *118*
communication, *24*, 37, *94*, 124
compensation, 40, *46*, *49*, *58*, *59*,
   *62*, *64*, *65*, *66*, *70*, *87*, *90*, 99
conditions of employment, *6*, *18*, *83*
confidential, *22*, *24*, 88
consolidate, 90
Consumer Price Index, *70*
continuous-operation, 33, 47, *48*,
   *49*, *59*, *60*, *68*
contracting out, *93*, *111*, *113*, *117*
contracts, *111*, *112*, *119*
contribute, *84*, *85*
contribution, *85*, 86, *87*, *88*
core, 102, *117*
costs, *14*, *23*, 66, *75*, *85*, *86*, 100
counseling, *20*
court, *27*, *52*, *112*
coverage, *84*, 85, *87*, *88*
cumulative, 33, 38, 43, 49, 50, 59,
   60, 64, 111
cumulative-hour, *38*, *49*, *50*, *59*, *60*,
   *64*

## D

daily rate, *8*, *31*, *49*, *62*
daylight saving time, *52*, 53
death benefit, *23*, *43*, *46*, *80*, *84*,
   *86*, *87*
deduction, 22, 25, 26, 48
deduction(s), *22*, *23*, *25*, *26*, *27*,
   *28*, 48
dental, 21, 85, 86, 99
dental plan, *21*, *84*, *85*, *86*
dependent, 84
disability, *9*, *23*, 35, *40*, *43*, *45*,
   *46*, *51*, *52*, *80*, 84, *86*, *87*, 88, 99

disciplinary action, *17, 20, 47, 78, 79*
discipline, *80*
discrimination, *9*
dormitory, *72*
double-time, *37*
drivers license, *93*
dues, *22, 23, 24, 25, 28*
dues deduction, 22, 28
duties, *17, 21, 43, 46, 50, 57, 68, 77, 80*, 90, 91, 92, *93*, 110, 121
Duties Description Record(s), *8, 31, 49, 62*
duty, *17, 29, 30, 36, 37*, 40, *41, 42, 43, 45, 47, 48, 49, 50, 51, 52, 57, 59*

## E

ECHs. see Electrical Craft Helpers
EDMs. see Electric Distribution Mechanic
EDMTs. see Electric Distribution Mechanic Trainee
election, *9, 28, 38, 42, 84*
Electric Distribution Mechanic, *117*
Electric Distribution Mechanic Trainee, *117*
Electric Distribution Mechanics, 117
Electrical Craft Helpers, *117*
Electrical Mechanic Trainee, *117*
eligible, *21, 84, 85, 86*, 97, 98, 100, 120, 121, 122, 123, 124, 125
emergency, *36*, 40, 47, *51, 52, 55, 58, 63*, 69, *91, 111*
emergency appointment, *40, 69*
employee list, *79*
Employee Relations Board, 7, *8, 9, 13, 14, 28, 81*
employment, *6, 10, 18, 23, 24, 25, 26, 27, 52, 83*, 97
EMTs. see Electrical Mechanic Trainee
enrollment, *88*
examinations, *42, 43*
exempt, *25, 117*
expedited, *11, 111, 112*
expenses, *14, 65, 70, 71, 73, 75, 76*
expertise, *111*
expiration, *15, 16, 78, 79, 82, 83*

## F

Fair Labor Standards Act, 34, *82*
family, *46, 85*, 86, *87, 88*
fees, *14, 22, 23, 25, 26*, 65, 66, *86, 92, 93, 113, 114,* 115
Focused Separation Program, *117*
formula, *85*, 97, 98
FSP. see Focused Separation Program
full-time, *10, 18, 21, 46, 48, 49, 59*

## G

General Manager, 7, 13, 16, 17, 19, 31, 35, 42, 45, 46, 48, 57, 60, 65, 66, 70, 72, 73, 75, 76, 77, 90, 94, 95, 103, 118, 123, 124
grievance, *9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 29, 78, 80, 82, 111, 113*
ground rules, *95*

## H

H rate, *90, 91*
health, *6, 21, 63, 77, 84, 85*
Health Plan, *84*
hire, *79, 80*
hold harmless, *23, 27, 86*
holdover, *30, 34*
holiday equivalent, 29, 33, 61, 62
holidays, *29, 33, 43, 48, 49, 58, 59, 60, 62*, 68, 97
home, *27, 46, 69,* 70
housing, *58, 72*

## I

implementation, 23, 66, *84, 90, 91, 94, 95*
indemnify, *23, 27, 86*, 100
indemnity, 85
informal, *10, 11, 14, 95, 112*
insurance, *23, 46, 67, 84, 85, 86, 87,* 99
Internal Revenue Code, *25*
interviews, *43*
investigating, *18*

## J

JFB, *114, 115*
job security, *93, 111*
job site, 48, 58
Joint Labor/Management Resolution Board, *94*
Joint Safety Committee, *82*
jury duty, *45*

## L

laid off, *93*
lay off, *80*
layoff, *117*, 120
leaves of absence, *21, 23,* 40
licenses, *42, 43, 93*
limited appointments, *91*
lockout, *6, 7*
lodging, *69, 75, 77*
lunch, *47, 48, 70*

## M

mailing, *75*
Management Rights, *17*
meals, *67, 68, 69, 70, 75,* 77
meals away from home, *70*
meet and confer, *24, 29, 83, 118*
meetings, *10, 13, 18, 19, 20, 28*
members, *6, 12, 21, 23, 24, 28, 84,*
*95,* 97, 98, *114, 118*
mess facilities, *72, 73*
mileage, *65, 66*
military, *46,* 120, 121
mission, *17*
moving, *70, 71*
Mutual Gains Bargaining, 94, 95

## N

negotiations, *21, 22, 82, 83*
Nevada, *24, 42*
Newhall, *70, 71*
no lockout, 6
no strike, 6
notice, *13, 14, 15, 16, 17, 22, 23,*
*34, 43, 50, 51, 55,* 57, 83, 123
Notice to Correct Deficiencies, *78*
NTCDs. see Notice to Correct
  Deficiencies

## O

Obligation to Support, *84*
official trip, *73, 75, 76*
Ontario, *70, 71*
operating needs, *22, 31, 36, 43, 51,*
*59, 72*
operations, *6, 7, 17, 19*
ordered trips, *73, 75*
ordinance, 62, 83
ordinance(s), *7, 9, 22, 62, 83, 111,*
*112*
organization, *17, 21, 24, 25, 27, 84*
out of town, *69*
overtime, *29, 30, 31, 32,* 33, 34,
35, *36, 37, 38, 40, 51, 53, 54,*
*58, 59, 62, 64, 65, 67, 68,* 97,
100, *114, 117*
overtime log, 38
overtime meals, *67, 68*

## P

paid, 33, *34,* 35, *36, 37, 40, 44,*
*45, 48, 53, 61, 62, 65, 66, 68,*
*69, 73, 86,* 91, 92, 99, *114,* 121
parking fees, *65, 66, 114, 115*
part-time, *48, 117*
pass, *114*
pay, *8, 21, 22, 23, 24, 25, 31,* 33,
*34, 37, 41, 42, 43, 45,* 46, 48,
*51, 54, 59, 60, 61, 62, 63,* 64,

65, 66, 67, 72, 73, 74, 76, 77,
*86,* 87, 91, 92, 97, 99, 109, *114*
pay differential(s), *63, 64, 65*
payment, *34,* 35, 37, *44, 51,* 68
payroll, *23, 25, 44, 66, 79, 80, 87,*
88
penalty, *22, 34, 37, 51, 68*
per diem, *45,* 66
permanent reporting location, *54,*
*55, 56, 57, 58, 114*
permit, *18, 93*
personal reasons, 35, *43, 46*
Personnel Department, *42,* 110
personnel file, *78, 79*
polls, *42*
position, 38, 71, 90, 91, 92, 109,
120, 121, 122, 123
position(s), *8, 22, 31, 38, 42, 48,*
*49, 71, 90, 91, 92, 117, 119*
practical consequences, *17, 113*
Preamble, *11*
precedent, *83*
premium, *36, 37, 53, 54,* 109
promote, *6, 80,* 101
proprietary, *111*
protective, 76, 77
public agency, *52*

## Q

qualified, *24, 40,* 120, 123

## R

rate differentials, *90*
ratified, 90
recognition, 7
recorded, *31*
regular shift, *36, 37*
regulations, *9, 28, 47, 82, 92, 114*
reimburse, *69,* 77, 99, 100
reliability, *118, 119*
relief, *51*
religious objections, *25*
renewals, *93*
rental, *19, 111*
replacement, *76*
report, *6, 13, 27, 37,* 40, *52, 55,*
*56, 57, 114, 116*
reporting location(s), *54, 55, 69*
reporting locations, 55, 57
representation, *6, 11,* 18, *22, 24,*
*26, 27, 28,* 99
rescission, *28*
resolution(s), *10, 48, 75, 81, 85,*
*94, 95, 111*
rest periods, *47*
restrictions, *7, 48,* 88
retire, *71,* 98
retirement, *23,* 35, *43, 46, 71, 80,*
*84, 86, 87,* 97, 98, 99
rotating shift, *114*
rules, *9, 14, 21, 28, 47, 50,* 77,
*78, 80, 82, 92, 95, 112, 114*

## S

safety, *6*, *48*, *63*, 77, *82*, 101, *118*
salaries, 25, 59, 90
salary range, 21, 88, 89, 91, 92, 104, 105, 106, 107, 108, 109
Savings Clause, *82*
scheduled overtime, *30*, *37*, *67*, *114*
scheduling, *10*, 17
scope, *9*, *50*, *94*, *95*
Scope of Implementation, *90*
scramble, *115*
security, *6*, *19*
self-representation, *18*
seniority, *55*, 92, 99, 120, 122
service, *6*, *15*, *16*, 17, *19*, *21*, *23*, *24*, 25, *43*, *45*, *49*, *54*, *59*, *71*, 75, *86*, 97, 99, 100, *111*, *118*, *119*, 120
shift, *22*, *30*, *31*, 33, *34*, 36, *40*, *44*, *47*, *48*, 49, *51*, *53*, 54, *59*, *60*, *64*, *65*, 114
shift differentials, *53*
shift swaps, *54*
sick benefits, *86*
signature, 90
staffing, 17, *117*, *119*
standards, *6*, 17, *118*, *119*
step, 11, 12, 13, 14, *46*, 91, *92*, 109, 110
stewards, *18*, *20*, *94*
straight-time rate, *33*, *36*, *51*
strike(s), *6*, 7
subordinate(s), *80*, *94*, *118*
subpoena, *52*
subsidy, *85*, *114*, *115*
Supplemental Benefits, *86*
survivor, *87*, *88*
suspend, *47*, *80*
suspensions, 78

## T

take-home vehicles, *115*
tardiness, *79*
telegraph, 75
telephone, *19*, 75
temporary, *31*, *40*, *46*, *54*, *55*, 56, 57, 58, *69*, 77, *86*, *87*, 88, *91*, *92*, 121

temporary headquarters, *55*, *56*, 57, 58
term, *6*, 7, 8, *23*, *82*, *83*, *85*, *91*, 98, 99
time and one-half, 33, 34
time limits, *10*, *14*, *15*, *16*, *95*, *112*
time off, *21*, *22*, *29*, 35, *36*, *42*, *43*, *44*, *58*, 99, 100
tips, 75
tools, *76*, 77
trainee, *91*
transfer, *26*, 35, *70*, *71*, 75, *78*, *80*, 117, 123, 124, 125
transit, *114*, *115*
transportation, *55*, *56*, *58*, *66*, 73, 74, 75, *76*, *114*
travel, *36*, *54*, *56*, *57*, *58*, *69*, 73, 74, 75, 76

## U

uniforms, *76*
union, 9, 99
union activity, *9*, *18*
unused personal time, *44*
unused sick time, *86*, *87*

## V

vacant, *71*
vacation, *40*, *41*, *59*, *62*, *63*, 97, 99, 100
valet service, 75
van pools, *114*, *115*
veteran, *46*
voting, *42*

## W

wages, *6*, *18*, *22*, *50*, *59*, *83*
waiver, *10*, *15*, *16*, *17*, *83*, *112*, 124
weather, *63*
witness, *52*
work schedule, *29*, 33, 48, *50*, *51*, 54, *55*, *57*, *58*, 68, 119
workday, *29*, *30*, 33, *36*, *37*, *47*, *49*, *50*, *51*, *59*, *60*, *61*, *67*, *68*
Working Rules, 17, *80*

EXHIBIT B

# AGREEMENT AND DECLARATION OF TRUST

## BETWEEN

## LOCAL 18, INTERNATIONAL BROTHERHOOD OF

## ELECTRICAL WORKERS, AFL-CIO

## AND

## THE DEPARTMENT OF WATER AND POWER

## OF THE CITY OF LOS ANGELES

## FOR THE JOINT SAFETY AND TRAINING INSTITUTE

## TABLE OF CONTENTS

| ARTICLE | SUBJECT | PAGE |
|---------|---------|------|
| | AGREEMENT AND DECLARATION OF TRUST | 1 |
| | DESIGNATION OF BENEFICIARIES | 1 |
| | RECITALS | 1 |
| | AGREEMENT | 4 |
| I | DEFINITIONS | 4 |
| II | NAME AND OFFICES | 5 |
| III | STRUCTURE | 6 |
| IV | APPOINTMENT AND REMOVAL OF TRUSTEES | 8 |
| V | MEETINGS OF THE BOARD OF TRUSTEES | 10 |
| VI | RESPONSIBILITIES AND DUTIES OF THE TRUSTEES | 13 |
| VII | LIABILITIES AND INDEMNIFICATION OF TRUSTEES | 15 |
| VIII | CONTRIBUTIONS TO THE TRUST FUND | 17 |
| IX | POWERS OF THE TRUSTEES | 17 |
| X | OWNERSHIP IN AND RIGHTS TO FUND | 19 |
| XI | JOINT SAFETY PROGRAMS | 20 |
| XII | JOINT TRAINING PROGRAMS | 21 |
| XIII | MISCELLANEOUS | 22 |
| XIV | AMENDMENT AND TERMINATION | 25 |

## AGREEMENT AND DECLARATION OF TRUST

This Agreement and Declaration of Trust is entered by and between International Brotherhood of Electrical Workers, Local 18, AFL-CIO ("Local 18") and the Department of Water and Power of the City of Los Angeles ("DWP") to reflect creation of a single entity to replace the Joint Safety Institute (JSI), formed on July 1, 2000 and the Joint Training Institute (JTI), formed on April 11, 2002.

## DESIGNATION OF BENEFICIARIES

This Trust is established for the benefit of those employees of the DWP represented by Local 18 with respect to all aspects of safety and training on the job, either in the field or within DWP's various work facilities.

## RECITALS

**Origin.** The concept of the Joint Safety Institute was originally expressed in a letter dated September 17, 1999, signed by the parties hereto, and addressed to S. David Freeman. The concept of the Joint Training Institute was expressed in a memorandum to the Board of Water and Power Commissioners dated March 23, 2001 signed by S. David Freeman. By entering into this Agreement, the parties agree to create a single entity to replace JSI and JTI and, through the creation of this new single entity, direct the Trustees to carry out the duties, powers, and purposes stated herein.

**Purpose.** Local 18 and the DWP desire to create, establish, and maintain this Trust as an independent advisory body that promotes joint labor-management activities designed to improve labor-management relations and communications with respect to issues of health, safety, and training and to recommend  preparatory and competency-based training and learning opportunities that create a flexible and skilled workforce that is committed to excellence in public service.  The trust fund shall assist the DWP in the development of safety and training

1

programs, information sharing, mentoring, research and establishment of programs and systems to support this mutual objective. The Trust shall also advise the DWP with regard to training, research, and findings, and recommend a diverse range of opportunities for training, retraining, and personal growth to enhance employee development and satisfaction. It shall identify necessary support areas for training with the appropriate technical skills and resources, identify targeted training for frontline employees, and suggest best training practices and resources to meet current and future work requirements and avoid duplication of program offerings.

**Mission Statement.** The mission statement of this Trust is as follows:

1.      "To create and foster a culture and environment that continuously improves workplace training as well as employee health and safety to prevent injuries and illnesses to fellow workers."

2.      "To promote open communication and mutual trust and respect between labor and management on issues of training, health and safety."

3.      To advise the DWP regarding training needs and assist in the development and improvement of training programs for employees represented by Local 18.

4.      To conduct studies to determine where there is a need to design new training programs that focus on increased career mobility job satisfaction and lifelong learning of employees represented by Local 18 and to thereby improve the services of the DWP to the public it serves.

5.      To identify the job classifications and operational and service areas of the DWP in which retraining of employees represented by Local 18 can be conceived and carried out; and

6.      To recommend potential outreach efforts in targeted neighborhoods, communities, and groups on training and educational programs that will develop skills for gainful employment at the DWP.

**Philosophy.** This amended and re-stated Agreement and Declaration of Trust serves as a demonstration of the philosophy of both Local 18 and the DWP that:

1.      Safety and Training are core values;

2.      Safety and Training require labor and management commitment and extensive employee involvement;

3.      Labor and management must continuously work toward mutual trust and respect in matters of health, safety and training;

4.      The programs of this Joint Safety and Training Institute must impact front-line employees; and

5.      Supervisors and front-line employees require ongoing, effective safety, training, and communications.

**Training Program Components.** The Trust shall advise the parties concerning:

1.      Training and Development, including basic skills, job skills (apprenticeship programs), life skills, health and safety, and labor-management skills;

2.       Career Advisement and Education, including upward mobility counseling, tuition reimbursement and scholarship loans; and

3.      Partnerships with the Business Units to identify training needs, design targeted training programs, secure feedback, schedule and evaluate training and, in return, enhance training value and the Department's ability to deliver quality programs and services through a coordinated platform.

**Memoranda of Understanding.** The parties originally entered into a Letter of Agreement amending the Memoranda of Understanding between the DWP and Local 18 for the period October 1, 1996 through September 30, 2002 to provide for the establishment of a Joint Safety Institute. The Memoranda of Understanding were amended by DWP and Local 18

3

effective May 7, 2002 to establish the Joint Training Institute.  The Memoranda of Understanding were amended by the DWP and Local 18, effective October 1, 2017, to provide that the parties will take the necessary steps to create a single entity to replace the Joint Training Institute and the Joint Safety Institute.

## AGREEMENT

NOW, THEREFORE, to accomplish the foregoing, the parties hereby establish the Joint Safety and Training Institute by agreeing as follows:

## ARTICLE I

## DEFINITIONS

Section 1.  Employer

The term "Employer" as used herein shall mean the DWP or any successor thereto.

Section 2.  Union

The term "Union" as used herein shall mean Local 18 or any successor thereto.

Section 3.  Trust

The term "Trust" or "Trust Fund" shall mean the entire trust estate which is created, held and established pursuant to the terms of this Trust Agreement, and which shall include all moneys and assets of every kind and nature which belong to, or are a part of this trust estate.

Section 4.  Joint Safety and Training Institute.

The term "Joint Safety and Training Institute" as herein used shall mean this Trust Fund.

4

Section 5. <u>Safety Programs</u>

The term "Joint Safety Programs" or "Safety Programs" shall mean the programs of review, recommendation, implementation and training prescribed by the Board of Trustees in accordance with this Trust Agreement.

Section 6. <u>Training Programs</u>

The term "Joint Training Programs" or "Training Programs" shall mean the programs and initiatives focusing on development of basic job and life skills, career counseling for education and upward mobility, tuition reimbursement, grants and scholarships, and partnerships with agencies at the local, state and federal levels for the purpose of increasing workforce productivity and promoting quality of work-life as recommended by the Board of Trustees in accordance with this Trust Agreement.

Section 7. <u>Board of Trustees</u>

The term "Board of Trustees" or "Trustees" or "Board" wherever used in this Agreement shall mean the Board of Trustees created by this Agreement.

Section 8. <u>Joint Labor Management Safety Committees</u>

The term "Joint Labor Management Safety Committees" as herein used shall mean the Joint Labor Management Safety Committees previously established by the parties pursuant to their Memoranda of Understanding and any other understandings.

## ARTICLE II

## NAME AND OFFICES

Section 1.

The Trustees shall conduct the business of the Trust and execute all documents and instruments in the name of the Joint Safety and Training Institute.

Section 2.

The Trustees shall maintain the principal office for the transaction of the business of this Trust in the County of Los Angeles, State of California, and may establish ancillary offices in other such places as the Trustees determine.

### ARTICLE III

### STRUCTURE

Section 1.

The Joint Safety and Training Institute shall utilize the organizational structure set forth below unless and until modified or amended by the written agreement of both Local 18 and the DWP.

Section 2.

A Board of Trustees shall at all times govern the activities of this Trust. They shall exercise general supervision, direction and control of all aspects of the Trust Fund, the Safety Programs and the Training Programs, subject to any limitations set forth herein. They shall exercise their general supervision, direction, and control in a manner consistent with the terms of this Agreement, the mission statements and the philosophy expressed above. The Trustees shall be selected, appointed, and removed in accordance with the procedures set forth in this agreement.

Section 3.

Pursuant to its authority under Article IX, Section 5, the Board of Trustees may select and appoint an Executive Director, who shall be responsible for the overall management and operations of the Trust between meetings of the Board of Trustee. The Executive Director may exercise any authority provided under this Agreement or delegated or subsequently ratified by the Board of Trustees.

The Employer and Union Administrators as well as any support staff shall report to the

Executive Director on a day-to-day basis. The Executive Director shall report to the Board of

Trustees at its regular or special meetings.

Section 4.

The Trust shall employ an administrative staff with the title "Administrators." The

Administrators shall be responsible for developing, recommending, and implementing Safety

Programs and Training Programs, both general and site specific, to the Board of Trustees. In

this regard they shall develop plans for Safety Programs and Training Programs, provide

direction and assistance to the Executive Director and shall coordinate the purchasing of goods

and services. The Executive Director may hire, on behalf of the Trust, such employees and

staff to assist the Administrators in their duties as may be specified from time to time by the

Trustees.

The Administrators shall be selected by the Employer Trustees and the Union Trustees.

The Administrator selected by the Employer Trustees shall serve at the pleasure of the

Employer Trustees and may be terminated or removed from the position of Administrator by

them at any time and for any lawful reason. The Administrator selected by the Union Trustees

shall serve at the pleasure of the Union Trustees and may be terminated or removed from the

position of Administrator by them at any time and for any lawful reason. The salaries, benefits,

authority, and responsibilities of the Employer Administrators and the Union Administrators

shall be the same unless otherwise determined by the Board of Trustees.

Section 5.

Except for the payment of the salaries of the Executive Director, the Administrators and

the regular employees of the Trust, no Trustee or employee of the DWP shall receive

compensation from nor become an employee of the Trust. However, the Trust may, in the

7

discretion of the Board of Trustees, reimburse such persons for ordinary and necessary expenses incurred directly in the performance of their duties if reimbursement is not available from any other source.

Notwithstanding the previous paragraph, a trainer in peer-led training programs may receive a stipend from the Trust for providing classroom instruction to employees of the DWP.

## ARTICLE IV

## APPOINTMENT AND REMOVAL OF TRUSTEES

Section 1.

The DWP and Local 18 shall each appoint an equal number of Trustees. Such appointments shall be made in writing, and written evidence thereof shall be signed by the General Manager of the Department of Water and Power in the case of an appointment by the DWP and the Business Manager of Local 18 in the case of an appointment by Local 18.

The Trustees appointed by the DWP shall be referred to as "Employer Trustees." Employer Trustees must be active employees or managers of the DWP.

The Trustees appointed by Local 18 shall be referred to as "Union Trustees." Union Trustees must be members or employees of Local 18.

Local 18 and DWP shall have the right to designate alternate Trustees, provided that at all times the number of acting Employer Trustees or Union Trustees shall be equal. In the event there are an unequal number of Trustees at any time, Local 18 or DWP, shall promptly appoint or remove a trustee or alternate trustee as necessary to make the number of trustees equal on both sides. In the interim, if necessary, the Board of Trustees may meet and take action even when the number of acting Employer Trustees or Union Trustees are not equal, provided that a quorum is present.

8

Section 2.

Any Trustee appointed hereunder may qualify by executing and delivering to the DWP, to Local 18 and to the principal place of business of the Board of Trustees an instrument accepting such appointment and agreeing to be bound by the terms of this Trust Agreement. Thereafter, upon the approval of the appointment by the Board of Trustees, such Trustee, without any further act, shall become vested with all of the, rights, powers, discretion, duties and obligations of a Trustee and shall be deemed to accept the duties of a Trustee as created and established by this Agreement.

Section 3.

Each Trustee shall continue to serve during the existence of this Trust until such Trustee's death, incapacity, resignation or removal, as provided herein.

Section 4.

A Trustee may resign and become and remain fully discharged from all future duty or responsibility hereunder by giving thirty (30) days' notice in writing sent by United States mail to the Board of Trustees, which notice shall state the date such resignation shall take effect, and such resignation shall take effect on said date unless a successor Trustee has been appointed at an earlier date, in which event such resignation shall take effect immediately upon the appointment of said successor Trustee.

Section 5.

Any Employer Trustee may be removed at any time and for any lawful reason by the DWP, unless such removal will impair the efficient operation of the Trust. Any Union Trustee may be removed at any time and for any lawful reason by Local 18, unless such removal will impair the efficient operation of the Trust.

Section 6.

In the event of the resignation, removal, or disqualification of any Trustee, a successor shall promptly be appointed by the DWP or Local 18 pursuant to Article IV, Section 1 and 2, above. The party designating any successor Trustee to fill any vacancy shall forthwith notify all of the Trustees and the DWP and Local 18 of the name and address of each such Trustee.

Section 7.

No vacancy or vacancies in the office of the Trustee shall impair the power of the remaining Trustees acting in the manner herein provided to administer the affairs of the Trust.

## ARTICLE V

## MEETINGS OF THE BOARD OF TRUSTEES

Section 1.

Except as provided in Article III, Section 3 above, no action can be taken by the Trust unless at a meeting of the Trustees at which a quorum is present. To constitute a quorum at any regular or special meeting of the Board of Trustees there must be present in person at least two (2) Employer Trustees and at least two (2) Union Trustees. In the absence of a quorum, the Board of Trustees shall not transact any business at a meeting.

Section 2.

The Board of Trustees at its first meeting of each calendar year shall elect a Chair and a Secretary from its members. At no time shall the Chair and Secretary both be Employer Trustees or Union Trustees. The offices of Chair and Secretary shall rotate annually between Employer Trustees and Union Trustees. The Secretary or his or her designee shall maintain minutes and records of all meetings, proceedings and acts of the Board of Trustees. Copies of all approved minutes and records shall be made available to all members of the Board of Trustees, the DWP and Local 18, and as otherwise provided by law.

10

<u>Section 3</u>.

A meeting of the Trustees shall be called upon written notice given by the Chair or the Secretary at least seven (7) business days before the date of such meeting. Such notices shall set forth in detail the agenda and time and place of the meeting, which shall be in the County of Los Angeles, State of California.

In the event exigent circumstances require it, the Chair or the Secretary may call for a meeting of the Board to be conducted by phone or video conferencing or by email polling. The quorum requirement of Section 1 of this article shall apply. If a meeting is conducted by email polling, the Executive Director shall prepare a written motion or resolution for Trustees consideration and transmit it to each participating Trustee at least 24 hours before voting is to be conducted. The Trustees may discuss the resolution by exchanges of emails. Copies of these emails shall be retained by the Secretary as the minutes of the meeting. All Trustee shall keep valid email addresses on file with the Secretary.

Except as provided above, no action may be taken except at a properly noticed meeting. Subject to the foregoing, meetings of the Board of Trustees shall be held at a time and place to be fixed by the Board of Trustees and shall be held at least quarterly.

<u>Section 4</u>.

The Employer Trustees collectively shall have one (1) vote. The Union Trustees collectively shall have one (1) vote. The vote of the Employer Trustees shall be determined by a concurrence of all of the Employer Trustees present and the vote of the Union Trustees shall be determined by a concurrence of all of the Union Trustees present. If a deadlock occurs among the Employer Trustees, the vote of the Employer Trustees as a unit shall be determined by the General Manager of the DWP, or his designee, to whom the Employer Trustees shall submit the issue on which the deadlock occurs within fourteen (14) days of the occurrence of

11

such deadlock. In any deadlock between the Union Trustees, the vote of the Union Trustees shall be determined by the Business Manager of Local 18, to whom the Union Trustees shall submit the issue on which the deadlock occurs within fourteen (14) days of the occurrence of such deadlock.

Section 5.

If Employer Trustees and the Union Trustees do not concur on any material matter before them, the dispute shall be deemed deadlocked and subject to the dispute procedures set forth in Section 6, below.

Section 6.

In the event of a deadlock of the Board of Trustees on any matter within the scope of the terms of this Agreement, the matter may upon five (5) business days written notice by either the DWP or the Union Trustees be referred by them for final decision to a neutral arbitrator to decide such dispute. If the Trustees cannot agree upon a neutral arbitrator within fifteen (15) days of the notice of referral of the deadlock, the Superior Court of the State of California for the county in which the Trust Fund has its principal office may be petitioned to appoint such neutral arbitrator. The arbitrator selected shall have no authority to alter, amend, or modify this Agreement and Declaration of Trust. Within the scope of such authority, the decision of the neutral arbitrator shall be final and binding upon the Trustees as to the matter in dispute. Any expenses incurred for the services of such arbitrator shall be paid out of the Trust Fund. Any other expenses (such as attorney's fees) incurred by either party shall be paid by the party incurring them.

## ARTICLE VI

## RESPONSIBILITIES AND DUTIES OF THE TRUSTEES

Section 1.

The Trustees are fiduciaries who shall have the exclusive authority and discretion to control and manage the assets operation and administration of the Trust, the Joint Safety Program and the Joint Training Program except as may otherwise be provided herein.

Section 2.

Each of the Trustees shall exercise their powers and duties hereunder exclusively for the purposes of this Institute and defraying reasonable expenses of administering the Institute and shall do so with the care, skill, prudence and caution under the circumstances then prevailing that a prudent person acting in a like capacity would use in the conduct of an enterprise of a like character and with like aims.

Section 3.

No Trustee shall deal with the assets of the Institute for his or her own interest or account, nor shall a Trustee act in his or her individual or any other capacity other than as a Trustee in any transaction involving the Institute or represent a party whose interests are adverse to the interests of the Institute, nor shall any Trustee receive any consideration for his or her own personal account from any party dealing with the institute in connection with a transaction involving the Trust.

Section 4.

All checks, instruments or documents of the Joint Safety and Training Institute shall be executed by at least two (2) Trustees authorized by the Board to so execute the same on behalf of all of the Trustees, but at all times one of the two Trustees so executing said check,

13

instrument or document shall be an Employer Trustee and the other Trustee so executing the same shall be a Union Trustee.

Checks for pre-authorized operating expenses may be signed by the Executive Director alone and a log of such checks will be provided to the Trustees at the next regular Board of Trustees meeting.

Section 5.

The Trustees may delegate any of their administrative duties or powers hereunder to any of their agents or employees of the Trust. Such delegation, however, will not relieve the Trustees of their fiduciary responsibilities under this Art.VI.

Section 6.

The Trust Funds shall be held by the Trustees and administered, applied and disposed of for the uses, purposes and objectives declared in this Agreement and according to its terms and provisions. The Trustees shall have full authority to retain such part of any contributions as they, in their discretion, determine appropriate for the purpose of establishing a reserve and assuring the proper operation of the Fund as determined by the Trustees.

Section 7.

The Trustees or their designees shall maintain books, records, and accounts of all of their transactions as Trustees. Such books, records and accounts of the Trustees shall be audited annually, or more often as the Trustees may determine, by a certified public accountant. All such books and records and accounts shall be available for inspection to DWP and Local 18 upon request and as required by law.

Section 8.

The Trustees shall prepare or cause to be prepared such reports, descriptions, summaries and other information as are required by law or as the Trustees deem necessary or appropriate

14

and to furnish such reports, descriptions, summaries and information to participants and their beneficiaries, Local 18, the DWP and to government agencies as required by law.

Section 9.

The Trustees shall serve without compensation from the Trust Fund. The Trustees may be reimbursed for expenses properly and actually incurred in attending regular, special, or committee meetings of the Board of Trustees, in attending conferences, seminars and workshops relating to plan operation and administration or in otherwise carrying out or conducting the affairs of the Trust.

Section 10.

Those Trustees and other officials of the Joint Safety and Training Institute who handle money or sign checks shall be bonded in an amount required by applicable law but not less than $500,000.00 in any event.  The premiums for said bond shall be paid from the Trust Fund.

Section 11.

The Trustees or their representatives may apply for grants and stipends from appropriate private or public sources.

## ARTICLE VII

## LIABILITIES AND INDEMNIFICATION OF TRUSTEES

Section 1.

The Trustees, individually and collectively, shall be responsible for their acts and/or omissions done or allowed in violation of the terms of this Trust Agreement, including, but not limited to the duties and responsibilities set forth above.

Section 2.

A trustee shall be liable for the breach of this Trust Agreement by another trustee if he or she participates knowingly in, or knowingly undertakes to conceal, such breach, or if by his

15

or her own breach of the Trust Agreement, he or she enables such other trustee to commit a breach.

Section 3.

Except as stated in Sections 1 and 2 above, the Trustees, to the fullest extent permitted by law, shall incur no individual or collective responsibility, liability or obligation for any action taken, or for any act omitted to be taken by them, nor shall said Trustees incur any individual or collective responsibility, liability or obligation for any act or omission of any agent, employee or attorney selected by them with reasonable care, nor for any act or omission of any other Trustee or Trustees.

Section 4.

The Trust Fund shall exonerate, reimburse, indemnify and hold harmless the Trustees, individually and collectively, against any and all expenses and liabilities arising out of activities authorized by this Trust Agreement, and the Trustees, individually and collectively, shall be further indemnified and reimbursed from the Trust Fund for the cost and expense, including attorney fees, of defending any suit or proceeding brought against the Trustees individually or collectively or the Fund, except to the extent it shall be adjudged by a court of competent jurisdiction that such Trustee or Trustees was or were acting in violation of the duties and responsibilities imposed upon such Trustee by this Trust Agreement or by law.

Section 5.

The Trustees may provide errors and omissions and fiduciary liability insurance at the expense of the Trust insuring the Trustees, other fiduciaries and the Trust itself against the wrongful acts or omissions of fiduciaries for the protection of the Trust, provided that such insurance, to the extent required by law, shall permit recourse by the insurance carrier against the fiduciaries who commit breaches of fiduciary duty.  Nothing herein shall be deemed to

16

preclude a Trustee from purchasing such insurance for the individual protection of a fiduciary or from purchasing a waiver of such right of recourse by the insurance carrier of any insurance policy purchased by the Trust Fund, with respect to such fiduciary.

## ARTICLE VIII

## CONTRIBUTIONS TO THE TRUST FUND

To fund the activities and programs established under this Trust Agreement, all IBEW-represented employees shall contribute each pay period an amount calculated as a percentage of their compensation for each hour worked for the DWP, as provided in the applicable Memorandum of Understanding.  The DWP shall deduct that amount from the paychecks of all such bargaining-unit members and forward the same to this trust fund each pay period.

## ARTICLE IX

## POWERS OF THE TRUSTEES

Section 1.

The Trust Fund shall be held by the Trustees and administered applied and disposed of by the Trustees in a manner consistent with this Agreement and applicable law.  The Trustees shall have all powers of trustees provided for by Article 2 of Chapter 2 of Part 4 of Division 9 of the California Probate Code, and all other powers described in this Article.

Section 2.

To carry out the purposes of this Trust, the Trustees, subject to the limitations set forth in this Agreement, are authorized to enter into appropriate contracts with appropriate government agencies and/or private firms or corporations.

17

Section 3.

The Trustees shall receive any and all contributions, income, dividends and such other moneys as shall be payable to the Trustees for the purposes of this Trust and shall deposit such moneys in such bank or banks or other depositories, as they may select.

Section 4.

The Trustees are authorized to pay for all the costs of the Safety Programs and the Training Programs, except that in no event shall employees or managers of Local 18 or the DWP receive compensation from this Trust for their attendance at programs or participation in the programs.

Costs payable by the Trust include all reasonable administration and overhead costs including the salary of the administrators and staff the fees of professional service providers, training materials and publications and other ordinary and necessary costs of the programs, in accordance with the terms of this Trust Agreement.

Section 5.

The Trustees shall have the power to employ such executive, administrative, clerical, secretarial and legal personnel and other employees or contractors as may be necessary in connection with the administration of this Trust.

Section 6.

The Trustees shall have the right to invest and reinvest such part of the Trust Fund and income therefrom as in their discretion they shall deem prudent. In this connection they shall have all rights, powers and privileges of any other owner of investments. Investment shall be diversified in order to minimize the risk of large losses, unless under the circumstances it is clearly not prudent to do so. The Trustees shall establish a funding policy, which shall be reviewed by them at least annually.

Section 7.

The Trustees from time to time may appoint an Investment Manager who shall have the power to manage, acquire or dispose of all or such portion(s) of the Trust assets as the Trustees shall determine.  Such appointments shall not be effective until accepted by the Investment Manager in writing delivered to the Trustees and acknowledging that such Investment Manager is a fiduciary with respect to the Trust Fund.  No person or organization shall be so appointed other than one who is registered as an investment advisor under the Investment Advisors Act of 1940, as amended, or is an insurance company qualified to perform the services of an investment manager under the laws of more than one state, or is a bank as defined in said Act.

## ARTICLE X

## OWNERSHIP IN AND RIGHTS TO FUND

Section 1.

Title to and ownership of the Trust's funds shall be vested in and remain exclusively in the Trustees.  No indication of ownership of any assets shall be maintained outside the jurisdiction of the Superior Court of the State of California.

Section 2.

This Trust shall be irrevocable, and the Fund shall be administered for the sole purpose as provided hereunder.  The Fund shall not be subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance or charge by any person other than the Trustees or representatives, and then only to the extent and for the purposes as herein specifically provided.

19

## ARTICLE XI

## JOINT SAFETY PROGRAMS

Section 1.

A key objective of the parties in creating this Joint Safety and Training Institute is for the Trustees to establish and maintain effective Joint Safety Programs. In this regard, the Trustees shall seek to create an infrastructure and operating plan to accomplish the following:

a.    Serve as a neutral body/liaison between labor and management and safety organizations.

b.    Coordinate selected safety training to improve safety skills of front-line and supervisory personnel;

c.    Conduct joint safety tours in the field;

d.    Develop and promote key safety initiatives;

e.    Continually evaluate the effectiveness of safety programs;

f.    Communicate safety information, trends, and best safety practices;

g.    Serve as a resource and coach to safety leaders and various groups;

h.    Conduct surveys and safety training needs assessments;

i.    Formalize and implement Worker Safety Group Processes and the Joint Safety Tour Process; and

j.    Develop short term and long-term strategic safety improvement objectives for the DWP and Local 18.

Section 2.

The Joint Safety Program and specific ancillary programs and activities shall be established and maintained by the Trustees who shall give due consideration to, but shall not be

20

bound by, the recommendations of the Joint Safety Administrators. The Joint Safety Program Administrators shall act only in an advisory capacity to the Trustees.

<u>Section 3</u>.

The Trustees or their representatives may apply for funding for Joint Safety Programs or other ancillary programs from appropriate private or public or governmental sources.

**ARTICLE XII**

**<u>JOINT TRAINING PROGRAMS</u>**

<u>Section 1</u>.

Another key objective of the parties in creating this Joint Safety and Training Institute is for the Trustees to establish and maintain effective joint training programs. In this regard, the Trustees shall seek to create an infrastructure and operating plan to accomplish the following:

a.      Determine what training programs are in existence within the relevant areas of the Department.;

b.      Determine what training and/or retraining programs are necessary and not currently provided;

c.      Develop training programs to suggest to the parties, including basic skills, job skills (apprenticeship programs) life skills and labor management skills;

d.      Engage in resource planning, assessment of training and retraining needs based upon attrition in the workforce and the ongoing need to have competent replacements in place in a reasonable timeframe;

e.      Develop career advisement and education programs, including upward mobility counseling, tuition reimbursement, scholarships loans, etc.; and

f.      Serve as a neutral body/liaison between labor, management and training organizations.

21

## ARTICLE XIII

### **MISCELLANEOUS**

Section 1.

This Trust is created and accepted in California, and all questions pertaining to the validity or construction of the trust estate and the operation and conduct thereof shall be determined in accordance with the laws of the State of California, and any applicable federal laws.

Section 2.

Each Trustee shall deposit with the Trustees, with Local 18 and with the DWP a written designation of his address. Notices sent by certified mail to the last address thus recorded for each Trustee shall be deemed proper notice as herein provided. Any notice given hereunder to the DWP or to Local 18 or to the Trustees shall be in writing and shall be sent by certified mail to the DWP or to Local 18 or to the Trustees at their respective addresses.

Section 3.

Any dispute arising with respect to the administration of this Trust or the application of the terms and provisions of this Trust shall not be subject to settlement through any grievance procedure established by any collective bargaining agreements in effect between the DWP and Local 18. All such disputes shall be resolved in the manner provided in Article V, Section 6 of this Agreement.

Section 4.

Nothing in this Agreement shall be deemed or construed in any way to alter, amend, or modify any provisions of any collective bargaining agreements by and between the DWP and Local 18. By entering into this Trust Agreement, Local 18 does not assume, and shall not be liable for breach of, any duty or responsibility the DWP may have to provide a safe and

22

healthful workplace. The Joint Safety and Training Institute is an independent body, and not the agency, subsidiary, or affiliate of either the DWP or Local 18. The Joint Safety and Training Institute shall not exercise any authority that may be lawfully delegated by the DWP or the City Council.

Section 5.

This Agreement shall be binding upon the successors and assigns of the DWP, Local 18 and the Trustees.

Section 6.

The Trust herein is created and accepted and its headquarters and principal office shall be in the County of Los Angeles, State of California, and all questions pertaining to said Trust, the validity and administration thereof and any and all questions, disputes, grievances or actions at law that may arise with reference to the provisions of this Agreement its performance or observance or enforcement or the construction of the terms and obligations thereof shall be determined in said County of Los Angeles in accordance with the laws of the State of California.

Section 7.

In the event that any provision of this Agreement is held illegal or invalid for any reason, said illegality or invalidity shall not affect the remaining parts of this Agreement and this Agreement shall be construed and enforced as if said illegal or invalid provision had never been inserted herein; provided, however, that the remaining parts of this Agreement further the objectives and purposes of this Trust Agreement. Should any material provision of this Agreement be declared illegal or invalid, DWP and Local 18 shall promptly adopt a new provision to take the place of that declared to be illegal or invalid.

Section 8.

The programs to be provided hereunder shall conform to all applicable laws.

Section 9.

This agreement is made only for the benefit of the beneficiaries of this Trust, as defined in the <u>DESIGNATION OF BENEFICIARIES</u>, above. Only DWP, Local 18, the Trustees (collectively or individually), and the employee beneficiaries shall have any right to enforce or sue with respect to any provision hereof.

Section 10.

In this Agreement whenever the context so requires, the masculine gender includes the feminine and neuter, and the singular number includes the plural.

Section 11.

No party dealing with the Trustees shall be obligated to see to the application of any moneys or property of the Trust or to see that the terms of the Trust have been complied with or be obligated to inquire as to the necessity or expediency of any act of the Trustees. The DWP shall not be liable for any payment to the Trust or Fund except as it has agreed in writing to pay. Neither the DWP nor the employee beneficiaries contributing to the Trust Fund pursuant to Article VIII shall have any right to return of any money due and paid by said contributor into the Trust Fund. In the event of a termination of this Trust, any funds remaining in the Trust at the time of termination shall be used by the Trustees for the purposes of the Trust, and shall not revert to the DWP, Local 18 or the employee contributors. Every instrument executed by the Trustees shall be conclusive in favor of every person relying thereon, that (a) at the time of the delivery of said instrument the Trust hereby created was in full force and effect, and (b) that said instrument was executed in accordance with the terms and conditions imposed by this Trust Agreement, and (c) the Trustees were duly authorized and empowered to execute such

24

instrument.  The receipt given by the Trustees for any moneys or other property received by them shall effectually discharge the person or persons paying or transferring the same, and such person shall not be answerable for the loss or misapplication thereof.  In the event that any dispute shall arise as to the persons for whom payment of any fund and/or delivery of any contracts or other property shall be made by the Trustees, the Trustees may withhold such payment and/or delivery until such dispute shall have been determined by a court of competent jurisdiction or shall have been settled by the parties concerned.

Section 12.

Either the DWP or Local 18, or both, may at any time, but not more often than once every calendar year, require that the Trust be specially audited by an independent certified public accounting firm.  A report of such audit shall be presented, upon completion, to both the DWP and Local 18.  The costs of the audit shall be paid by the Trust.

**ARTICLE XIV**

**AMENDMENT AND TERMINATION**

Section 1.

The provisions of this Agreement may be amended only by the mutual written agreement of the DWP and Local 18, provided that no amendment, termination or interpretation hereof shall permit the diversion of any of the trust estate then in the hands of the Trustees from the purpose of this Trust, nor shall any amendment, termination or interpretation hereof permit any return or payment over of any part of the Fund to any of the parties hereto.

Section 2.

This Trust shall continue concurrently with the term of the authorizing MOU and any subsequent amendments thereto.  However, this trust may be terminated by the written agreement of both the DWP and Local 18 at any time.

25

Section 3.

In the event of termination.  The Trustees shall:

a.      Pay out of the Trust fund any expenses incurred up to the date of termination of

the Trust and any expenses related to the termination; and

b.      Arrange for a final audit and report of all Trust-related transactions and

accounts, for the purpose of terminating the Trust.

If, after payment of all expenses and obligations, there still remain Trust assets, the

Trustees shall allocate funds for the Trust objectives under this Trust Fund.  In no event shall

any of the assets remaining in the Trust be paid to or recoverable by Local 18 or DWP.

IN WITNESS WHEREOF, the parties hereto have signed this amended Agreement this

day of _March 27_, 2019.

Department of Water and Power                  International Brotherhood of Electrical
of the City of Los Angeles                     Workers, Local 18, AFL-CIO

By: _____                  By: _____
        David H. Wright                                Brian D'Arcy
        General Manager                                Business Manager

By: _____                  By: _____
        BARBARA E. MOSCHOS                             Gus Corona
        BOARD SECRETARY                                President


APPROVED AS TO FORM AND LEGALITY
MICHAEL N. FEUER, CITY ATTORNEY

MAR 08 2019

BY: _____
JOSEPH A. BRAJEVICH
GENERAL COUNSEL

AUTHORIZED BY RES. 019 162
MAR 12 2019